**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **COUNTY OF NASSAU, COUNTY OF ALLEGANY, COUNTY OF CLINTON, COUNTY OF CORTLAND, COUNTY OF FRANKLIN, COUNTY OF FULTON, COUNTY OF GREENE, COUNTY OF HERKIMER, COUNTY OF LEWIS, COUNTY OF MADISON, COUNTY OF MONTGOMERY, COUNTY OF NIAGARA, COUNTY OF OSWEGO, COUNTY OF SCHENECTADY, and COUNTY OF STEUBEN,**<br><br>Plaintiffs,<br><br>v.<br><br>**ACTAVIS HOLDCO US, INC.;**<br>**ACTAVIS ELIZABETH LLC;**<br>**ACTAVIS PHARMA, INC.;**<br>**AMNEAL PHARMACEUTICALS, INC.;**<br>**APOTEX CORP.;**<br>**AUROBINDO PHARMA USA, INC.; BARR PHARMACEUTICALS, LLC; BRECKENRIDGE PHARMACEUTICAL, INC.; CITRON PHARMA LLC;**<br>**DAVA PHARMACEUTICALS, LLC;**<br>**DR. REDDY'S LABORATORIES, INC.;**<br>**FOUGERA PHARMACEUTICALS INC.;**<br>**GENERICS BIDCO I, LLC;**<br>**GLENMARK PHARMACEUTICALS, INC.;**<br>**GREENSTONE LLC;** | **Case No. :**<br>**2:19-cv-07071-LHD-SJB**<br><br><br>**Amended Complaint**<br><br><br>**JURY TRIAL DEMANDED** |

**HERITAGE PHARMACEUTICALS, INC.; LANNETT COMPANY, INC.; LUPIN PHARMACEUTICALS, INC.; MAYNE PHARMA USA INC.; MUTUAL PHARMACEUTICAL COMPANY, INC.; MYLAN INC.; MYLAN PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL, INC.; PERRIGO NEW YORK, INC.; PFIZER, INC.; PLIVA, INC.; SANDOZ, INC.; SUN PHARMACEUTICAL INDUSTRIES, INC.; TARO PHARMACEUTICALS USA, INC.; TEVA PHARMACEUTICALS USA, INC.; UPSHER-SMITH LABORATORIES, LLC; WEST-WARD PHARMACEUTICALS CORP.; WOCKHARDT USA LLC; and ZYDUS PHARMA-CEUTICALS (USA), INC.,**

Defendants.

## Amended Complaint and Demand for Jury Trial

## TABLE OF CONTENTS

I.  NATURE OF THE ACTION ..................................................................7

II.  STATE AND FEDERAL INVESTIGATIONS ....................................13

III.  JURISDICTION AND VENUE ............................................................23

IV.  PLAINTIFFS .........................................................................................24
Nassau County ......................................................................................... 24
Allegany County ....................................................................................... 26
Clinton County .......................................................................................... 28
Cortland County ........................................................................................ 30
Franklin County ........................................................................................ 32
Fulton County ............................................................................................ 34
Greene County ........................................................................................... 36
Herkimer County ....................................................................................... 38
Lewis County .............................................................................................. 40
Madison County ........................................................................................ 42
Montgomery County ................................................................................ 44
Oswego County ......................................................................................... 46
Niagara County ......................................................................................... 48
Schenectady County: ............................................................................... 50
Steuben County ......................................................................................... 52

V.  DEFENDANTS ......................................................................................54
Actavis ......................................................................................................... 54
Amneal ........................................................................................................ 56
Apotex ......................................................................................................... 56
Aurobindo ................................................................................................... 57
Breckenridge Pharmaceutical, Inc. ....................................................... 57
Citron .......................................................................................................... 58
Dr. Reddy's Laboratories, Inc. ............................................................... 58
Fougera ....................................................................................................... 59
Glenmark Pharmaceuticals, Inc., USA. ................................................ 59
Greenstone, LLC ...................................................................................... 60
Heritage Pharmaceuticals, Inc. ..............................................................61
Lannett Company, Inc. ............................................................................ 62
Lupin Pharmaceuticals, Inc. ................................................................... 62
Mayne Pharma USA, Inc. ....................................................................... 63
Mylan .......................................................................................................... 63
Par. ............................................................................................................... 64
Perrigo ........................................................................................................ 66
Pfizer ........................................................................................................... 66
Sandoz ......................................................................................................... 67

Sun ....................................................................................................... 68

Teva ..................................................................................................... 69

Upsher ................................................................................................. 70

West-Ward Pharmaceuticals Corp. ................................................... 71

Wockhardt USA LLC ........................................................................... 71

Zydus  Pharmaceuticals  (USA),  Inc. ................................................ 72

**VI.    CO-CONSPIRATORS** ................................................................. **72**

Ascend ................................................................................................. 72

Unknown Co-Conspirators ................................................................ 73

**VII.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE ....73**

**VIII.   THE GENERIC DRUG INDUSTRY** ................................................ **74**

A. Generic Drugs Are Commodity Products ..................................... 74

B. Defendants' Cartel Agreement Includes All Generic Products ......... 78

C. Pricing in the U.S. Prescription Drug Industry ............................ 84

**IX.    DEFENDANTS' OVERARCHING CONSPIRACY** ......................... **88**

A. The Co-Operative Principle of "Fair Share" Governed Defendants' Cartel .................... 93

B. Sales Managers Played a Key Role in Implementing the Conspiracy ................... 97

C. Defendants Frequently Communicated Directly and Privately ....................... 101

**X.    ADDITIONAL DETAILS AND EXAMPLES OF, AS PART OF THEIR OVERARCHING CONSPIRACY, DEFENDANTS CONTINUING TO CONSPIRE TO FIX PRICES, ALLOCATE MARKETS AND RIG BIDS FOR THE DRUGS AT ISSUE** ................................................... **114**

A.  Nystatin ......................................................................................... 114

B.  Clonidine TTS Patch and Doxazosin Mesylate ........................... 132

C.  Irbesartan ..................................................................................... 141

D.  Nimodipine ................................................................................... 143

E.  Levonorgestrel/EE ....................................................................... 150

G.  Doxycycline Hyclate ..................................................................... 157

H.  Doxycycline Monohydrate ........................................................... 169

I.  Zoledronic Acid ............................................................................. 176

J.  Tizanidine ...................................................................................... 183

K.  Meprobamate ................................................................................ 186

L.  Nabumetone, Pravastatin, Ranitidine, and Adapalene Gel ........... 190

M.  Drospirenone/EE .......................................................................... 196

N.  Acetazolamide .............................................................................. 201

O.  Temozolomide .............................................................................. 209

P.  Azithromycin Suspension ............................................................. 213

R.  Tolterodine Tartrate ...................................................................... 222

S.  Norethindrone/EE .......................................................................... 226

T.  Capecitabine .................................................................................. 228

U.  Dexmethylphenidate HCL Extended Release .................................... 232
V.  Piroxicam ................................................................................................ 235
W.  Niacin ER ............................................................................................... 238
X.  Baclofen ................................................................................................. 241
Y.  Fosinopril-HCTZ .................................................................................. 246
Z.  Glipizide-Metformin ............................................................................ 254
AA.  Glyburide ............................................................................................. 258
AB.  Glyburide-Metformin ......................................................................... 264
AC.  Leflunomide ......................................................................................... 268
AD.  Paromomycin ....................................................................................... 272
AE.  Theophylline Extended Release .......................................................... 275
AF.  Verapamil HCL .................................................................................... 278
AG.  Fenofibrate ........................................................................................... 283
AH.  Diflunisal .............................................................................................. 291
AI.  Ketoconazole ........................................................................................ 293
AJ.  Fluocinonide ........................................................................................ 297
AK.  Warfarin, Carbamazepine, and Clotrimazole .................................... 302
AL.  Tobramycin .......................................................................................... 306
AM.  Glimepiride ......................................................................................... 309
AN.  Griseofulvin ......................................................................................... 310
AO.  Gabapentin ........................................................................................... 312
AP.  Celecoxib .............................................................................................. 314
AQ.  Cabergoline .......................................................................................... 316

XI.  GENERIC    PHARMACEUTICAL    MARKETS'    HIGH
SUSCEPTIBILITY TO COLLUSION AND DEFENDANTS' CARTEL
.......................................................................................................... 321
A.  Fungible Products ................................................................................ 322
B.  Inter-Competitor Contacts and Communications .............................. 323

XII.  FACTS RELATING TO STATUTES OF LIMITATION .................. 325

XIII.  PLAINTIFFS' MEDICAID OVERPAYMENTS ................................ 332

XIV.  CONTINUING VIOLATION ............................................................. 335

XV.  DEFENDANTS' ANTITRUST VIOLATIONS ................................. 335

XVI.  CAUSES OF ACTION ......................................................................... 338
FIRST COUNT .................................................................................... 338
SECOND COUNT ................................................................................ 340
THIRD COUNT ................................................................................... 342
FOURTH COUNT ............................................................................... 346

XVII.  PRAYER FOR RELIEF ..................................................................... 347

**XVIII.  JURY DEMAND** ...................................................................**349**

# I.    NATURE OF THE ACTION

1.    This suit is brought by the Counties of Nassau, Allegany, Clinton, Cortland, Franklin, Fulton, Greene, Herkimer, Lewis, Madison, Montgomery, Niagara, Oswego, Schenectady, and Steuben ("Plaintiffs" or "Counties"), which are both Direct Purchasers of generic pharmaceutical drugs and End-Payer Purchasers of generic pharmaceutical drugs.

2.    The Counties seek injunctive relief, damages and relief from harms that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise, maintain, and/or stabilize the prices of all of their generic pharmaceuticals, which are referred to collectively herein as the "Drugs at Issue" or "Price-Fixed Generic Drugs."

3.    Defendants organized and directed an overarching conspiracy to raise prices and minimize competition in the generic drug industry.  This overarching conspiracy encompassed an agreement amongst all Defendants, which covered all generic drugs that were not at the time part of an exclusivity period, but were manufactured and/or sold by Defendants during the Relevant Period, and which further included multiple subsidiary agreements among certain Defendants, relating to individual Drugs at Issue.

4.    Defendants' conspiratorial conduct was widespread and has had a huge effect on the marketplace.  Indeed, numerous lawsuits alleging conspiratorial conduct involving many of these same Defendants are currently pending.

5.     In a competitive marketplace, each generic drug manufacturer prices its drug competitively relative to other manufacturers.  Accordingly, if any one company decided to raise prices, it would do so at the risk of losing customers and sales to its rivals with more competitive prices.  But, beginning at least as early as 2011, the generic pharmaceutical market throughout the United States, including within this County and within Plaintiffs' borders, has lacked such competition.

6.     Defendants engaged in pervasive conspiratorial conduct intended to, and which in fact did, maintain inflated prices and avoid competition with each other. Defendants' illegal agreements raised prices, maintained artificially inflated prices, and thwarted Congress's goal of lowering drug prices.

7.     Throughout the conspiracy, Defendants communicated with each other to determine and agree on the amount of market share each competitor would be allocated.  These shares were determined by the timing of each Defendant's entry into the market, with early entrants entitled to a larger share than later entrants.

8.     The purpose of Defendants' unlawful "fair share" allocation was to fix, maintain and stabilize prices; some of the sub-parts of the conspiracy related to just one particular generic drug, while other parts were related to multiple generic drugs, but each entrant benefited from this co-ordination as a whole, even if a manufacturer did not seek a market allocation for a particular drug.

9.    Defendants implemented their "fair share" agreement by refusing to bid for a particular customer or by providing a sham bid high enough that Defendants knew it would not be successful.

10.    Additionally, in conjunction with their market allocation agreement, Defendants also agreed to raise prices for the Drugs at Issue.  Defendants were able to raise, maintain, fix, and/or slow the decline of prices, which prices would have been lower in the absence of their conspiratorial agreements.

11.    Through this industry-wide market allocation agreement, Defendants implemented substantial price increases on a number of additional generic drugs. Generic drugs are pharmaceutically equivalent to the referenced brand name drug in dosage, form, route of administration, strength or concentration, and amount of active ingredient. ("API") Generic drugs can save (and have saved) consumers, other purchasers of drugs, and taxpayers tens of billions of dollars annually – because generic drugs are a lower-priced alternative to brand name drugs.  When the manufacturer of a branded drug loses the market exclusivity that comes with patent rights, generic drugs offer lower prices and greater access to healthcare for all consumers in the United States through genuine competition.  A consumer with a prescription can fill that prescription not only with the brand name drug, but also with a generic version of that drug.  State laws often require pharmacists to fill prescriptions with generic versions of the drug, which should represent great savings to those who bear the economic costs of these

drugs – but as a result of Defendants' overarching conspiracy, Plaintiffs were denied those savings.

12. For example, during the conspiracy, Defendants' price increases included increases on: (1) acetazolamide of approximately 75%; (2) albuterol of more than 3,400%; (3) amitriptyline of more than 900%; (4) baclofen of more than 400%; (5) benazepril HCTZ of more than 300%; (6) clobetasol of more than 800%; (7) clomipramine of more than 2,700%; (8) desonide of more than 140%; (9) digoxin of more than 630%; (10) divalproex ER by as much as 361%; (11) econazole of more than 600%; (12) fluocinonide of more than 200%; (13) fosinopril HCTZ of approximately 200%; (14) levothyroxine of as much as 120%; (15) nystatin of approximately 100%; (16) paromomycin of approximately 100%; (17) pravastatin of more than 100%; (18) propranolol of more than 1700%; (19) theophylline ER of approximately 150%; and (20) ursodiol of more than 560%. All of these price increases were collusive, and nearly all of these abrupt and substantial price increases were carried out by two or more Defendants that are the subject of the pending state and federal actions.

13. The generic drug pricing described in this Complaint cannot be explained by changes in supply, the costs of production, or demand, or any other competitive market feature. Instead, the price levels were the result of an illegal agreement among Defendants to fix the prices of the Drugs at Issue and not the result of free and fair market competition.

14.     The generic pharmaceutical industry has a number of features that make it highly susceptible to collusion:

- the markets for the Drugs at Issue were controlled by Defendants;

- these markets are subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements;

- each generic drug in Defendants' cartel is a commodity product, for which demand is highly inelastic, because Federal regulations require generic products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another; and

- interchangeability of one generic form of a drug with another of the same drug facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.

15.     Because purchasers choose which generic pharmaceutical product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to raise its prices without assurance that its competitors either would also increase prices or at least not compete on pricing.

16.     Moreover, due to the regulated nature of the industry, generic pharmaceutical manufacturers are typically able to determine in advance which manufacturers are coming in and out of the market for a particular generic drug. Armed

with that knowledge, Defendants were able to reach a common understanding that each competitor would be entitled to a "fair share," meaning that each Defendant would be entitled to a percentage of the market for each generic drug that it manufactures.

17. Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunity to agree on drug prices and allocate markets and customers.

18. As alleged in greater detail below, the sheer volume of industry meetings provided repeated opportunity for Defendants to implement and maintain their conspiracy, and evidence uncovered in the pending governmental investigations described below confirms that Defendants availed themselves of this opportunity.

19. Defendants implemented their conspiracy through meetings and communications between and among their representatives, including at industry events such as the Generic Pharmaceutical Association ("GPhA") (now Association for Accessible Medicines), National Association of Chain Drug Stores ("NACDS"), Healthcare Distribution Management Association ("HDMA") (now Healthcare Distribution Alliance) ("HDA"), Efficient Collaborative Retail Marketing ("ECRM"), and Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP").

20. These examples and others of this type of routine, in-person meeting facilitated Defendants' ability to reach agreement on their "fair shares" of the market for any given drug and to limit the electronic evidence of the agreement and its terms.

21.    As just one example, zoledronic acid was the part of the price-fixing scheme between Heritage and Dr. Reddy's.

22.    Heritage was the first generic manufacturer of the drug and entered the market in the spring of 2013, but Dr. Reddy's was close behind.  Executives at the companies cut deals so each got a "fair share" of the market, while also fixing an inflated price.  Dr. Reddy's wound up with about 60 percent of the market and Heritage got 40 percent.

23.    Evidence demonstrates that Heritage and Dr. Reddy's executives knew they were acting illegally. For example, as the discussions with Dr. Reddy's took place, a Heritage executive "sent a text message to his entire sales team reminding them not to put their pricing discussions with competitors in writing."[1]

24.    Extreme and unprecedented price increases in the generic drug industry have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants such as Plaintiff Counties.

25.    The "Relevant Period" referred to throughout this Complaint is approximately 2011 continuing through the present.

## II.    STATE AND FEDERAL INVESTIGATIONS

26.    The Office of the Attorney General for the State of Connecticut

---

[1] Thomas Sullivan, "300 Drugs Now Under Investigation in 'Generic Drug Cartel,'" February 11, 2019, https://www.policymed.com/2019/02/300-drugs-now-under-investigation-in-generic-drug-cartel.html.

("Connecticut AG") has been leading a multi-state attorney general investigation of the generic drug industry in parallel to that of DOJ and confirms there is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States….[and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[2]

27.     The Connecticut AG began an investigation in July of 2014 into generic drugs' dramatic price increases.  This has now been joined by the AG's of 45 states, Puerto Rico and the District of Columbia.

28.     In 2018, the Connecticut AG filed a Consolidated Amended Complaint ("2018 State AG Complaint") in the U.S. District Court for the Eastern District of Pennsylvania alleging price-fixing and customer allocation.[3]

29.     The State AG Complaint describes the defendants' participation "in an overarching conspiracy, the effect of which was to minimize if not thwart competition across the generic drug industry."[4]

30.     The 2017 State AG Complaint focuses on the following generic drugs: Acetazolamide, Doxycycline Hyclate Delayed Release, Doxycycline Monohydrate, Fosinopril-Hydrochlorothiazide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin,

---

[2] Press Release (Dec. 15, 2016), http://portal.ct.gov/AG/Press- Releases/2016-Press-Releases.
[3] Case 2:17-cv-03768-CMR, ECF 15.

[4] State AG Complaint ¶ 2.

Theophylline, Verapamil, and Zoledronic Acid.[5]

31.     Additionally, the States make clear that they uncovered wide-ranging conduct implicating numerous different drugs and competitors and suggest that additional drugs and manufacturers will be added at the appropriate time.

32.     After filing a Consolidated Amended Complaint that named 17 corporate defendants and two individual defendants and addressed conspiratorial conduct related to numerous drugs that were not already subject to independent litigation, the Connecticut AG acknowledged that "[b]ased upon our investigation, there certainly will be additional complaints. . . . [A]bsolutely, there will be additional complaints, in the future. They will likely be focused on specific defendants and [ ] the drugs that they sell."[6]

33.     More recently, the Connecticut AG noted the States' investigation has "exploded into wide-ranging conduct in all areas of the generic drug industry," the existing litigation "is essentially dwarfed by the conduct we're seeing in the rest of our investigation," and the States expect to bring even more actions in the future.[7]

34.     Indeed, on May 10, 2019, a total of 43 states (including New York State), led by Connecticut Attorney General William Tong, brought a lawsuit against Teva

---

[5] State AG Complaint ¶ 1.

[6]  02/21/2018 Status Conference Hearing Transcript at 7.

[7] Can Celik, *'More to come' from states' generic drug investigation, Connecticut official says*, mLex (Apr. 12, 2018).

Pharmaceuticals and 19 of the nation's largest generic drug manufacturers, alleging a broad conspiracy to artificially inflate and manipulate prices, reduce competition, and unreasonably restrain trade for more than 100 different generic drugs (the "2019 State AG Complaint"). The drugs at issue account for billions of dollars of sales in the United States.  The States allege that the Defendants' conduct artificially increased prices to health insurers, taxpayer-funded healthcare programs like Medicare and Medicaid, and individuals who paid and continue to pay inflated prices for their prescription drugs.

35.    The 2019 State AG Complaint alleges that Teva, Sandoz, Mylan, Pfizer and 16 other generic drug manufacturers engaged in a broad, co-ordinated, and systematic conspiracy to fix prices, allocate markets, and rig bids for more than 100 different generic drugs.  The drugs span all types, including, for example, tablets, capsules, suspensions, creams, gels, and ointments; and classes, including, for example, statins, ACE inhibitors, beta blockers, antibiotics, anti-depressants, contraceptives, and non-steroidal anti-inflammatory drugs.  They treat a range of diseases and conditions from basic infections to diabetes, cancer, epilepsy, multiple sclerosis, HIV, ADHD, and more.  In some instances, the co-ordinated price increases were over 1,000 percent.

36.    There is an interconnected web of industry executives where these competitors who met with each other during industry dinners, lunches, cocktail parties, golf outings and communicated via frequent telephone calls, e-mails, and text messages, initiating their illegal agreements.  The allegations in this Complaint are based on, and supported by, information and evidence gleaned from, *inter alia*, documents produced

by dozens of companies and individuals throughout the generic pharmaceutical industry and extracted information from an industry-wide phone call database consisting of more than 11 million phone call records from hundreds of individuals at various levels of the Defendant companies and other generic manufacturers.

37.     In this internal correspondence, Defendants used terms such as "fair share," "playing nice in the sandbox," "rules of the road," "responsible competitor," and "High Quality Competitor" to describe how they unlawfully eliminated competition, raised prices, and enforced and reinforced their collusive agreement.

38.     In addition, an ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Defendant Heritage relating to the sale of Glyburide and Doxycycline Hyclate.  DOJ has made clear that its "investigation is ongoing"[8] and that the evidence uncovered during the course of its investigation into those drugs also "implicates…a significant number of the Defendants…[and] a significant number of the drugs at issue" in the Multidistrict Litigation pending in the Eastern District of Pennsylvania.[9]  In late April, 2018, Bloomberg reported that at least two companies

---

[8] DOJ, Division Update Spring 2017 (Mar. 28, 2017), https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures- individual-and-corporate-guilty-pleas-collusion-industries-where-products.

[9] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

were expected to be indicted, and that another company could plead guilty before then.[10]

39.     The DOJ convened a grand jury to investigate a number of the Defendants identified in this Complaint.  To empanel a grand jury, DOJ's Guidelines require senior executives in the Antitrust Division to conclude that sufficient credible evidence of collusion exists.  Upon information and belief, nearly all of the Defendants identified in this Complaint were served with grand jury subpoenas.  Indeed, the following companies have publicly acknowledged receiving the grand jury subpoenas: Mylan, Teva, Actavis, the Sandoz Defendants, Endo, Par, Sun, Impax, Lannett, Mayne, Dr. Reddy's, Sandoz, Aurobindo, and Taro.  Privately-held companies are under no obligation to make this disclosure.).

40.     DOJ also executed search warrants at the corporate offices of Perrigo, Mylan, and ACETO (which purchased Citron in 2016).  For this to occur, DOJ had to persuade a federal judge that there was probable cause to believe that one or more antitrust violations had occurred, and that evidence of these violations would be found at the corporate offices of Mylan, Perrigo, and ACETO.

41.     Upon information and belief, the DOJ has granted conditional amnesty to one of the Defendants in this case.  Under DOJ Guidelines, for DOJ to grant a

---

[10] David McLaughlin & Drew Armstrong, *Generic-Drug Companies to Face First Charges in U.S. Probe*, BLOOMBERG (Apr. 24, 2018), *available at* https://www.bloomberg.com/news/articles/2018-04-24/generic-drug-companies-said-to-face- first-charges-in-u-s-probe.

company conditional amnesty, the company had to confess to criminal violations of U.S. antitrust laws and inform upon its co-conspirators, based on information known to the amnesty applicant. As explained on the DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[11]

42. At least two Defendants have been raided by federal authorities in connection with the investigation. Perrigo disclosed that its offices were raided in 2017, and Mylan's Pennsylvania headquarters were raided by the FBI in the fall of 2016. Teva, Mylan, and Allergan disclosed in their SEC filings in 2015 and 2016 that they had received grand jury subpoenas.[12]

43. Now in its sixth year, the federal criminal investigation into generic drug price-fixing has begun to bear fruit. On December 12 and 13, 2016, DOJ filed criminal informations accusing Heritage executives of conspiring with unidentified co-conspirators who "knowingly entered into and engaged in a combination and

---

[11] DOJ, Frequently Asked Questions About the Antitrust Division's Leniency Program (updated Jan. 26, 2017), available at https://www.justice.gov/atr/page/file/926521/download.

[12] David McLaughlin & Drew Armstrong, *Generic-Drug Companies to Face First Charges in U.S. Probe*, BLOOMBERG (Apr. 24, 2018), https://www.bloomberg.com/news/articles/2018-04-24/generic-drug-companies-said-to-face-first-charges-in-u-s-probe.

conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products . . . the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of doxycycline hyclate sold in the United States."[13]

44.    On January 9, 2017, Chief Executive Officer ("CEO") Jeffrey Glazer ("Glazer") and President Jason Malek ("Malek") of Heritage pled guilty to felony charges that they conspired with competitors to manipulate prices and allocate customers for Doxycycline Hyclate and Glyburide;[14] Malek admitted substantially the same facts.[15]

45.    As they awaited sentencing, Glazer and Malek co-operated with DOJ's investigation.  Moreover, according to Richard Vanderford in *Generic Pharma Investigation Still Broad*, Prosecutor Says, mLex (Feb. 21, 2017), as a further indication of criminal price-fixing in the generic drug industry, "It is understood that Heritage is co-operating with prosecutors in exchange for amnesty from criminal prosecution under the DOJ's leniency program[.]."  More criminal charges and guilty pleas are expected to follow.[16]

---

[13] Information ¶ 6, United States v. Glazer, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, United States v. Malek, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

[14] Tr. of Plea Hearing at 19:16-20:4, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also id.* at 22:4-11 (admitting facts).

[15] Tr. of Plea Hearing at 19:12-20:1, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also id.* at 21:23-22:6 (admitting facts).

[16] *See*, *e.g.*, fn. 14, David McLaughlin & Drew Armstrong, *supra*.

46.     Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much broader. The investigations reportedly cover two dozen drugs and more than a dozen manufacturers.[17]

47.     Press reports indicate that "[t]he Department of Justice believes price-fixing between makers of generic pharmaceuticals is widespread."[18]   DOJ and a federal grand jury in the Eastern District of Pennsylvania have focused on at least 18 pharmaceutical companies, including at least 15 of the Defendants here.

48.     On May 31, 2019, DOJ announced that Heritage Pharmaceuticals agreed to plead guilty to a single felony charge alleging that from about April of 2014 until at least December of 2015, Heritage participated in a criminal antitrust conspiracy with other companies and individuals engaged in the production and sale of generic pharmaceuticals, one purpose of which was to fix prices, rig bids, and allocate customers for glyburide, a medicine used to treat diabetes.  Heritage also agreed to pay $7.1 million to resolve allegations under the False Claims Act related to the price-fixing conspiracy.  The government alleged that between 2012 and 2015, Heritage paid and

---

[17] May 31, 2019 Department of Justice Office of Public Affairs Press Release, "Pharmaceutical Company Admits to Price Fixing in Violation of Antitrust Law, resolves Related False Claims Act Violations," https://www.justice.gov/opa/pr/pharmaceutical-company-admits-price-fixing-violation-antitrust-law-resolves-related-false

[18] PaRR Report, DoJ Believes Collusion over Generic Drug Prices Widespread (June 26, 2015) ("PaRR Report"), http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

received remuneration through arrangements on price, supply, and allocation of customers with other pharmaceutical manufacturers for certain generic drugs in violation of the Anti-Kickback Statute, and that its sale of such drugs resulted in claims submitted to or purchases by federal healthcare programs. The drugs allegedly implicated in this scheme address a wide variety of health conditions, and include hydralazine, used to treat high blood pressure, theophylline, used to treat asthma and other respiratory problems, and glyburide. As part of this settlement, Heritage agreed to co-operate fully in the criminal investigation of other generic pharmaceutical manufacturers, including most or all of the Defendants to this Complaint.

49.    Based on all of these numerous investigations, allegations, guilty pleas, and other evidence, as well as their own experience with the Drugs at Issue, the Plaintiff Counties bring their present Complaint. The allegations herein are based on Plaintiffs' knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by investigation by and under the supervision of Plaintiffs' counsel, as well as the investigations conducted by other parties, as outlined above. Plaintiffs believe substantial additional evidentiary support exists for the allegations set forth herein and will be found after a reasonable opportunity for discovery.

## III.   JURISDICTION AND VENUE

50.    Plaintiffs bring this action under §1 of the Sherman Act, 15 U.S.C. § 1, and for treble damages and injunctive relief pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and for costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs herein by reason of the violations of §§1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

51.    Plaintiffs also bring this action pursuant to New York State's antitrust statute, the Donnelly Act, GBL § 340, and pursuant to common law.

52.    This action arises from Defendants' conduct in the State of New York or aimed at the State of New York, and caused Plaintiff's damages in the State of New York, and in the case of Plaintiff County of Nassau ("Nassau County" or "Nassau"), in Nassau County.  During the Relevant Period, Defendants resided, transacted business, were found, or had agents in New York State and Nassau County.

53.    Venue is also proper in this court because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Nassau County, a substantial portion of the affected interstate trade and commerce described below has been carried out in Nassau County, and resultant harm and damages were suffered in Nassau County.

54.    This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in Nassau County; (b) sold generic drugs throughout the United States, including in

Nassau; (c) had substantial contacts with the United States, including in Nassau; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in Nassau; and/or (e) took overt action in furtherance of the conspiracy in Nassau or conspired with someone who did, and by doing so could reasonably have expected to be sued in Nassau.  In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act.

## IV.    PLAINTIFFS

### Nassau County

55.    The County of Nassau ("Nassau" or "Nassau County") is a County of the State of New York, located on the western portion of Long Island.  As of the 2010 census, the population of Nassau was in excess of 1.3 million.

56.    Nassau County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

57.    In addition, Nassau County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Nassau.

58.    Nassau County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury

or condition, Nassau County reimburses qualified medical costs, including pharmaceutical costs.

59.    Nassau County also provides reimbursement for the pharmaceutical costs of Medicaid beneficiaries.   The federal government pays approximately half of Medicaid's share of prescription drug costs.  *See* 42 U.S.C. § 1396d(b).  Responsibility for the remaining fifty percent is apportioned among state and local authorities according to state law. *See id.* In New York, the State reimburses providers directly for the total share of prescription drug costs attributable to both state and local government. N.Y. Soc. Serv. Law § 367–b.  By statute, each county is then billed for approximately twenty-five percent of the total costs (*i.e.*, fifty percent of the State's costs) for prescription drugs associated with county residents.  N.Y. Social Services Law § 368–a; *see also id.* § 367–b(6).

60.    The Medicaid program relies on "average" or "estimated" wholesale pricing data supplied by each manufacturer in determining the amounts due from the New York State (and Plaintiff Counties).   One of the many harmful results of the antitrust conspiracy and other wrongdoing alleged herein is that Plaintiffs, including Nassau County, have overpaid for pharmaceuticals provided through Medicaid.

61.    In sum, from 2012 through the present, Nassau County, both directly and indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.  For example, as a result of Defendants' conspiracy,

between 2013 and 2014, the price of a bottle of doxycycline shot up 8, 281% – from $20 to more than $1,800 per bottle, significantly damaging Plaintiffs.

62.     From 2012 through the present, and continuing into the future until this court enjoins the conduct at issue, Nassau County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Nassau County was injured in its business or property by reason of the violations of law alleged herein.

**Allegany County**

63.     The County of Allegany ("Allegany" or "Allegany County") is a County of the State of New York, located on the western portion of the State and bordered to the south by Pennsylvania.  As of the 2010 census, the population of Allegany was in excess of 46,000.

64.     Allegany County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

65.     In addition, Allegany County provides medical and pharmaceutical benefits to the inmates of its county jails.  Allegany County directly purchases such pharmaceuticals and provides them to inmates.

66.     Allegany County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury

or condition, Allegany County reimburses qualified medical costs, including pharmaceutical costs.

67.     Allegany County also provides reimbursement for the pharmaceutical costs of Medicaid beneficiaries.  The federal government pays approximately half of Medicaid's share of prescription drug costs.  *See* 42 U.S.C. § 1396d(b).  Responsibility for the remaining fifty percent is apportioned among state and local authorities according to state law.  *See id.*  In New York, the State reimburses providers directly for the total share of prescription drug costs attributable to both state and local government. N.Y. Soc. Serv. Law § 367–b.  By statute, each county is then billed for approximately twenty-five percent of the total costs (*i.e.*, fifty percent of the State's costs) for prescription drugs associated with county residents.  N.Y. Social Services Law § 368–a; *see also id.* § 367–b(6).

68.     The Medicaid program relies on "average" or "estimated" wholesale pricing data supplied by each manufacturer in determining the amounts due from the New York State (and Plaintiff Counties).   One of the many harmful results of the antitrust conspiracy and other wrongdoing alleged herein is that Defendants fraudulently reported inaccurate pricing information as to the costs of pharmaceuticals reimbursed by Medicaid – including the Drugs at Issue.  As a result, Plaintiffs, including Allegany County, have overpaid for pharmaceuticals provided through Medicaid.

69.     In sum, from 2012 through the present, Allegany County, both directly and indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

70.     From 2012 through the present, and continuing into the future until this court enjoins the conduct at issue, Allegany County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Allegany County was injured in its business or property by reason of the violations of law alleged herein.

**Clinton County**

71.     The County of Clinton ("Clinton" or "Clinton County") is a County of the State of New York, located on the northern portion of the State and bordered to the north by Canada.  As of the 2010 census, the population of Clinton was in excess of 82,000.

72.     Clinton County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

73.     In addition, Clinton County provides medical and pharmaceutical benefits to the inmates of its county jails.  Clinton County directly purchases such pharmaceuticals and provides them to inmates.

74.     Clinton County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Clinton County reimburses qualified medical costs, including pharmaceutical costs.

75.     Clinton County also provides reimbursement for the pharmaceutical costs of Medicaid beneficiaries.   The federal government pays approximately half of Medicaid's share of prescription drug costs.  *See* 42 U.S.C. § 1396d(b).  Responsibility for the remaining fifty percent is apportioned among state and local authorities according to state law.  *See id.*  In New York, the State reimburses providers directly for the total share of prescription drug costs attributable to both state and local government. N.Y. Soc. Serv. Law § 367–b.  By statute, each county is then billed for approximately twenty-five percent of the total costs (*i.e.*, fifty percent of the State's costs) for prescription drugs associated with county residents.  N.Y. Social Services Law § 368–a; *see also id.* § 367–b(6).

76.     The Medicaid program relies on "average" or "estimated" wholesale pricing data supplied by each manufacturer in determining the amounts due from the New York State (and Plaintiff Counties).   One of the many harmful results of the antitrust conspiracy and other wrongdoing alleged herein is that Defendants fraudulently reported inaccurate pricing information as to the costs of pharmaceuticals reimbursed by Medicaid – including the Drugs at Issue.  As a result, Plaintiffs, including Clinton County, have overpaid for pharmaceuticals provided through Medicaid.

77.     In sum, from 2012 through the present, Clinton County, both directly and indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

78.     From 2012 through the present, and continuing into the future until this court enjoins the conduct at issue, Clinton County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.   As a result of Defendants' conspiracy, Clinton County was injured in its business or property by reason of the violations of law alleged herein.

**Cortland County**

79.     The County of Cortland ("Cortland" or "Cortland County") is a County of the State of New York, located south of Syracuse.  As of 2018, the population of Cortland was in excess of 47,000.

80.     Cortland County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

81.     In addition, Cortland County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Cortland.

82.     Cortland County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury

or condition, Cortland County reimburses qualified medical costs, including pharmaceutical costs.

83.    Cortland County also provides reimbursement for the pharmaceutical costs of Medicaid beneficiaries.  The federal government pays approximately half of Medicaid's share of prescription drug costs.  *See* 42 U.S.C. § 1396d(b).  Responsibility for the remaining fifty percent is apportioned among state and local authorities according to state law. *See id.* In New York, the State reimburses providers directly for the total share of prescription drug costs attributable to both state and local government. N.Y. Soc. Serv. Law § 367–b.  By statute, each county is then billed for approximately twenty-five percent of the total costs (*i.e.*, fifty percent of the State's costs) for prescription drugs associated with county residents.  N.Y. Social Services Law § 368–a; *see also id.* § 367–b(6).

84.    The Medicaid program relies on "average" or "estimated" wholesale pricing data supplied by each manufacturer in determining the amounts due from the New York State (and Plaintiff Counties).   One of the many harmful results of the antitrust conspiracy and other wrongdoing alleged herein is that Plaintiffs, including Cortland County, have overpaid for pharmaceuticals provided through Medicaid.

85.    In sum, from 2012 through the present, Cortland County, both directly and indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

86.     From 2012 through the present, and continuing into the future until this court enjoins the conduct at issue, Cortland County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.   As a result of Defendants' conspiracy, Cortland County was injured in its business or property by reason of the violations of law alleged herein.

**Franklin County**

87.     The County of Franklin ("Franklin" or "Franklin County") is also a County of the State of New York, bordering the Canadian Provinces of Quebec and Ontario.  As of the 2010 census, the county population was in excess of 51,000.

88.     Franklin County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.   Franklin County provides medical benefits through a third-party provider, Excellus BlueCross BlueShield ("Excellus"), and provides pharmaceutical benefits through ProAct, Inc. ("ProAct"), a pharmacy benefit manager.

89.     Pursuant to Franklin County's contract with Excellus, Franklin pays both an administrative fee for each covered member, and separately pays for health benefits provided by Excellus to covered members on a weekly basis.

90.     Pursuant to Franklin County's contract with ProAct, Franklin likewise pays an administrative fee for each covered member, and also pays for the costs of any

pharmaceuticals dispensed to covered members above the designated co-pay.

91.     In addition, Franklin County provides medical and pharmaceutical benefits to the inmates of its county jails.   Franklin directly purchases such pharmaceuticals and provides them to its inmates.

92.     Franklin County also provides workers' compensation, including pharmaceutical benefits. to its employees.  Where an employee suffers a covered injury or condition, Franklin County reimburses qualified medical costs, including pharmaceutical costs.

93.     Franklin County also provides reimbursement for the pharmaceutical costs of Medicaid beneficiaries.  The federal government pays approximately half of Medicaid's share of prescription drug costs.  *See* 42 U.S.C. § 1396d(b).  Responsibility for the remaining fifty percent is apportioned among state and local authorities according to state law. *See id.* In New York, the State reimburses providers directly for the total share of prescription drug costs attributable to both state and local government. N.Y. Soc. Serv. Law § 367–b.  By statute, each county is then billed for approximately twenty-five percent of the total costs (*i.e.*, fifty percent of the State's costs) for prescription drugs associated with county residents.  N.Y. Social Services Law § 368–a; *see also id.* § 367–b(6).

94.     The Medicaid program relies on "average" or "estimated" wholesale pricing data supplied by each manufacturer in determining the amounts due from the New York State (and Plaintiff Counties).   One of the many harmful results of the

antitrust conspiracy and other wrongdoing alleged herein is that Defendants fraudulently reported inaccurate pricing information as to the costs of pharmaceuticals reimbursed by Medicaid – including the Drugs at Issue.  As a result, Plaintiffs, including Franklin County, have overpaid for pharmaceuticals provided through Medicaid.

95.    In sum, from 2012 through the present, Franklin County, both directly and indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

96.    Throughout the Relevant Period through the present, and continuing into the future until this court enjoins the conduct at issue, Franklin County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products. As a result of Defendants' conspiracy, Franklin County was injured in its business or property by reason of the violations of law alleged herein.

97.    From 2012 to the present, the amount that Franklin County has paid for Drugs at Issue would have been substantially less but for the wrongdoing by Defendants alleged in this complaint.

**Fulton County**

98.    The County of Fulton ("Fulton" or "Fulton County") is a County of the State of New York, located in the central portion of the State just north of Albany.  As of the 2010 census, the population of Fulton was in excess of 55,000.

99.     Fulton County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

100.    In addition, Fulton County provides medical and pharmaceutical benefits to the inmates of its county jails.   Fulton County directly purchases such pharmaceuticals and provides them to inmates.

101.    Fulton County also provides workers' compensation, including pharmaceutical benefits, to its employees.   Where an employee suffers a covered injury or condition, Fulton County reimburses qualified medical costs, including pharmaceutical costs.

102.    Fulton County also provides reimbursement for the pharmaceutical costs of Medicaid beneficiaries.   The federal government pays approximately half of Medicaid's share of prescription drug costs.  *See* 42 U.S.C. § 1396d(b).  Responsibility for the remaining fifty percent is apportioned among state and local authorities according to state law.  *See id.*  In New York, the State reimburses providers directly for the total share of prescription drug costs attributable to both state and local government. N.Y. Soc. Serv. Law § 367–b.  By statute, each county is then billed for approximately twenty-five percent of the total costs (*i.e.*, fifty percent of the State's costs) for prescription drugs associated with county residents.  N.Y. Social Services Law § 368–a; *see also id.* § 367–b(6).

103.    The Medicaid program relies on "average" or "estimated" wholesale pricing data supplied by each manufacturer in determining the amounts due from the

New York State (and Plaintiff Counties). One of the many harmful results of the antitrust conspiracy and other wrongdoing alleged herein is that Defendants fraudulently reported inaccurate pricing information as to the costs of pharmaceuticals reimbursed by Medicaid – including the Drugs at Issue. As a result, Plaintiffs, including Fulton County, have overpaid for pharmaceuticals provided through Medicaid.

104. In sum, from 2012 through the present, Fulton County, both directly and indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

105. From 2012 through the present, and continuing into the future until this court enjoins the conduct at issue, Fulton County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products. As a result of Defendants' conspiracy, Fulton County was injured in its business or property by reason of the violations of law alleged herein.

**Greene County**

106. The County of Greene ("Greene" or "Greene County") is a County of the State of New York, located on the eastern portion of the State just south of Albany. As of the 2010 census, the population of Greene was in excess of 49,000.

107. Greene County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

108.    In addition, Greene County provides medical and pharmaceutical benefits to the inmates of its county jails.   Greene County directly purchases such pharmaceuticals and provides them to inmates.

109.    Greene County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Greene County reimburses qualified medical costs, including pharmaceutical costs.

110.    Greene County also provides reimbursement for the pharmaceutical costs of Medicaid beneficiaries.   The federal government pays approximately half of Medicaid's share of prescription drug costs.  *See* 42 U.S.C. § 1396d(b).  Responsibility for the remaining fifty percent is apportioned among state and local authorities according to state law.  *See id.*  In New York, the State reimburses providers directly for the total share of prescription drug costs attributable to both state and local government. N.Y. Soc. Serv. Law § 367–b.  By statute, each county is then billed for approximately twenty-five percent of the total costs (*i.e.*, fifty percent of the State's costs) for prescription drugs associated with county residents.  N.Y. Social Services Law § 368–a; *see also id.* § 367–b(6).

111.    The Medicaid program relies on "average" or "estimated" wholesale pricing data supplied by each manufacturer in determining the amounts due from the New York State (and Plaintiff Counties).   One of the many harmful results of the antitrust conspiracy and other wrongdoing alleged herein is that Defendants

fraudulently reported inaccurate pricing information as to the costs of pharmaceuticals reimbursed by Medicaid – including the Drugs at Issue. As a result, Plaintiffs, including Greene County, have overpaid for pharmaceuticals provided through Medicaid.

112. In sum, from 2012 through the present, Greene County, both directly and indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

113. From 2012 through the present, and continuing into the future until this court enjoins the conduct at issue, Greene County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products. As a result of Defendants' conspiracy, Greene County was injured in its business or property by reason of the violations of law alleged herein.

**Herkimer County**

114. The County of Herkimer ("Herkimer" or "Herkimer County") is a County of the State of New York, located between the two major New York cities of Syracuse and Albany. As of the 2010 census, the County population was in excess of 64,500.

115. Herkimer County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

116. In addition, Herkimer County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Herkimer.

117.    Herkimer County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Herkimer County reimburses qualified medical costs, including pharmaceutical costs.

118.    Herkimer County also provides reimbursement for the pharmaceutical costs of Medicaid beneficiaries.  The federal government pays approximately half of Medicaid's share of prescription drug costs.  *See* 42 U.S.C. § 1396d(b).  Responsibility for the remaining fifty percent is apportioned among state and local authorities according to state law. *See id.* In New York, the State reimburses providers directly for the total share of prescription drug costs attributable to both state and local government. N.Y. Soc. Serv. Law § 367–b.  By statute, each county is then billed for approximately twenty-five percent of the total costs (*i.e.*, fifty percent of the State's costs) for prescription drugs associated with county residents.  N.Y. Social Services Law § 368–a; *see also id.* § 367–b(6).

119.    The Medicaid program relies on "average" or "estimated" wholesale pricing data supplied by each manufacturer in determining the amounts due from the New York State (and Plaintiff Counties).   One of the many harmful results of the antitrust conspiracy and other wrongdoing alleged herein is that Plaintiffs, including Herkimer County, have overpaid for pharmaceuticals provided through Medicaid.

120.    In sum, from 2012 through the present, Herkimer County, both directly and indirectly, purchased and paid some or all of the purchase price for Drugs at Issue

manufactured by Defendants. For example, as a result of Defendants' conspiracy, between 2013 and 2014, the price of a bottle of doxycycline shot up 8, 281% – from $20 to more than $1,800 per bottle, significantly damaging Plaintiffs.

121. From 2012 through the present, and continuing into the future until this court enjoins the conduct at issue, Herkimer County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products. As a result of Defendants' conspiracy, Herkimer County was injured in its business or property by reason of the violations of law alleged herein.

## Lewis County

122. The County of Lewis ("Lewis" or "Lewis County") is a County of the State of New York, located on the western portion of the State and north of Syracuse. As of the 2010 census, the population of Lewis was in excess of 27,000.

123. Lewis County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

124. In addition, Lewis County provides medical and pharmaceutical benefits to the inmates of its county jails. Lewis County directly purchases such pharmaceuticals and provides them to inmates.

125. Lewis County also provides workers' compensation, including pharmaceutical benefits, to its employees. Where an employee suffers a covered injury

or condition, Lewis County reimburses qualified medical costs, including pharmaceutical costs.

126.  Lewis County also provides reimbursement for the pharmaceutical costs of Medicaid beneficiaries.  The federal government pays approximately half of Medicaid's share of prescription drug costs.  *See* 42 U.S.C. § 1396d(b).  Responsibility for the remaining fifty percent is apportioned among state and local authorities according to state law.  *See id.*  In New York, the State reimburses providers directly for the total share of prescription drug costs attributable to both state and local government. N.Y. Soc. Serv. Law § 367–b.  By statute, each county is then billed for approximately twenty-five percent of the total costs (*i.e.*, fifty percent of the State's costs) for prescription drugs associated with county residents.  N.Y. Social Services Law § 368–a; *see also id.* § 367–b(6).

127.  The Medicaid program relies on "average" or "estimated" wholesale pricing data supplied by each manufacturer in determining the amounts due from the New York State (and Plaintiff Counties).   One of the many harmful results of the antitrust conspiracy and other wrongdoing alleged herein is that Defendants fraudulently reported inaccurate pricing information as to the costs of pharmaceuticals reimbursed by Medicaid – including the Drugs at Issue.  As a result, Plaintiffs, including Lewis County, have overpaid for pharmaceuticals provided through Medicaid.

128.    In sum, from 2012 through the present, Lewis County, both directly and indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

129.    From 2012 through the present, and continuing into the future until this court enjoins the conduct at issue, Lewis County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.   As a result of Defendants' conspiracy, Lewis County was injured in its business or property by reason of the violations of law alleged herein.

**Madison County**

130.    The County of Madison ("Madison" or "Madison County") is a County of the State of New York, located in the central portion of the State and in the Syracuse metropolitan statistical area.   As of 2018, the population of Madison was in excess of 70,000.

131.    Madison County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

132.    In addition, Madison County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Madison.

133.    Madison County also provides workers' compensation, including pharmaceutical benefits, to its employees.   Where an employee suffers a covered injury

or condition, Madison County reimburses qualified medical costs, including pharmaceutical costs.

134. Madison County also provides reimbursement for the pharmaceutical costs of Medicaid beneficiaries. The federal government pays approximately half of Medicaid's share of prescription drug costs. *See* 42 U.S.C. § 1396d(b). Responsibility for the remaining fifty percent is apportioned among state and local authorities according to state law. *See id.* In New York, the State reimburses providers directly for the total share of prescription drug costs attributable to both state and local government. N.Y. Soc. Serv. Law § 367–b. By statute, each county is then billed for approximately twenty-five percent of the total costs (*i.e.*, fifty percent of the State's costs) for prescription drugs associated with county residents. N.Y. Social Services Law § 368–a; *see also id.* § 367–b(6).

135. The Medicaid program relies on "average" or "estimated" wholesale pricing data supplied by each manufacturer in determining the amounts due from the New York State (and Plaintiff Counties). One of the many harmful results of the antitrust conspiracy and other wrongdoing alleged herein is that Defendants fraudulently reported inaccurate pricing information as to the costs of pharmaceuticals reimbursed by Medicaid – including the Drugs at Issue. As a result, Plaintiffs, including Madison County, have overpaid for pharmaceuticals provided through Medicaid.

136. In sum, from 2012 through the present, Madison County, both directly and indirectly, purchased and paid some or all of the purchase price for Drugs at Issue

manufactured by Defendants.

137.    From 2012 through the present, and continuing into the future until this court enjoins the conduct at issue, Madison County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.   As a result of Defendants' conspiracy, Madison County was injured in its business or property by reason of the violations of law alleged herein.

**Montgomery County**

138.    The County of Montgomery ("Montgomery" or "Montgomery County") is a County of the State of New York, located on the central portion of the State and west of Albany.   As of the 2010 census, the population of Montgomery was in excess of 50,000.

139.    Montgomery County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

140.    In addition, Montgomery County provides medical and pharmaceutical benefits to the inmates of its county jails.   Montgomery County directly purchases such pharmaceuticals and provides them to inmates.

141.    Montgomery County also provides workers' compensation, including pharmaceutical benefits, to its employees.   Where an employee suffers a covered injury

or condition, Montgomery County reimburses qualified medical costs, including pharmaceutical costs.

142.    Montgomery County also provides reimbursement for the pharmaceutical costs of Medicaid beneficiaries.  The federal government pays approximately half of Medicaid's share of prescription drug costs.  *See* 42 U.S.C. § 1396d(b).  Responsibility for the remaining fifty percent is apportioned among state and local authorities according to state law.  *See id.*  In New York, the State reimburses providers directly for the total share of prescription drug costs attributable to both state and local government. N.Y. Soc. Serv. Law § 367–b.  By statute, each county is then billed for approximately twenty-five percent of the total costs (*i.e.*, fifty percent of the State's costs) for prescription drugs associated with county residents.  N.Y. Social Services Law § 368–a; *see also id.* § 367–b(6).

143.    The Medicaid program relies on "average" or "estimated" wholesale pricing data supplied by each manufacturer in determining the amounts due from the New York State (and Plaintiff Counties).   One of the many harmful results of the antitrust conspiracy and other wrongdoing alleged herein is that Defendants fraudulently reported inaccurate pricing information as to the costs of pharmaceuticals reimbursed by Medicaid – including the Drugs at Issue.  As a result, Plaintiffs, including Montgomery County, have overpaid for pharmaceuticals provided through Medicaid.

144.   In sum, from 2012 through the present, Montgomery County, both directly and indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

145.   From 2012 through the present, and continuing into the future until this court enjoins the conduct at issue, Montgomery County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.   As a result of Defendants' conspiracy, Montgomery County was injured in its business or property by reason of the violations of law alleged herein.

**Oswego County**

146.   The County of Oswego ("Oswego" or "Oswego County") is a County of the State of New York, located on the northern portion of the State and bordered to the north by Lake Ontario.   As of the 2010 census, the population of Oswego was in excess of 122,100.

147.   Oswego County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

148.   In addition, Oswego County provides medical and pharmaceutical benefits to the inmates of its county jails.   Oswego County directly purchases such pharmaceuticals and provides them to inmates.

149.    Oswego County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Oswego County reimburses qualified medical costs, including pharmaceutical costs.

150.    Oswego County also provides reimbursement for the pharmaceutical costs of Medicaid beneficiaries.  The federal government pays approximately half of Medicaid's share of prescription drug costs.  *See* 42 U.S.C. § 1396d(b).  Responsibility for the remaining fifty percent is apportioned among state and local authorities according to state law.  *See id.*  In New York, the State reimburses providers directly for the total share of prescription drug costs attributable to both state and local government. N.Y. Soc. Serv. Law § 367–b.  By statute, each county is then billed for approximately twenty-five percent of the total costs (*i.e.*, fifty percent of the State's costs) for prescription drugs associated with county residents.  N.Y. Social Services Law § 368–a; *see also id.* § 367–b(6).

151.    The Medicaid program relies on "average" or "estimated" wholesale pricing data supplied by each manufacturer in determining the amounts due from the New York State (and Plaintiff Counties).   One of the many harmful results of the antitrust conspiracy and other wrongdoing alleged herein is that Defendants fraudulently reported inaccurate pricing information as to the costs of pharmaceuticals reimbursed by Medicaid – including the Drugs at Issue.  As a result, Plaintiffs, including Oswego County, have overpaid for pharmaceuticals provided through Medicaid.

152.    In sum, from 2012 through the present, Oswego County, both directly and indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

153.    From 2012 through the present, and continuing into the future until this court enjoins the conduct at issue, Oswego County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.   As a result of Defendants' conspiracy, Oswego County was injured in its business or property by reason of the violations of law alleged herein.

**Niagara County**

154.    The County of Niagara ("Niagara" or "Niagara County") is a County of the State of New York, located on the northern portion of the State and bordered to the north by Lake Ontario.  As of the 2010 census, the population of Niagara was in excess of 216,000.

155.    Niagara County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

156.    In addition, Niagara County provides medical and pharmaceutical benefits to the inmates of its county jails.   Niagara County directly purchases such pharmaceuticals and provides them to inmates.

157. Niagara County also provides workers' compensation, including pharmaceutical benefits, to its employees. Where an employee suffers a covered injury or condition, Niagara County reimburses qualified medical costs, including pharmaceutical costs.

158. Niagara County also provides reimbursement for the pharmaceutical costs of Medicaid beneficiaries. The federal government pays approximately half of Medicaid's share of prescription drug costs. *See* 42 U.S.C. § 1396d(b). Responsibility for the remaining fifty percent is apportioned among state and local authorities according to state law. *See id.* In New York, the State reimburses providers directly for the total share of prescription drug costs attributable to both state and local government. N.Y. Soc. Serv. Law § 367–b. By statute, each county is then billed for approximately twenty-five percent of the total costs (*i.e.*, fifty percent of the State's costs) for prescription drugs associated with county residents. N.Y. Social Services Law § 368–a; *see also id.* § 367–b(6).

159. The Medicaid program relies on "average" or "estimated" wholesale pricing data supplied by each manufacturer in determining the amounts due from the New York State (and Plaintiff Counties). One of the many harmful results of the antitrust conspiracy and other wrongdoing alleged herein is that Defendants fraudulently reported inaccurate pricing information as to the costs of pharmaceuticals reimbursed by Medicaid – including the Drugs at Issue. As a result, Plaintiffs, including Niagara County, have overpaid for pharmaceuticals provided through Medicaid.

160.    In sum, from 2012 through the present, Niagara County, both directly and indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

161.    From 2012 through the present, and continuing into the future until this court enjoins the conduct at issue, Niagara County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Niagara County was injured in its business or property by reason of the violations of law alleged herein.

**Schenectady County:**

162.    The County of Schenectady ("Schenectady" or "Schenectady County") is a County of the State of New York, located northwest of Albany.  As of the 2010 census, the county population was in excess of 154,000.

163.    Schenectady County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents. Schenectady County provides medical benefits through a third-party provider, Empire Blue Cross ("Empire") and MVP Healthcare ("MVP"), and provides pharmaceutical benefits through ProAct, Inc. ("ProAct"), a pharmacy benefit manager.

164.    In addition, Schenectady County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Schenectady.

165.    Schenectady County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Schenectady County reimburses qualified medical costs, including pharmaceutical costs.

166.    Schenectady County also provides reimbursement for the pharmaceutical costs of Medicaid beneficiaries.  The federal government pays approximately half of Medicaid's share of prescription drug costs.  *See* 42 U.S.C. § 1396d(b).  Responsibility for the remaining fifty percent is apportioned among state and local authorities according to state law. *See id.* In New York, the State reimburses providers directly for the total share of prescription drug costs attributable to both state and local government. N.Y. Soc. Serv. Law § 367–b.  By statute, each county is then billed for approximately twenty-five percent of the total costs (*i.e.*, fifty percent of the State's costs) for prescription drugs associated with county residents.  N.Y. Social Services Law § 368–a; *see also id.* § 367–b(6).

167.    The Medicaid program relies on "average" or "estimated" wholesale pricing data supplied by each manufacturer in determining the amounts due from the New York State (and Plaintiff Counties).   One of the many harmful results of the antitrust conspiracy and other wrongdoing alleged herein is that Plaintiffs, including Schenectady County, have overpaid for pharmaceuticals provided through Medicaid.

168.    In sum, from 2012 through the present, Schenectady County, both directly and indirectly, purchased and paid some or all of the purchase price for Drugs at Issue

manufactured by Defendants.

169.    From 2012 through the present, and continuing into the future until this court enjoins the conduct at issue, Schenectady County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.   As a result of Defendants' conspiracy, Schenectady County was injured in its business or property by reason of the violations of law alleged herein.

**Steuben County**

170.    The County of Steuben ("Steuben" or "Steuben County") is a County of the State of New York, located on the western portion of the State and bordered to the south by Pennsylvania.   As of the 2010 census, the population of Steuben was in excess of 98,000.

171.    Steuben County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

172.    In addition, Steuben County provides medical and pharmaceutical benefits to the inmates of its county jails.   Steuben County directly purchases such pharmaceuticals and provides them to inmates.

173.    Steuben County also provides workers' compensation, including pharmaceutical benefits, to its employees.   Where an employee suffers a covered injury

or condition, Steuben County reimburses qualified medical costs, including pharmaceutical costs.

174.   Steuben County also provides reimbursement for the pharmaceutical costs of Medicaid beneficiaries.  The federal government pays approximately half of Medicaid's share of prescription drug costs.  *See* 42 U.S.C. § 1396d(b).  Responsibility for the remaining fifty percent is apportioned among state and local authorities according to state law.  *See id.*  In New York, the State reimburses providers directly for the total share of prescription drug costs attributable to both state and local government. N.Y. Soc. Serv. Law § 367–b.  By statute, each county is then billed for approximately twenty-five percent of the total costs (*i.e.*, fifty percent of the State's costs) for prescription drugs associated with county residents.  N.Y. Social Services Law § 368–a; *see also id.* § 367–b(6).

175.   The Medicaid program relies on "average" or "estimated" wholesale pricing data supplied by each manufacturer in determining the amounts due from the New York State (and Plaintiff Counties).   One of the many harmful results of the antitrust conspiracy and other wrongdoing alleged herein is that Defendants fraudulently reported inaccurate pricing information as to the costs of pharmaceuticals reimbursed by Medicaid – including the Drugs at Issue.  As a result, Plaintiffs, including Steuben County, have overpaid for pharmaceuticals provided through Medicaid.

176.    In sum, from 2012 through the present, Steuben County, both directly and indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

177.    From 2012 through the present, and continuing into the future until this court enjoins the conduct at issue, Steuben County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Steuben County was injured in its business or property by reason of the violations of law alleged herein.

## V.    DEFENDANTS

**<u>Actavis</u>**

178.    Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  In March, 2015, Actavis, plc (the parent company of Defendant Actavis) merged with Allergan, plc ("Allergan") and adopted Allergan's name.

179.    In August, 2016, Defendant Teva USA purchased Actavis's generics business, which included Actavis Inc., Actavis Elizabeth Inc., and Defendant Actavis Pharma Inc. from Allergan, plc.  All the assets of the entities were then transferred to

the newly formed Actavis Holdco. The acquisition cost Teva USA $33.43 billion in cash and approximately 100 million shares of Teva securities.

180. Defendant Actavis Pharma, Inc. ("Actavis Pharma") is also a Delaware corporation with its principal place of business in Parsippany, New Jersey. Actavis Pharma is, however, a wholly-owned subsidiary of Actavis Holdco and is now a principal operating company in the U.S. for Teva's generic product lines acquired from Allergan plc.

181. Actavis Elizabeth LLC ("Actavis Elizabeth") is also a Delaware limited liability company based in New Jersey, but its principal place of business is in Elizabeth. It is a wholly-owned subsidiary of Actavis Holdco and is a research, development and manufacturing entity for Actavis's generic operations.

182. Actavis Holdco (and its predecessors), Actavis Pharma, and Actavis Elizabeth are collectively defined as "Actavis." Unless addressed individually, Actavis Holdco, Actavis Pharma and Actavis Elizabeth acted in concert in furthering the conspiracy described herein and are collectively referred to as "Actavis." Actavis is defined to include its managers, officers, employees, and agents acting on its behalf.

183. Throughout the Relevant Period, Actavis directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the

following drugs:  clobetasol propionate, desonide, doxy hyclate, fluocinonide, glyburide-metformin, propranolol, verapamil, and ursodiol.

**Amneal**

184.    Defendant Amneal Pharmaceuticals, Inc. ("Amneal") is another Delaware corporation with its principal place of business in New Jersey, but Amneal's principal place of business is at 400 Crossing Boulevard in Bridgewater.  Amneal is defined to include its managers, officers, employees, and agents acting on its behalf.

185.    Throughout the Relevant Period, Amneal directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing.

**Apotex**

186.    Defendant Defendant Apotex Corp. ("Apotex") is a Florida corporation with its principal place of business in Weston, Florida.  Apotex is defined to include its managers, officers, employees, and agents acting on its behalf.

187.    Throughout the Relevant Period, Apotex directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the

unlawful conduct alleged in this Complaint, including price-fixing, for at least the following drugs:  leflunomide and pravastatin.

**Aurobindo**

188.   Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is another Delaware corporation with its principal place of business in New Jersey, but Aurobindo's principal place of business is in Dayton, New Jersey.  Aurobindo is defined to include its managers, officers, employees, and agents acting on its behalf.

189.   Throughout the Relevant Period, Aurobindo directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following drugs:  fosinopril HCTZ, glyburide, and glyburide-metformin.

**Breckenridge Pharmaceutical, Inc.**

190.   Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is yet another Delaware corporation with its principal place of business in New Jersey, but Breckenridge's principal place of business is in Fairfield, New Jersey.  Breckenridge is defined to include its managers, officers, employees, and agents acting on its behalf. Breckenridge is wholly-owned by Pensa Pharma S.A.

191.   Throughout the Relevant Period, Breckenridge directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold

one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least propranolol.

**Citron**

192.    Defendant Defendant Citron Pharma, LLC ("Citron") is yet another Delaware limited liability company with its principal place of business in New Jersey, but Citron's principal place of business is in East Brunswick.  Citron is defined to include its managers, officers, employees, and agents acting on its behalf.

193.    Throughout the Relevant Period, Citron directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least fosinopril HCTZ and glyburide.

**Dr. Reddy's Laboratories, Inc.**

194.    Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is yet another Delaware corporation with its principal place of business in New Jersey, but Dr. Reddy's principal place of business is in Princeton.  Dr. Reddy's is defined to include its managers, officers, employees, and agents acting on its behalf.

195.   Throughout the Relevant Period, Dr. Reddy's directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following drugs:  divalproex ER, meprobamate, and zoledronic acid.

**Fougera**

196.   Defendant Fougera Pharmaceuticals, Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York.  In 2012, Novartis International AG acquired Fougera.  Fougera is defined to include its managers, officers, employees, and agents acting on its behalf.

197.   Throughout the Relevant Period, Fougera directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following drugs:  clobetasol propionate, desonide, econazole, and lidocaine-prilocaine.

**Glenmark Pharmaceuticals, Inc., USA**

198.   Defendant Glenmark Pharmaceuticals, Inc., USA ("Glenmark") is yet another Delaware corporation with its principal place of business in New Jersey, but Glenmark's principal place of business is in Mahwah.  Glenmark is defined to include

its managers, officers, employees, and agents acting on its behalf.

199. Throughout the Relevant Period, Glenmark directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least fosinopril HCTZ and pravastatin.

## Greenstone, LLC

200. Defendant Greenstone LLC ("Greenstone") is a limited liability corporation, whose principal place of business is Pfizer's New Jersey campus at 100 Route 206 in North Peapack. Greenstone is a wholly-owned subsidiary of Defendant Pfizer Inc. ("Pfizer," described in more detail below), and has at all relevant times operated as the generic drug division of Pfizer. Greenstone is defined to include its managers, officers, employees, and agents acting on its behalf.

201. Greenstone operates as an *alter ego* of Pfizer: as set forth in more detail below, Pfizer directly controls the operations of its wholly-owned subsidiary, which takes no significant action without the knowledge of its boss, Pfizer (including, for example, as also set forth in more detail below, increasing the price of the Azithromycin antibiotic) – a master-and-servant relationship that makes the two companies indistinguishable.

202.    There are other ways in which the operations of Pfizer and Greenstone are mixed and in which Greenstone lacks the independence that characterizes a non-*alter ego* relationship:  most of Greenstone's workers are actually employed by Pfizer's Essential Health Division, including Greenstone's President, and Greenstone relies on Pfizer for financial analysis, human resources and employee benefit purposes.

203.    Throughout the Relevant Period – at the direction and under the control of Pfizer as its alter ego – Greenstone directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least azithromycin, cabergoline, celecoxib, diclofenac, disopyramide phosphate, doxazosin mesyltate, ethosuximide, fluconazole, gabapentin, medroxyprogesterone, nadolol, piroxicam, and tolterodine tartrate.

**Heritage Pharmaceuticals, Inc.**

204.    Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is another Delaware corporation with its principal place of business in Mahwah, New Jersey. Heritage is defined to include its managers, officers, employees, and agents acting on its behalf.  In April 2011, Emcure (a pharmaceutical company based in India) acquired Heritage.

205.   Throughout the Relevant Period, Heritage directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following drugs:   acetazolamide, doxy DR, fosinopril HCTZ, glipizide, glyburide, glyburide-metformin, leflunomide, meprobamate, nimodipine, nystatin, paromomycin, propranolol, theophylline ER, verapamil, and zoledronic acid.

**Lannett Company, Inc.**

206.   Defendant Lannett Company, Inc. ("Lannett") is another Delaware corporation, but its principal place of business is in Philadelphia, Pennsylvania.  Lannett is defined to include its managers, officers, employees, and agents acting on its behalf.

207.   Throughout the Relevant Period, Lannett directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following drugs:  baclofen, digoxin, doxycycline, levothyroxine, and ursodiol.

**Lupin Pharmaceuticals, Inc.**

208. Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is another Delaware corporation, but its principal place of business is in Baltimore, Maryland. Lupin is defined to include its managers, officers, employees, and agents acting on its behalf.

209. Throughout the Relevant Period, Lupin directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold at least one Price-Fixed Generic Drug in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least pravastatin.

**Mayne Pharma USA, Inc.**

210. Defendant Mayne Pharma USA, Inc. ("Mayne") is yet another Delaware corporation with its principal place of business in New Jersey, but Mayne's principal place of business is in Paramus. Mayne is defined to include its managers, officers, employees, and agents acting on its behalf.

211. Throughout the Relevant Period, Mayne directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold at least one Price-Fixed Generic Drug in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least doxy hyclate DR.

**Mylan**

212.   Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.  Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.  It is a subsidiary of Mylan Inc.  Mylan Pharmaceuticals, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

213.   Mylan Inc. and Mylan Pharmaceuticals, Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company.  Unless addressed individually, Mylan Inc. and Mylan Pharmaceuticals, Inc. are collectively referred to herein as "Mylan." Mylan is defined to include its managers, officers, employees, and agents acting on its behalf.

214.   Throughout the Relevant Period, Mylan directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following drugs:  albuterol, amitriptyline, benazepril HCTZ, clomipramine, digoxin, divalproex ER, doxy hyclate, doxy DR, glipizide, levothyroxine, propranolol, and verapamil.

**Par**

215.    Defendant Par Pharmaceutical, Inc. ("PPI") is a New York corporation with its principal place of business in Chestnut Ridge, New York.

216.    Defendant Generics Bidco I, LLC ("Generics Bidco") is a Delaware company with its principal place of business in Huntsville, Alabama.  Generics Bidco formerly conducted business as Qualitest Pharmaceuticals ("Qualitest").

217.    Defendant DAVA Pharmaceuticals, LLC ("DAVA") is yet another Delaware corporation with its principal place of business in New Jersey, but DAVA's principal place of business is in Fort Lee.

218.    PPI, Generics Bidco and DAVA are wholly-owned subsidiaries of Endo International plc ("Endo"), an Irish corporation with its principal place of business located in Dublin, Ireland, and its U.S. headquarters located in Malvern, Pennsylvania.

219.    PPI, Generics Bidco and DAVA collectively do business as Par Pharmaceutical. Unless addressed individually, Endo, PPI, Generics Bidco, DAVA and Qualitest are collectively referred to herein as "Par."  Par is defined to include its managers, officers, employees, and agents acting on its behalf.

220.    Throughout the Relevant Period, Par directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the

following drugs:  amitriptyline, baclofen, digoxin, divalproex ER, doxy hyclate, and propranolol.

**Perrigo**

221.   Defendant Perrigo New York, Inc. ("Perrigo") is another Delaware corporation, but its executive offices are in Allegan, Michigan, and its primary business location is in the Bronx, NY.  Perrigo is a subsidiary of Perrigo Company, plc, an Irish company.  Perrigo is defined to include its managers, officers, employees, and agents acting on its behalf.

222.   Throughout the Relevant Period, Perrigo directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold at least one Price-Fixed Generic Drug in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least clobetasol propionate, desonide, and econazole nitrate.

**Pfizer**

223.   Defendant Pfizer, Inc. ("Pfizer") is another Delaware corporation, with its with its principal place of business at 235 East 42nd Street in New York, New York, and as described above, is the corporate parent of its wholly-owned subsidiary and alter ego, Greenstone, whose activities it directs.  Pfizer is defined to include its managers, officers, employees, and agents acting on its behalf.

224.   Throughout the Relevant Period, Pfizer directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold at least one Price-Fixed Generic Drug in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least azithjromycin, and fluconazole.

**Sandoz**

225.   Defendant Sandoz, Inc. is a Colorado corporation with its principal place of business in Princeton, New Jersey.  Sandoz, Inc. distributes the drugs that its parent, Sandoz Germany, develops and manufacturers.  In 2012, Sandoz, Inc. acquired and integrated Fougera into its US-based generic pharmaceutical business and Novartis International AG, based in Basel, Switzerland, acquired Sandoz, Inc. and Sandoz Germany.  Unless referred to individually, Fougera, Sandoz Inc., and Sandoz Germany are collectively referred to herein as "Sandoz."  Sandoz is further defined to include its managers, officers, employees, and agents acting on its behalf.

226.   Throughout the Relevant Period, Sandoz directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following:   amitriptyline, benazepril HCTZ, clobetasol propionate, clomipramine,

desonide, fosinopril-hydrochlorothiazide, lidocaine-prilocaine, levothyroxine sodium, and pravastatin.

**Sun**

227.    Defendant Sun Pharmaceutical Industries, Inc. ("SPII") is a Michigan corporation with its principal place of business in Cranbury, New Jersey.  SPII is a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd. ("Sun Pharma"), an Indian corporation, which also owns a majority stake in Taro Pharmaceutical Industries, Ltd., and Taro's U.S. subsidiary, Taro Pharmaceutical USA, Inc.

228.    Beginning in 1997, Sun Pharma began a series of investments in Caraco Pharmaceutical Laboratories Ltd. ("Caraco") and in 2013 acquired 100% of Caraco and merged it into SPII to become Sun Pharma's US operations for generic pharmaceutical products.

229.    In 2012, SPII acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia.  Until at least June of 2016, URL and Mutual operated a pharmaceutical manufacturing facility in Philadelphia.  On or about April 28, 2015, URL was merged with Mutual.

230.    Defendant Mutual is a Delaware corporation with its principal place of business located in Philadelphia, PA. It is a wholly-owned subsidiary of SPII.  Many of the pharmaceutical products sold and distributed throughout the United States during

the Relevant Period by SPII, URL and Mutual were marked with the trade name "MUTUAL" on the pill or capsule.

231. Defendant Taro Pharmaceuticals U.S.A., Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York. Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli entity, which in turn is majority-owned by Sun Pharma. Unless referred to individually, Taro, SPII, URL, and Mutual are collectively referred to herein as "Sun." Sun is defined to include its managers, officers, employees, and agents acting on its behalf.

232. Throughout the Relevant Period, Sun directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following: albuterol, digoxin, doxy hyclate, nimodipine, nystatin, and paromomycin.

**Teva**

233. Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is another Delaware corporation, principal place of business in North Wales, Pennsylvania. It is a subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity.

234. Defendant Barr Pharmaceuticals, LLC ("Barr") is a Delaware limited liability company with its principal place of business in North Wales, Pennsylvania. Barr is a wholly-owned subsidiary of Teva USA, which acquired Barr (then called Barr

Pharmaceuticals, Inc.) in 2008.

235.  Defendant PLIVA, Inc. is a New Jersey corporation with its principal place of business in East Hanover, New Jersey.  PLIVA is a wholly owned subsidiary of Teva USA, which acquired the PLIVA assets as part of the Barr acquisition.  Unless referred to individually, Teva USA, Barr, and PLIVA are collectively referred to herein as "Teva."  Teva is further defined to include its managers, officers, employees, and agents acting on its behalf.

236.  Throughout the Relevant Period, Teva directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold at least one Price-Fixed Generic Drug in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least : acetazolamide, baclofen, fluocinonide, glipizide, glyburide, glyburide-metformin, leflunomide, nystatin, pravastatin, propranolol, and theophylline ER.

**Upsher**

237.  Defendant Upsher-Smith Laboratories, LLC (f/k/a Upsher-Smith Laboratories, Inc.) ("Upsher-Smith" or "Upsher") is a Minnesota limited liability company with its principal place of business in Maple Grove, Minnesota.  Upsher is defined to include its managers, officers, employees, and agents acting on its behalf.

238.  Throughout the Relevant Period, Upsher directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold

at least one Price-Fixed Generic Drug in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least baclofen and propranolol.

## West-Ward Pharmaceuticals Corp.

239.   Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") is yet another Delaware corporation with its principal place of business in New Jersey, but West-Ward's principal place of business is in Eatontown.  West-Ward is defined to include its managers, officers, employees, and agents acting on its behalf.

240.   Throughout the Relevant Period, West-Ward directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold at least one Price-Fixed Generic Drug in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least digoxin and doxy hyclate.

## Wockhardt USA LLC

241.   Like Actavis, Defendant Wockhardt USA LLC ("Wockhardt") is a Delaware limited liability company  with its principal place of business in Parsippany, New Jersey, at 20 Waterview Boulevard.  Wockhardt is further defined to include its managers, officers, employees, and agents acting on its behalf.

242.    Throughout the Relevant Period, Wockhardt directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold at least one Price-Fixed Generic Drug in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least clobetasol and enalapril maleate.

**Zydus Pharmaceuticals (USA), Inc.**

243.    Defendant Zydus Pharmaceuticals (USA), Inc. ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, NJ.  Zydus is defined to include its managers, officers, employees, and agents acting on its behalf.

244.    Throughout the Relevant Period, Zydus directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold at least one Price-Fixed Generic Drug in Nassau County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least acetazolamide, divalproex ER, and pravastatin.

## VI.    CO-CONSPIRATORS

**Ascend**

245.    Ascend Laboratories, LLC ("Ascend") is a New Jersey limited liability company  with its principal place of business, like Defendants Actavis and Wockhardt,

in Parsippany, New Jersey.  During the Relevant period, Ascend marketed and sold generic pharmaceuticals in this District and throughout the United States.

**Unknown Co-Conspirators**

246.    Various other persons, firms, corporations, and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein.  In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.  Plaintiffs reserve all of their rights to amend this Complaint, including naming additional co-conspirators and adding additional allegations regarding them as they are discovered.

## VII.   INTERSTATE AND INTRASTATE TRADE AND COMMERCE

247.    During the Relevant Period, Defendants sold and distributed generic drugs in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in in Nassau County and throughout New York State and the United States.

248.    Defendants' and their co-conspirators' conduct, including the marketing and sale of generic drugs, took place within the United States and has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States, and in particular between New York State, including the Plaintiff Counties, and other States.

249.   Defendants' anticompetitive conduct occurred in part in trade and commerce as set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within New York State and Plaintiff Counties were foreclosed from offering less expensive generic drugs to Plaintiffs.  The foreclosure of these less-expensive generic products directly impacted and disrupted commerce for Plaintiffs within New York and forced Plaintiffs to pay supra-competitive prices.

## VIII.  THE GENERIC DRUG INDUSTRY

### A.     Generic Drugs Are Commodity Products

250.   A generic drug has the molecularly identical active pharmaceutical ingredient ("API") as the equivalent brand name drug, and thus is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[19]  Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[20]  As a result, one generic version of a given drug can readily be substituted for a different generic version, making the generic pharmaceutical markets very price-sensitive in the absence of collusion.

251.   In a competitive market, generic drugs cost substantially less than branded drugs.  The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average,

---

[19] FDA Website, http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

[20] *Id.*

the retail price of a generic drug is 75 percent lower than the retail price of a brand-name counterpart."[21]   And that is a conservative estimate – according to the Federal Trade Commission ("FTC"), in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[22]  Mature generic markets typically have several manufacturers that compete for sales, which – especially since their products are legally required to be interchangeable with those of their competitors – keeps prices down to the competitive level.

252.   In 2015, generic drug sales in the United States were approximately $74.5 billion; approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.

253.   Generic drug price competition should provide, and in the past has provided, enormous savings in this enormous market to Plaintiffs, as well as to consumers, pharmacies, other drug purchasers, and state Medicaid programs.

254.   The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the "Hatch-Waxman Act," Pub. L. No. 98-417, 98 Stat. 1585.  The Hatch-Waxman Act streamlines the regulatory hurdles that generic drug makers must clear prior to marketing and selling generic drugs.   Generic drug

---

[21] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), available at https://www.cbo.gov/publication/21800.

[22] FTC, *Pay-For-Delay:  How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), available at http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.

manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

255.    Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions unless the prescribing physician orders otherwise by writing "dispense as written" or similar words on the prescription.

256.    Generic drugs are commodity products; each generic is required by law to be substitutable for another generic version of the same drug; each generic version of a given drug has a molecularly identical API.

257.    As a result of this legally-mandated fungibility, pricing is the main differentiating feature.  As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[23]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

258.    It is well-established that competition among generic manufacturers drives down prices.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales.  When lower-priced generics become available,

---

[23] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf.

the brand drug quickly loses market share as purchasers switch to the less expensive alternatives.  As the number of manufacturers increases, the price of a generic drug approaches the manufacturers' marginal cost.

259.   As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:



Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

260.   When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share.

261.   A recent government report confirmed this phenomenon in interviews with generic manufacturers:  "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base.  Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that

generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[24]

262.   When there are multiple generic manufacturers in an established generic market, prices should remain low and stable, and should not increase absent a market disruption.  That, however, is not what has been happening in the United States, including within Plaintiff Counties, since at least 2010, because of the actions of Defendants' cartel for generic pharmaceuticals.

## B.   Defendants' Cartel Agreement Includes All Generic Products

263.   As just discussed, and unlike their branded counterparts, generic drugs are commodities.  As a result, generic manufacturers – including Defendants here – are constantly making decisions to enter new markets and leave and re-enter existing markets.  In Defendants' cartel, these decisions are based in large part on who the competitors are and how co-operative these companies are with their co-conspirators.

264.   For example, in July of 2013, Defendant Sandoz was looking to implement a strategy that involved temporarily delisting ten products that they overlapped on with Defendant Taro.  Their strategy was for Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at

---

[24] U.S. Government Accountability Office Report:  *Generic Drugs Under Medicare* ("GAO Report") at 23, (August 2016), *available at* https://www.gao.gov/assets/680/679022.pdf

the higher price – a win-win for the erstwhile competitors, but a lose-lose for Plaintiffs and their taxpayers.

265.   Because of this overarching agreement, all Defendants are competitors with each other for ***every generic product*** that each of them made or sold that, at the time of sale, was not under a legal period of exclusivity, such as a patent or an award of exclusivity under the Hatch-Waxman Act.  Collectively, these products are referred to herein as the "Drugs at Issue."  The products identified by name in this Complaint are merely exemplars of the products that are at issue in this case; the full scope of this Complaint includes every generic product that was manufactured by any Defendant and purchased or reimbursed by any Plaintiff during the Relevant Period.

266.   For example, in August of 2015, Defendant Taro declined to bid on Etodolac Extended Release (ER) Tablets at a large supermarket chain where Defendant Zydus was the incumbent because, as Taro voiced internally, competing would have violated the rules of Defendants' cartel about "playing nice in the sandbox," so Zydus would likely retaliate and take share (*i.e.*, actually compete on price, albeit only temporarily and as a form of communication and punishment) from them on another product, such as what C.L., an analyst at Taro, identified as Warfarin Sodium Tablets. In addition, this pricing instability could spread to other products.  As C.L. explained in an internal e-mail, Zydus "could hit us [Taro] on Warfarin. Not worth a fight in the sandbox over 300 annual units for Etodolac."

267.   As discussed more fully below, both Etodolac ER and Warfarin were drugs where Taro had previously agreed with its competitors, including Teva and Zydus, to fix prices and allocate customers.  As these examples make clear, the inter-dependence among generic manufacturers transcends product markets as these companies make decisions not only based on what impact their actions will have in a given product market, but also on how those actions will impact other product markets where the competitors overlap, whether present or future markets.

268.   As a result of the actions by Defendants' cartel, for example, between July, 2013, and July, 2014, the prices of more than 1,200 generic medications increased an average of 448 percent.  A separate analysis conducted by Defendant Sandoz showed that during the calendar years 2013 and 2014, there were almost 1,500 examples of generic WAC prices more than doubling in that time, of which 178 increased by more than ten-fold.  During the year ending June 30, 2014, more than $500 million of Medicaid drug reimbursements were for *generic* drugs whose prices had increased by over 100% during that time – all of which were due to the actions of Defendants.  The cost of their cartel to American society, and particularly to Plaintiffs and Plaintiffs' taxpayers, is staggering.

269.   As described below, far more Defendants had the right (i.e., regulatory approval) to sell the Drugs at Issue than actually did so during the Relevant period.  And all Defendants could have obtained approval or otherwise acquired marketing rights (by, e.g., licensing) to sell the Drugs at Issue, had they chosen to do so.

270.   Although the process for obtaining approval to sell a generic drug can be long, every Defendant possesses great expertise in this area and has been through this process, successfully, multiple times.   Indeed, the core function of Defendants' businesses is to market and sell generic pharmaceuticals and, accordingly, Defendants are highly adept at obtaining access to the markets for generic pharmaceuticals, including acquiring regulatory approval and further including for the Drugs at Issue.

271.   Defendants gain access to generic pharmaceutical markets through at least three methods, all of which were employed by Defendants during the relevant time frame:

First, Defendants can go through the ANDA process to obtain approval from the FDA to sell a specific drug. Heritage and Dr. Reddy's, for example, applied for ANDA's relating to Zoledronic Acid (and, as described below, co-ordinated with each other while their applications were pending, to ensure that each would obtain a "fair share" of the market once the ANDA's were approved).

Secondly, Defendants can obtain existing ANDA's by purchasing them from companies that have ANDA's, or by acquiring the company that owns them. For example, in 2008, Teva acquired Barr, which had an ANDA for Acetazolamide capsules.

Thirdly, Defendants can license the use of an ANDA held by someone else. For example, during the relevant time frame, neither Glenmark nor Citron owned an

ANDA for any Drug at Issue, yet both were able to obtain rights to market Drugs at Issue via licensing arrangements.

272.   Table 2 shows some of the ANDA's owned or licensed by Defendants for some of the Drugs at Issue:

### Table 1:  Some of Defendants' ANDA's

| | | |
|---|---|---|
| Acetazolamide | Capsules | **Heritage, Teva, Zydus** |
| | Tablets | Actavis*, Heritage, **Lannett**, Sun, **Taro**, Teva* |
| Doxycycline Hyclate | Regular Release | **Actavis**, Citron, **Mylan, Par, Sun**, Teva*, **West-Ward**, Zydus |
| | Delayed Release | Actavis, **Heritage, Mayne, Mylan** |
| Doxycycline Monohydrate | | **Heritage, Lannett, Mylan, Par**, Sandoz*, Sun, Zydus |
| Fosinopril-HCTZ | | Actavis*, **Aurobindo, Citron, Glenmark, Heritage**, Mylan*, **Sandoz**, Sun*, Teva* |
| Glipizide Metformin | | **Heritage, Mylan**, Sun, **Teva**, Zydus |
| Glyburide | | Actavis, **Aurobindo, Citron, Heritage, Teva**, Zydus |
| Glyburide Metformin | | **Actavis, Aurobindo, Citron**, Dr. Reddy's, **Heritage, Teva***, Zydus |
| Leflunomide | | **Apotex, Heritage**, Sandoz*, **Teva** |
| Meprobamate | | Actavis, **Dr. Reddy's, Heritage**, Lannett*, Mylan*, Perrigo*, Sandoz*, Sun*, Taro, Teva*, West-Ward* |
| Nimodipine | | **Heritage, Sun** |
| Nystatin | Tablets | Actavis*, **Heritage**, Sandoz*, **Sun, Teva** |
| | Ointment | **Actavis, Perrigo, Sandoz** |
| | Cream | **Actavis, Par, Perrigo, Sandoz, Taro** |
| Paromomycin | | **Heritage, Sun** |
| Theophylline | | Actavis*, **Heritage, Teva** |
| Verapamil | | **Actavis, Heritage, Mylan**, Sun*, Teva* |
| Zoledronic Acid | | Actavis, Apotex, Aurobindo, **Dr. Reddy's, Heritage**, Mylan, **Par**, Sun, Teva, West-Ward |

                    *     = Discontinued
                **Bold** = Drug-specific agreement (see above Table 1)

Note that Table 2 includes "discontinued" ANDA's, which can be re-activated with relative ease.

273.   Table 2 shows some of the extent to which these Defendants can and do access the markets for Drugs at Issue. Defendants listed in bold type were the primary manufacturers during the Relevant period, but many more Defendants had or later obtained ANDA's for Drugs at Issue.  The competitive overlap of these Defendants is indisputable, examples of which are mapped below:



As in the preceding figure of example agreements and communications, this figure understates relationships between the Defendants in a number of ways:

First, the relationship map shows a single line between Defendants regardless of how many drugs for which they have common ANDA's.  For example, Par, Mylan and Sun have overlapping ANDA's for at least 3 formulations of Drugs at Issue (Doxycycline Hyclate, Doxycycline Monohydrate, and Zoledronic Acid) but the graphic shows only a single line between each of them; Mylan and Heritage have overlapping ANDA's for at least 7 formulations of Drugs at Issue, though the graphic shows only a single line between them;

Secondly, the graphic above is limited to ANDA's for formulations of just *some* of the Drugs at Issue. If it were expanded to include all of the drugs in the conspiracy, which is virtually all drugs in Defendants' portfolios of generic pharmaceuticals, the web of competitive overlap would be even denser.

Thirdly, the graphic does not capture Defendants' ability to seek out and license ANDA's, which essentially provides every Defendant with access to the markets for every generic drug for sale in the United States, including every Drug at Issue in this case.

### C.     Pricing in the U.S. Prescription Drug Industry

274.   In essence, the generic pharmaceutical supply chain is as follows: Manufacturers sell drugs to wholesalers.  Wholesalers sell drugs to pharmacies or to entities like Plaintiffs, who in turn dispense the drugs to end users.  Plaintiffs are thus

both direct and indirect purchasers from wholesalers: Plaintiffs purchase drugs directly from wholesalers and dispense them to their prisoners, and Plaintiffs also reimburse purchases from Plaintiffs' beneficiaries, such as employees, retirees, and Plaintiffs' Medicaid beneficiaries.

275. Sometimes, large corporations and/or government entities, such as Plaintiff Franklin, have their agreements and payments arranged and intermediated by middlemen known as Pharmacy Benefit Managers ("PBM's") – Plaintiff Franklin's PBM is ProAct, described above. In those cases, Plaintiffs still bear the economic loss of higher generic pharmaceutical prices resulting from the illegal conduct alleged herein.

276. Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious. Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC"). NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[25]

---

[25] CMS, *Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs* at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf

277.   NADAC is an average of the drug acquisition costs submitted by retail community pharmacies."[26]  In effect, NADAC is "a single national average."[27]  Thus, NADAC is a reliable way to track general price trends in the marketplace.

278.   Other reports are more easily manipulated by manufacturers to mislead purchasers and reimbursors who bear the ultimate economic burden of higher drug prices, such as Plaintiffs.  Drug manufacturers report supposed benchmarks—such as Wholesale Acquisition Cost ("WAC") and Actual Wholesale Price ("AWP")—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry.  But despite the obvious implications of their names, these price-points are not actual transaction costs; rather, they are the manufacturer's nominal sticker or list "price," which does not take into account discounts that are almost invariably provided, and thus are an imperfect measure of the true economic cost of purchase to the middlemen, such as pharmacies.

279.   The amount that an end-payer, such as Plaintiffs, will pay for a generic drug is typically determined with reference to a list price, such as WAC.  The end-payer pays an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee.

---

[26] *Id.* at 15.

[27] *Id.*

280.   Over time, third-party payers and PBM's have learned that these list prices can be substantially higher than the actual economic cost incurred to acquire the drugs, which meant that end-payers were paying more than simply the acquisition cost plus a small amount.

281.   To combat this, some third-party payers and PBM's have implemented their own proprietary benchmark prices—Maximum Allowable Costs ("MAC's")—that set the amounts they will pay pharmacies for some generic drugs.  An MAC caps the amount that an end-payer will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

282.   Third-party payers ("TPP's") and PBM's set the MAC of a drug based on several factors, one of which is believed to be the lowest actual cost of acquisition in the market for that generic drug.  So, for example, if there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices.

283.   A pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price.

284.   Those who bear an economic cost of the purchase, such as Plaintiffs, have an incentive to buy the least expensive available drug.  MAC prices incentivize middlemen, such as PBM's and pharmacies, to choose the lowest priced option, so a generic manufacturer that increases its price for a drug should expect to lose sales to a

competitor with a lower price. Consequently, in the absence of co-ordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a competitor's lower price) without incurring the loss of a significant volume of sales. A manufacturer can only raise its price if it knows its competitors will raise their prices, too – such as happened here, where they are conspiring.

## IX.   DEFENDANTS' OVERARCHING CONSPIRACY

285.   Defendants have participated in a long-running conspiracy to allocate market shares and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue. As detailed below, Defendants facilitated their conspiracy through personal connections formed through frequent movement within the industry, through frequent in-person meetings at various happy hours, dinners, lunches, golf outings, trade shows, and industry conferences (facilitated in part through most of the conspirators' location near the New York, Philadelphia, and the parts of New Jersey and eastern Pennsylvania that are between them), and through frequent direct communications in person, via chat and e-mail, and on the telephone (both voice and text).

286.   During the Relevant Period, inter-defendant communications were commonplace in the industry, and started as far back as 2006. By at least 2011, if not before, every Defendant implemented anti-competitive agreements to increase prices

and allocate the markets of at least the Drugs at Issue, and form most Defendants, many more than one.

287.   The foundational agreement among all Defendants was premised on the understanding that they are current or future competitors with each other across numerous markets for generic drugs. All of these Defendants market and sell multiple products.  The effectiveness of an agreement on any one drug would be limited and unstable without a broader agreement that encompassed other drugs, as well.

288.   For example, an agreement between two Defendants to raise prices or to allocate market share on one drug might not hold if those same two Defendants were engaged  in vigorous price competition on another drug, or a third manufacturer – not party to that agreement – entered the market with an intent and ability to compete on price, since the two conspiring manufacturers' higher prices would simply have the effect of shifting most or all market share to the third manufacturer, with the competitive price.  Defendants understood that in order to be at its most effective, their agreement needed to extend to multiple manufacturers and drugs – and it did.

289.   In addition, Defendants would sometimes swap one market (or a share of one market) in return for another (or a share in another), but always under the terms of the conspiracy set forth herein.

290.   In furtherance of their objective, Defendants developed the concept and language of "fair share" and—without any apparent sense of irony—being a "responsible competitor" who would "play nice[ly] in the sandbox," in which each

market participant (within and across multiple drugs) was able to obtain an allocated share of market sales without resorting to, or experiencing, price competition.

291.    Because Defendants are repeat players who routinely enter new markets but face the same competitors, their basic agreement—to eschew price competition and seek only a "fair share" of the market—became the "rules of the road" that governed their overarching conspiracy.  As described more fully below, Defendants' decisions whether and when to enter a market, how to price their drugs, and which customers to target, were made in accordance with their unlawful "fair share" conspiracy and agreement.

292.    From this broad agreement among all Defendants to market and sell the Drugs at Issue under a "fair share" understanding, sprang subsidiary agreements among the manufacturing Defendants relating to each of the Drugs at Issue.  The higher prices and overcharges for the Drugs at Issue resulted from Defendants' anti-competitive conduct and are directly traceable through the pharmaceutical distribution chain to end-payers, such as Plaintiffs.

293.    Table 1 lists a few examples of Defendants' drug-specific agreements:

**Table 2:  Examples of Defendants' Unlawful Drug-Specific Agreements**

| Acetazolamide | Capsules | Heritage, Teva, Zydus |
|---|---|---|
|  | Tablets | Lannett, Taro |
| Doxycycline Hyclate | Regular Release | Actavis, Mylan, Par, Sun, West-Ward |
|  | Delayed Release | Heritage, Mayne, Mylan |
| Doxycycline Monohydrate |  | Heritage, Lannett, Mylan, Par |

| Fosinopril-HCTZ | | Aurobindo, Citron, Glenmark, Heritage, Sandoz |
|---|---|---|
| Glipizide Metformin | | Heritage, Mylan, Teva |
| Glyburide | | Aurobindo, Citron, Heritage, Teva |
| Glyburide Metformin | | Actavis, Aurobindo, Citron, Heritage, Teva |
| Leflunomide | | Apotex, Heritage, Teva |
| Meprobamate | | Dr. Reddy's, Heritage |
| Nimodipine | | Heritage, Sun |
| Nystatin | Tablets | Heritage, Sun, Teva |
| | Ointment | Actavis, Perrigo, Sandoz |
| | Cream | Actavis, Par, Perrigo, Sandoz, Taro |
| Paromomycin | | Heritage, Sun |
| Theophylline | | Heritage, Teva |
| Verapamil | | Actavis, Heritage, Mylan |
| Zoledronic Acid | | Dr. Reddy's, Heritage, Par |

294.   Each Defendant, including the Defendants who did not manufacture the particular drug involved in each drug-specific sub-part of the conspiracy, was a party to the broad, overarching conspiracy to abide by the "fair share" agreement, which covered all Drugs at Issue.  The purpose and effect of these agreements was to lessen competition in the markets for each and all of the Drugs at Issue.

295.   The figure below shows some communications used to facilitate this conspiracy, illustrating its complex but integrated nature:



296.   This graphic actually **understates** the web of communications that facilitated Defendants' overarching conspiracy by showing a single line between Defendants, regardless of how many communications or drug-specific agreements they have.   For example, Aurobindo and Citron entered into at least three drug-specific agreements (relating to Fosinopril-HCTZ, Glyburide, and Glyburide Metformin) but there is only a single line between them.

297.   Similarly, although Teva and Glenmark communicated at least 94 times in a 13-month period (Table 4, infra), this is depicted as a single dotted line in the graphic. Teva and Zydus communicated at least 638 times in a 13-month period (Table 4, infra),

but there is no indication of this in the graphic, which instead shows a single solid line for the agreement between them relating to Acetazolamide.

298.   Moreover, the communications included here are likely incomplete; Plaintiffs do not yet have access to discovery materials, which will likely reveal additional conduct and communications in furtherance of the unlawful conspiracy.

299.   These communications (for example, between Teva and each of Dr. Reddy's, Glenmark, Lannett, Mayne, Par and Sandoz) underscore the overarching nature of the conspiracy: even Defendants that were not selling the same Drugs at Issue were communicating in furtherance of the conspiracy in order to lessen competition in the markets for all Drugs at Issue.

300.   Both the "fair share" agreement and the drug-specific agreements created a web of relationships and understandings among and between all Defendants that had the purpose and effect of lessening competition among Defendants for all the Drugs at Issue.

**A.      The Co-Operative Principle of "Fair Share" Governed Defendants' Cartel**

301.   In a competitive generic drug market, new drug providers normally price their product below the incumbents' price, in order to gain market share.  As a result, each subsequent entry into a generic market decreases prices as manufacturers compete for market share. As discussed in detail below, this did not happen for the Drugs at

Issue because of Defendants' illegal conspiracy, including using their "fair play" and "fair share" agreement to co-ordinate market share and pricing.

302.   Because application for entry into a generic market is ultimately a public process (*i.e.*, FDA notifies the public of successful ANDA applications), Defendants knew which manufacturers have approval to manufacture every generic drug sold.  This, in turn, enabled the cartel to monitor compliance with its terms and to punish defectors – just as the cartel was cheating Plaintiffs, so even the most co-operative cartel member faced the constant temptation to cheat its *compares* by grabbing market share at the expense of the cartel's pricing arrangement.

303.   In addition, with each of the Drugs at Issue, Defendants knew approximately when each of them would enter the market.  This created an incentive and opportunity to co-ordinate pricing and allocate these markets among themselves in order to raise or maintain prices and maximize profits, at the expense of Plaintiffs.

304.   The practice of contacting competitors to determine their market intentions—through in-person meetings, telephone communications, and/or other interactions—dates back to at least 2006.  For example, when Glazer began working at Heritage in early 2006, the then-head of sales, Konstantine Ostaficiuk, taught him the importance of speaking to competitors in order to figure out pricing and how to secure adequate customer volume without depressing prices market wide.

305.   Defendants understood and engaged in the practice of contacting their competitors when they were preparing to enter a particular generic market so that they

could allocate the market according to their "fair share" agreement.  Reaching out to competitors was part of the "tool kit" used in the ordinary course of business.

306.   "Fair shares" were allocated to Defendants within a particular drug market based upon the number of competitors in the market and the timing of their entry into the market. Traditionally, the first entrant to the market received the largest share of the market, and each subsequent entrant received a progressively smaller share. This system aimed to allocate to each Defendant a "fair share" of the market without depressing prices.  As detailed below, through this overarching conspiracy, Defendants were able to raise prices and/or enter the market at elevated prices.

307.   The "fair share" agreement was so ingrained that some of Defendants' account managers and sales teams viewed contacting their counterparts at other companies—including discussubg market allocation and/or price increases—as part of the normal course of business.

308.   Defendants understood and agreed to the "rules of the road" and that they needed to "play nice in the sandbox" to participate in, maintain, and enforce the continued participation of others in their cartel.  This understanding meant that Defendants did not compete with each other on price and did not take advantage of another Defendant's price increase by providing a lower bid to "steal" the customer.

309.   Defendants referred to their participation in this scheme, and keeping prices elevated, as "playing nice in the sandbox."  For example – as discussed more fully below – in December of 2014, Defendant Teva was approached by a large retail

customer on behalf of Defendant Greenstone. The customer indicated that Greenstone was entering the market for Cabergoline and was seeking to target specific customers. The customer specifically requested that Teva give up a large customer to the new entrant and indicated that "Greenstone has promised to play nice in the sandbox." After discussing the matter internally, a Teva representative responded to the customer: "[t]ell Greenstone we are playing nice in the sandbox and we will let them have [the targeted customer.]."

310.    The concept of "fair share" was not limited to a specific drug. Rather, the concept of "fair share" extended across (at least) the Drugs at Issue. Defendants that "played fair" and maintained a "fair share" would benefit from the overarching conspiracy as a whole, even if Defendants would occasionally "lose out" on one specific drug.  Customers in one generic drug market were sometimes traded for customers in a different generic drug market, so that fair shares could be allocated across the larger market of generic competition generally.

311.    In other instances, competitors would support a price increase for one drug with the understanding that their competitors would support a price increase for a different drug.  Defendants who undercut other Defendants' prices were seen as "not playing fair" and "punishing" a competitor, which was contrary to the "fair share" agreement.

312.    Defendants routinely and readily agreed to follow or not to compete on price increases for a number of generic drugs.  Additionally, when customers requested

new bids in response to price increases instituted from other Defendants, the Defendant-competitors spoke to each other and devised strategies for responding without undermining pricing. Consequently, consistent with the interests of Defendants' cartel and in furtherance of its unlawful conspiracy, Defendants sometimes refused to bid or provided a cover bid that allowed a competitor's price increase to succeed, injuring Plaintiffs by forcing them to pay significantly more for the Drugs at Issue than they would have in the absence of the conspiracy.

## B. Sales Managers Played a Key Role in Implementing the Conspiracy

313. National Account Managers ("NAM's") direct the sales force within the generic pharmaceutical industry. Although Defendants' NAM's supposedly competed for the same customers, they also developed close relationships with each other. Defendants' NAM's frequently met with each other in various social settings, which made it easy to exchange competitive information.

314. Moreover, many of the NAM's and other marketing and sales personnel employed by Defendants worked at multiple companies—including other Defendants—during their careers. These employees maintained contact with people at their prior employers, which facilitated the conspiratorial agreements.

315. For example, Susan Knoblauch worked at Defendant Sun for nearly a decade before moving to a different sales position at Defendant Citron. Beth Hamilton worked at Defendant Apotex before moving to Defendant Mayne. Heritage's Daniel

Lukasiewicz began his career at Defendant Aurobindo, moved to Defendant Zydus and then to Defendant Heritage.

316.   This familiarity encouraged further collusion.  For example, as discussed below, in the spring and summer of 2014, Heritage's Lukasiewicz—at the direction of CEO Glazer—reached out to Aurobindo, his former place of employment, to co-ordinate pricing on Glyburide, Glyburide-Metformin and Fosinopril-HCTZ.

317.   Similarly, Teva's Director of Strategic Customer Marketing, Nisha Patel ("Patel"), met Heritage's then-Sr. Vice President Malek when she worked at Amerisource Bergen, which was a Heritage customer whom Malek managed.  When Patel moved to Defendant Teva in April of 2013, she contacted Malek to determine which generic drug products Teva sold that overlapped with generic drugs sold by Heritage so that they could co-ordinate pricing.  As detailed below, Malek and Patel used their relationship to orchestrate a number of price increases throughout the Relevant Period—some led by Teva, others led by Heritage.

318.   Malek and Patel's communications were valued and accepted by Malek's supervisors.  For example, in April of 2014, Malek and Glazer met with the CEO (Satish Mehta) and President Vikas Thapar) of Emcure, Heritage's parent, to discuss potential price increases for several drugs.  During that meeting, Heritage's Malek told Emcure's Mehta and Thapar about his contact at Teva, Nisha Patel.  Malek, who already had been discussing price increases for Nystatin with Patel since mid-2013, told them that Patel could be a vehicle for communicating with Teva about price increases and customer

allocation. Mehta and Thapar approved of Malek's strategy to co-ordinate prices and allocate customers with Teva.

319.    Defendants' geographic proximity to each other – at least 41 different generic drug manufacturers are concentrated between the New York City and Philadelphia metropolitan areas, including Defendants Actavis, Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage, Lannett, Par, Perrigo, Sandoz, Sun, Taro, Teva, West-Ward, Zydus and co-conspirator Ascend – facilitated Defendants' frequent in-person meetings at "industry dinners" and other social events. These events provided Defendants with additional opportunities to collude.

320.    Just as Scottish professor and economist Adam Smith commented it was inevitable over 200 years ago,[28] Defendants took advantage almost constant opportunities to interact with each other at trade shows and conferences to further their illegal conspiracy. These contacts were encouraged by Defendants' management. For example, Heritage's Malek expressly directed Heritage's NAM's to have pricing communications with competitors at trade association meetings.

321.    Trade shows and customer conferences were so abundant within the industry that during a 41-week period between February 20, 2013 and December 20,

---

[28] "People of the same trade seldom meet together, even for merriment and diversion but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices." Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations.* London, 1776.

2013, there were 44 different trade shows where Defendants had the opportunity to meet and collude with each other. See Exhibit 1 (Trade Association Attendance).

322.   Trade shows were not the only place where Defendant's personnel communicated with one another.  Defendants also had their own events and activities that presented numerous opportunities for sharing competitive information.  For instance, certain sales representatives, including those employed by Defendants, regularly met for what was referred to as "Girls Night Out" ("GNO") or "Women in the Industry" meetings or dinners which were used as a place to meet with competitors and discuss competitively sensitive information.  Some of these meetings were organized by Anne Sather, a Heritage NAM who resides in Minnesota. While GNO participants were largely salespeople residing in the area, sales representatives from out of the area also were aware of these dinners and were included in GNO when they were in the area.

323.   The types of inter-competitor contacts that transpired at GNO's were consistent with the types of contacts salespeople at Defendants were expected to have. For instance, since at least 2012, Heritage's Malek frequently instructed his NAM's to contact competitors to find out what they were doing.  This conduct was so common in the industry that Malek did not view inter-competitor communications as unusual.

324.   In addition to their regular meetings in person, Defendants used text messages, phone calls, and messages passed through third-party services such as LinkedIn to facilitate their conspiratorial communications.

### C.     Defendants Frequently Communicated Directly and Privately

325.   Between July 1, 2013 and July 30, 2014, senior sales executives and other individuals with pricing authority at Heritage and at Teva spoke with sales representatives of nearly every other U.S.-based corporate Defendant by telephone and/or text message on multiple occasions.

326.   During a one-year period, Heritage had at least 513 contacts with personnel at Actavis, Apotex, Ascend, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Teva, and Zydus.

327.   During that same one-year time period, Teva had at least 1,501 contacts with personnel at Actavis, Apotex, Ascend, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Teva, and Zydus.  Tables 3 and 4, below, tally some examples of these communications:

**Table 3: Heritage Phone/Text Conspiracy
Communications July 1, 2013 - July 30, 2014**

|  | July 2013 | Aug 2013 | Sep 2013 | Oct 2013 | Nov 2013 | Dec 2013 | Jan 2014 | Feb 2014 | Mar 2014 | Apr 2014 | May 2014 | Jun 2014 | Jul 2014 | Year TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis |  |  |  |  |  |  |  |  |  | 2 |  |  |  | 2 |
| Apotex |  |  |  |  |  |  |  |  |  |  | 17 | 2 | 1 | 20 |
| Ascend |  |  |  |  |  |  |  |  |  | 1 |  |  |  | 1 |
| Aurobindo |  |  |  |  | 1 | 1 |  | 1 |  | 5 | 2 | 1 | 3 | 14 |
| Citron |  |  |  | 6 | 1 | 12 |  | 7 | 1 |  | 2 | 29 | 52 | 110 |
| DRL | 1 | 6 | 3 | 2 |  |  |  |  | 1 | 5 | 3 |  |  | 21 |
| Glenmark |  |  |  |  |  |  |  |  | 1 |  |  |  | 3 | 4 |
| Lannett |  | 35 |  | 27 |  |  | 21 | 8 |  | 3 | 3 | 14 | 2 | 113 |
| Mayne |  |  |  |  |  |  | 1 |  | 2 | 7 | 3 |  |  | 13 |
| Mylan | 3 | 1 |  |  | 1 |  | 1 |  | 2 | 8 |  | 2 |  | 18 |
| Par |  |  |  |  |  |  |  |  |  |  | 3 | 6 |  | 9 |
| Sandoz |  |  |  |  |  |  |  |  |  |  | 4 | 3 |  | 7 |
| Sun | 1 | 2 |  | 1 |  |  |  | 3 |  | 3 | 10 | 32 | 7 | 59 |
| Teva | 7 | 9 |  |  |  |  |  | 5 | 5 | 3 |  | 1 | 5 | 35 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Zydus** | | 61 | 19 | 6 | | | | | | | | 1 | 87 |
| | | | | | | | | | | | | | 513 |

## Table 4: Teva Phone/Text Conspiracy Communications July 1, 2013-July 30, 2014

| | July 2013 | Aug 2013 | Sep 2013 | Oct 2013 | Nov 2013 | Dec 2013 | Jan 2014 | Feb 2014 | Mar 2014 | Apr 2014 | May 2014 | Jun 2014 | Jul 2014 | Year TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Actavis** | | 11 | 16 | 37 | 11 | 35 | 25 | 14 | 36 | 30 | 63 | 13 | 43 | 334 |
| **Apotex** | 3 | 4 | | | | | | | | | | | | 7 |
| **Ascend** | | 3 | | | | | | | | | | | | 3 |
| **Aurobindo** | 17 | 5 | 3 | 15 | 8 | 10 | 7 | 7 | 6 | 6 | | | 5 | 89 |
| **Citron** | | | | 3 | 3 | 3 | | 1 | | 1 | | 1 | | 12 |
| **DRL** | 2 | | | | | | | | | 2 | 1 | 3 | 6 | 14 |
| **Glenmark** | 7 | 8 | 1 | 17 | 18 | 21 | 5 | 4 | 2 | | 3 | | 8 | 94 |
| **Heritage** | 7 | 10 | | | | | | 5 | 5 | 3 | | 1 | 5 | 36 |
| **Lannett** | | | | | | | | 16 | 13 | | | 1 | 13 | 43 |
| **Mayne** | 2 | | 2 | 1 | 1 | 2 | 4 | 5 | | | | 7 | | 24 |
| **Mylan** | 28 | 22 | 2 | 7 | | 12 | 6 | 1 | 1 | 1 | 7 | 1 | | 88 |
| **Par** | | | 4 | 4 | 3 | 16 | 1 | 18 | 6 | 9 | 11 | 14 | 3 | 89 |
| **Sandoz** | 3 | 5 | 3 | | | | 7 | | 2 | 3 | | 1 | | 24 |
| **Sun** | | | | 2 | | 1 | | | | 1 | | | 2 | 6 |
| **Zydus** | 75 | 29 | 25 | 203 | 43 | 48 | 20 | 39 | 46 | 35 | 41 | 14 | 20 | 638 |
| | | | | | | | | | | | | | | 1,501 |

328.    These numbers are not, of course, the total volume of contacts between these Defendants during this period because they include only phone and text message records from some of Defendants' executives and salespeople.  It is clear, however, from the limited information adduced to date, that there was a widespread pattern of communications occurring simultaneously between Defendants that marketed and sold the Drugs at Issue.

329.    For example, and as detailed below, while Heritage's Associate Director of National Accounts Neal O'Mara was discussing pricing and market share of Zoledronic Acid with Vice President ("VP") of Sales and Marketing John Adams at Dr.

Reddy's, O'Mara and Heritage's Sr. NAM Matthew Edelson were also discussing pricing for Meprobamate with Dr. Reddy's. At the same time, Heritage's Sather was speaking with Director of National Accounts Tracy Sullivan at Lannett about pricing for Doxycycline Monohydrate ("Doxy Mono"). A month later, in April of 2013, Sun, Heritage, and Teva began discussing pricing for Nystatin. Similarly, in May 2013, Malek, with the assistance of Emcure CEO Mehta, began talking about the pricing for Doxycycline DR ("Doxy DR") with Defendant Rajiv Malik, President of Mylan.

330. From at least as early as the beginning of the Relevant period, Defendants conspired to raise prices, not just for the Drugs at Issue in this complaint.

331. For example, in the spring and summer of 2011, Defendants Taro and Perrigo imposed abrupt, large and nearly identical price increases for Nystatin external cream. Par joined the price increase by late summer. By October of that year, Actavis also joined the price increase. These Defendants maintained elevated prices thereafter. When Sandoz ramped up production two years later, in the summer of 2013, it imposed nearly identical prices for Nystatin cream.

332. Not long after the price increases for Nystatin cream in the summer of 2011, Actavis, Perrigo and Sandoz began to impose similar increases to Nystatin ointment. The price increases were large, abrupt and nearly identical, but staggered by approximately 6-month increments.

333. While the Nystatin cream and ointment increases were occurring, Defendants had the opportunity to meet and discuss pricing at the ECRM Retail

Pharmaceutical Conferences and NACDS Annual Meetings in 2011 and 2012. All four of these meetings were attended by Actavis, Par, Perrigo, Sandoz and Taro. *See* Exhibit 1.

334.    In the spring of 2012, Defendants Taro and Lannett tested the waters with a relatively small price increase for their Acetazolamide tablets. The increases were nearly simultaneous and nearly identical.

335.    In the summer of 2012, Heritage and Sun were discussing price increases for at least two more drugs: Nimodipine and Paromomycin.  Heritage and Sun were able to reach agreements through multiple emails, text messages and in-person communication at trade events, including at the 2012 ECRM  Retail Pharmaceutical Conference and the HDMA Business Leadership Conference. *See* Exhibit 1.  Actavis and West-Ward also attended 2012 conferences with Sun and Heritage, and in the following months joined Sun in dramatic Doxycycline Hyclate price increases.

336.    Heritage and Sun, as well as Defendants Actavis, Apotex, Aurobindo, Dr. Reddy's, Glenmark, Lannett, Mylan, Par, Perrigo, Sandoz, Taro, Teva, and Zydus, had the opportunity to discuss pricing and market share and otherwise further the conspiracy while attending the October 2012 GPhA meeting.  *See* Exhibit 1.

337.    By late 2012 and into early 2013, Sun increased list prices for Paromomycin consistent with Heritage's pricing, and Sun, Actavis and West-Ward all dramatically increased prices for regular release Doxycycline Hyclate.  Mylan increased prices for Verapamil tablets and allowed Heritage—a relative newcomer to the

market—to gain market share.   By March 1, 2013, Heritage had increased its Nimodipine list prices consistent with its agreement with Sun.

338.   Between January and March of 2013, representatives from Heritage and Dr. Reddy's spoke or texted multiple times, and representatives of all U.S. Defendants except Citron had attended at least one trade association meeting where Defendants had the opportunity to meet and discuss pricing and market allocation of multiple generic drugs.   *See* Exhibit 1.   During at least one of those trade association meetings, Dr. Reddy's Adams and Heritage's O'Mara discussed the pricing of at least Zoledronic Acid.

339.   On the heels of these communications and meetings, by April of 2013, Defendants had increased the prices of three additional Drugs at Issue:  Meprobamate (Dr.  Reddy's, Heritage), Nystatin tablets (Heritage, Sun), and Zoledronic Acid (Dr. Reddy's, Heritage).

340.   Sun implemented price increases for Nystatin tablets in order to facilitate Heritage obtaining a "fair share" of the market, just as Mylan had raised prices on Verapamil tablets to allow Heritage to gain share.   Defendants also raised prices on an additional Doxycycline Hyclate regular release product (Actavis, Sun, West-Ward).

341.   During this time-frame, Defendants also increased the prices of other drugs as part of their overarching conspiracy, including, for example, Albuterol (Mylan and Sun), Desonide (Actavis, Sandoz, Perrigo, Taro), and Propranolol capsules (Actavis, Breckenridge, and Upsher).

342.    Notably, even if a particular manufacturer was not directly involved in a price increase, it nonetheless monitored the increases carefully. For example, even though Heritage did not increase its price for Nystatin tablets in April 2013, it maintained close contact with Sun in the lead up to and following Sun's price increase. For example, the day after Sun increased its Nystatin prices, representatives for the two companies spoke for nearly 40 minutes.

343.    Defendants' pattern of conspiratorial communications continued through April and June of 2013 and beyond.  During April-June, 2013, Heritage spoke with at least Mylan, Teva, Sun, Dr. Reddy's and Lannett.  After a series of communications with Sun, Heritage doubled the price of Nimodipine.   Lannett and Par also independently spoke with each other.   Every U.S. Defendant except Mayne also attended at least one trade association meeting where Defendants had the opportunity to meet and discuss market share and pricing.  *See* Exhibit 1.

344.    Electronic contacts between Defendants increased dramatically starting in July of 2013. Between July and September of 2013, Teva and Heritage contacted their competitors via text or phone call hundreds of times.  *See* Tables 3 & 4, *supra*.

345.    Teva had at least 144 separate contacts with nine Defendants in July, 2013; at least 97 contacts with nine Defendants that August; and at least 56 different contacts with eight Defendants that September.  These discussions involved at least Doxycycline Hyclate, Doxycycline Monohydrate, and Nystatin tablets.

346.    Further, in addition to their phone and text contacts, between July and September of 2013, representatives from every U.S. Defendant (except Mayne) attended at least a second trade association meeting (besides at least one in April-June) where Defendants had the opportunity to discuss pricing and market allocation. *See* Exhibit 1.

347.    At least one of these meetings, the NACDS Total Store Expo, was attended by a number of individuals that are directly implicated in anticompetitive communications, including:  Heritage's Glazer, Malek, O'Mara, Sather and Edelson; Lannett's Sullivan; Mylan's VP of Sales, James Nesta ("Nesta" or "Jim Nesta") and Michael Aigner (Director, National Accounts); Sun's Susan Knoblauch (Sr. Manager of Sales); Aurobindo's Robert Cunard (CEO); and Apotex's Beth Hamilton (VP of Marketing).  Daniel Lukasiewicz, then employed by Zydus (and who would later join Heritage and assist in orchestrating various pricing agreements there), also attended. Sales representatives from Actavis, Dr. Reddy's, Glenmark, Par, Perrigo, Sandoz, Taro, Teva and West-Ward also attended the Expo.  As discussed below, at least Sather used this meeting as an opportunity to solidify agreements on pricing for multiple drugs.

348.    As was the case in prior months, price increases accompanied these inter-Defendant contacts.  By the end of the summer of 2013, Defendants Actavis and Mylan began to implement price increases for Verapamil capsules.  Defendants Heritage, Lannett, Mylan and Par were in frequent contact with each other and increased their Doxycycline Monohydrate prices.  During the same period, Heritage and Mylan were

frequently communicating in order to work out agreements relating to customers and pricing for Doxycycline Hyclate delayed release.

349.   During this time frame Defendants also increased the prices of various other drugs:  Clomipramine (Mylan, Sandoz, Taro); Divalproex (Dr. Reddy's, Mylan, Par, Zydus); Levothyroxine (Lannett, Mylan, Sandoz); and Pravastatin (Apotex, Glenmark, Sandoz, Teva, Zydus and MDL Defendant Lupin).  Concurrent with these price increases, Actavis entered the Desonide cream market at the same elevated prices that had already been implemented by Taro and Perrigo. Actavis, Taro and Perrigo maintained their elevated prices of Nystatin cream and ointment during the period, as well.

350.   Defendants remained in frequent contact between October and December of 2013.  In that three-month period, Teva and Heritage exchanged 582 text messages or phone calls with other Defendants.  *See* Tables 3 & 4.  Additionally, all but two Defendants attended at least one trade association meeting in the last quarter of 2013 and thus had ample opportunity to further their conspiratorial plans in person, without leaving an electronic footprint.  *See* Exhibit 1.

351.   Following these communications, Defendants implemented another price increase:  Acetazolamide tablets (Taro, Lannett).  Shortly after meeting at the GPhA Fall Technical Conference at the end of October, Taro and Lannett implemented large, nearly identical and nearly simultaneous price increases for Acetazolamide tablets.

352.   Defendants also raised the prices of two additional drugs:  Benazepril (Mylan, Sandoz) and Digoxin (Lannett, Mylan, Par, West-Ward and non-Defendant Impax).

353.   Continuing their conspiracy, Teva and Heritage contacted other Defendants by phone or text at least 348 times during the first quarter of 2014.  Teva was involved in the majority of the contacts.  *See* Tables 3 & 4.

354.   These communications were accompanied by numerous opportunities for Defendants to meet in person and thereby exchange information without leaving electronic footprints.  Representatives from every U.S. Defendant (except Glenmark) attended at least one trade association meeting during the first quarter of 2014, including the ECRM Retail Pharmacy Conference, which was attended by a number of Defendant personnel directly implicated in anticompetitive communications, from Heritage, Sun, and Apotex.  Representatives from Defendants Actavis, Citron, Dr. Reddy's, Lannett, Mayne, Par, Perrigo, Sandoz, Taro, Teva, West-Ward and Zydus also attended the conference.  *See* Exhibit 1.

355.   Following the price increases at the end of 2013, in January 2014, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.  Executives from Defendants Actavis, Aurobindo, Dr. Reddy's, Lannett and Sun, among others, attended.

356.    During this time frame (around the first quarter of 2014), Par also joined the Digoxin price and Sandoz joined the Desonide price increase, while Defendants Lannett, Par, Teva and Upsher-Smith imposed another price increase for Baclofen. Teva and Par's increases for Baclofen occurred after Teva and Par communicated at least 34 times during January and February.

357.    Between April and July of 2014, Teva and Heritage had 639 different phone or text contacts with their co-conspirators.  *See* Tables 3 & 4.  Teva, Actavis and Zydus were involved in almost half of those interactions—speaking or texting 259 times over the course of four months.  *See* Table 4.  And as Citron prepared to enter the market for numerous drugs, its contacts with Heritage greatly increased.  *See* Table 3. As discussed below, Heritage's communications involved at least 14 Drugs at Issue: Acetazolamide, Doxycycline Hyclate, Doxycycline Monohydrate, Fosinopril-HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline, and Verapamil.

358.    Defendants likewise advanced their conspiracy through attendance at (at least) four trade association meetings between April and July.  *See* Exhibit 1.  Several of Defendants' personnel directly implicated in anticompetitive communications attended at least one of these meetings, including:  Heritage's Glazer, Sather and O'Mara; Mylan's Nesta, Aigner and Jan Bell (Director National Accounts); Lannett's Sullivan; Sun's Knoblauch; Teva's Patel; Apotex's Hamilton; and Aurobindo's Cunard.  *Id.*  As discussed below, Heritage's Sather used the May, 2014, MMCAP National Member

Conference as an opportunity to confirm personally agreements on pricing for Drugs at Issue with Aurobindo (Fosinopril/HCTZ, Glyburide and Glyburide/Metformin), Sandoz (Fosinopril-HCTZ), and Lannett (Doxy Mono). Also during this time, Heritage, Mylan and Mayne co-ordinated Mayne's entry into the market for Doxycycline Hyclate (delayed release) so as not to erode pricing.

359. On June 1-4, 2014, Heritage's O'Mara and Sather, Teva's Patel, Mylan's Aigner, and Lannett's Sullivan all attended the HDMA Business and Leadership Conference. Nearly every Defendant had representatives attending this conference. *See* Exhibit 1. On June 3, while at the conference, Heritage's Sather had dinner and drinks with a number of Heritage's competitors at the Sandbar Restaurant, including personnel from Sandoz, Par, and Lannett—likely Tracy Sullivan. In advance of the dinner, one of the attendees, likely Sather, exchanged text messages with someone at Sandoz, who also was attending the meeting, and invited him to the dinner.

360. Following these trade association meetings, discussions among competitors picked up. Between June 3 and 10, 2014, an Aurobindo employee had three phone calls with a Sandoz employee and five phone calls and multiple text messages with Glenmark, likely to discuss pricing on Fosinopril-HCTZ.

361. On June 16, 2014, a different Glenmark employee called a different Aurobindo employee and they spoke for approximately 20 minutes. As discussed below, these discussions involved pricing agreements for generic drugs.

362.     On August 20, 2014, a Heritage employee exchanged text messages with a Sun employee, which described the pricing agreements reached with Actavis for Glyburide-Metformin and Verapamil.  Notably, Sun did not market or sell either drug at the time of this communication, thus highlighting the industry-wide nature of Defendants' conspiracy, regardless of whether a given Defendant was actually engaged in the manufacture or sale of a particular drug at issue, in this case, Glyburide-Metformin and Verapamil.  Sun needed to be kept apprised of drug-specific agreements between other Defendant co-conspirators—even for drugs Sun did not sell—because the efforts of all Defendants to inflate the prices of all Drugs at Issue were inter-related.

363.     Days later, the 2014 NACDS Total Store Expo, which was held in Boston from August 23-26, was attended by representatives from every U.S. Defendant.  A number of individuals directly implicated in anticompetitive communications attended, including from Heritage (Glazer, Malek, O'Mara, Edelson and Sather), Lannett (Sullivan), Mylan (Aigner and Nesta), Sun (Knoblauch), Teva (Patel), Apotex (Hamilton), Aurobindo (Cunard) and Mayne (Gloria Peluso-Schmid).

364.     Following these meetings and communications, Heritage began to announce price increases.  By July, Heritage had announced increases for Fosinopril-HCTZ, Glyburide, Acetazolamide (capsules), Glipizide-Metformin, Glyburide-Metformin, Leflunomide, Nystatin (tablets), Paromomycin, Theophylline and Verapamil (tablets).

365.   Thereafter, multiple Defendants either led or followed price increases for at least five Drugs at Issue:  Fosinopril-HCTZ (Aurobindo, Citron, Heritage, Glenmark, Sandoz); Leflunomide (Apotex, Heritage, Teva); Nystatin tablets (Heritage,  Sun); Paromomycin (Heritage, Sun); and Theophylline (Heritage, Teva).  Sandoz re-joined the Nystatin cream market at the elevated prices that already had been imposed by Actavis, Par, Perrigo, and Taro.

366.   Defendants also increased the prices of other Drugs at Issue during this time frame:  Amitriptyline (Mylan, Par, Sandoz); Clobetasol (Actavis, Perrigo, Sandoz, Taro and Wockhardt); Econazole (Perrigo, Taro); Fluocinonide (Actavis, Teva, and Taro); Lidocaine-Prilocaine (Sandoz); and Ursodiol (Actavis, Lannett).  In addition, Lannett joined the Baclofen price increase during this period.

367.   Defendants' frequent contacts and price increases continued in 2015. Defendants implemented additional price increases for Leflunomide and Verapamil capsules. Defendants also increased the prices of Propranolol tablets.  Prices for the Drugs at Issue remained elevated above competitive levels thereafter.

368.   The price increases implemented by Defendants during the Relevant Period were not the result of a free market. Rather, these price increases occurred because Defendants engaged in an overarching conspiracy to fix, raise, maintain, and/or stabilize prices of the Drugs at Issue.  As a result of Defendants' conspiracy, Plaintiffs paid more for Drugs at Issue than they otherwise would have and were harmed by Defendants' anticompetitive conduct.

## X.   ADDITIONAL DETAILS AND EXAMPLES OF, AS PART OF THEIR OVERARCHING CONSPIRACY, DEFENDANTS CONTINUING TO CONSPIRE TO FIX PRICES, ALLOCATE MARKETS AND RIG BIDS FOR THE DRUGS AT ISSUE

369.    From at least as early as 2011 until the present, Defendants unlawfully agreed to raise, stabilize, and/or maintain the prices of – and allocate customers and markets for – the Drugs at Issue, which includes all generic drugs made or sold by all Defendants that were not subject to a statutory exclusivity period.

370.    Additional details relating to some of the Drugs at Issue are as follows:

### A.    Nystatin

371.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Nystatin as follows:

372.    Nystatin, also known by the brand name Mycostatin®, *inter alia*, is a medication used to fight fungal infections.  It is produced in multiple formulations, including an external cream, an external ointment, and a tablet.  During the Relevant Period, Defendants Actavis, Par, Perrigo, Sandoz and Taro were the primary manufacturers of Nystatin external cream, while Defendants Actavis, Perrigo and Sandoz were the primary manufacturers of Nystatin ointment, and Teva, Heritage, and Sun (through Mutual) were the primary manufacturers for Nystatin tablets.

1.      **Nystatin External Cream**

373.    In the second half of 2011, Taro, Perrigo, Par, and Actavis all raised the list prices of Nystatin cream.  Taro and Perrigo increased their prices in very close succession in the late spring of 2011.  Par and Actavis followed the price increase in August and November of that year, respectively.  Sandoz joined the price increase when it re-entered the market in 2013.

374.    As late as 2009, Sandoz enjoyed approximately a 50% market share for Nystatin cream; but by the following summer (of 2010), Sandoz was effectively out of the market, and Taro was left with almost the entire market.  In 2009, Taro had approximately 40%, Perrigo had approximately 7% and Par and Actavis shared the remaining 3%.  Sandoz's market share declined through 2009 and into 2010; and Actavis and Par also were effectively out of the market.  While *de minimis* sales by Sandoz, Actavis, and Par continued, each had a market share of less than 1% by the spring of 2011; Perrigo had approximately a 4% share; and by May of that year, Taro had captured 96% of the Nystatin cream market.

375.    In June of 2010, Taro initiated an enormous price increase:  over 600%.  Yet rather than using this opportunity to compete on price in order to gain market share, Perrigo – enjoying, as mentioned above, barely 4% of the market – followed almost immediately Taro's increase and raised its own prices to nearly identical levels.  Perrigo ramped up production and gained some market share over the next two years,

but—as contemplated by the overarching "fair share" agreement—market prices remained elevated and stable.

376.   Further, there was no shortage of the raw materials or API in Nystatin cream, which is evidenced in part by Perrigo's increase in production.  Instead, this six-fold price increase was a direct result of the conspiracy at issue in this Complaint.

377.   In August, although it had only approximately 1% of the market, Par followed the Taro and Perrigo price increase in lockstep, also choosing to eschew price-competition. Par also managed to grow its market share over the next couple of years, but it did so without eroding the elevated prices imposed by Taro and Perrigo, just as the "fair share" agreement intended.

378.   In November, Actavis ramped up production of Nystatin cream and re-joined the market. It, too, immediately elevated its prices to match that of Taro, Perrigo and Par, also choosing to forgo price competition and the prospect of winning a larger share of the market.

379.   Even a fourth entrant into the Nystatin cream market did not cause prices to erode. Defendants' agreement was working and held firm in the face of the entrants of multiple-co-conspirators into the marketplace.

380.   Sandoz's share of the Nystatin cream market was close to 0% until the fall of 2013, at which point it ramped up production for re-entry into the market.  Like Perrigo, Par and Actavis, rather than compete on price in order to regain lost market share, Sandoz sold its Nystatin cream at the same price as its co-conspirators.  The

agreement was very much in effect: with even a fifth seller in the market, prices remained artificially inflated to the same cartel price.

381.   As depicted in the graph on the next page, Defendants' list price increases for Nystatin external cream were virtually identical, and once in place the prices remained stable and elevated thereafter:

**Figure 3**



382.   It is particularly indicative of the unlawfully collusive and conspiratorial nature Defendants' conduct that in 2009, prior to implementation of their anticompetitive scheme, Defendants had ***different*** prices for Nystatin cream; but once their anticompetitive pricing was in effect, their pricing was ***the same***.

383.   At the start of 2009, prior to Defendants' implementation of their anticompetitive scheme, Defendants Sandoz, Taro, and Actavis both sold Nystatin cream for approximately 0.1 $/unit, while Defendant Par sold Nystatin at double that

price (but only 10 cents per unit more), for $0.2/unit.  But once Defendants' conspiracy kicked in, **all** of the Defendants sold Nystatin price for $0.7/unit, merely tripling the cost of the product for Defendant Par, while Sandoz's, Actavis's, and Taro's cream septupled in price.

384.    Defendant Perrigo started at the same $0.1/unit price as Sandoz, Actavis, and Taro, but in early 2009, doubled its price to match Par – and then, in early 2011, more than tripled that higher price to reach the same elevated level as its competitors.

385.    Further, the graph shows that after a long period of relatively low and stable pricing for Nystatin external cream, Defendants implemented large, abrupt and nearly uniform price increases.  The AWP prices for Defendants' products also were elevated to essentially identical levels.

386.    AWP is useful as, *inter alia*, a reliable measure of relative cost.  In other words, while Figure 3 may not reflect the true economic cost of Nystatin cream in absolute terms, it does reflect the movement of the underlying true economic cost to purchasers and end-reimbursers, such as Plaintiffs, of Nystatin cream over time.

387.    As discussed above, no product shortages or other market changes can explain Defendants' price increases.  In a competitive generic pharmaceutical market, prices decline as the number of sellers increases.  Here, the elevated and stable pricing of Nystatin cream even as multiple sellers joined the market is consistent with anticompetitive conduct and inconsistent with competition.

388.   Throughout this period, Defendants had numerous opportunities to co-ordinate their pricing for Nystatin cream.  For example, Defendants had an opportunity to discuss pricing at the ECRM Retail Pharmacy Conference in March of 2011, which was attended by representatives from Actavis, Par, Perrigo, Sandoz, and Taro.  *See* Exhibit 1.

389.   The next month, in April, right before the price increases began, all Defendant manufacturers of Nystatin cream again gathered at the NACDS Annual Meeting.  The Nystatin cream manufacturers continued to meet at trade shows thereafter.

390.   For example, leading into and following Sandoz's price increase for Nystatin external cream, Sandoz had multiple opportunities to meet with other Defendants.  In April 2013, Sandoz was joined by Actavis, Par, Perrigo and Taro at the NACDS Annual Meeting.  Then, in June of 2013, representatives from these same companies attended the GPhA/FDA CMC Workshop in Bethesda, Maryland.   In August, all five Nystatin cream manufacturers converged again at the NACDS Total Expo in Las Vegas. These meetings were also attended by many other Defendants.

391.   The elevated prices of Nystatin cream that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more for Nystatin cream than they would have paid in a free and fair market.

392.   The unlawful agreement between Actavis, Par, Perrigo, Sandoz and Taro regarding Nystatin cream was part of Defendants' overarching conspiracy to restrain

trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### 2.     Nystatin External Ointment

393.   Defendants' conduct with respect to Nystatin external ointment followed the same pattern as their conduct with respect to Nystatin external cream.  In 2009, Sandoz had approximately 75% of the market, while Perrigo had 20% and Actavis had the remaining 5%.  From that point through the summer of 2011, Actavis and Sandoz reduced production until they were effectively out of the market. By the summer of 2010, Actavis had approximately a 0% market share, though *de minimis* sales appear to have continued, and by the summer of 2011, Sandoz's share the market was reduced to approximately 5%, down from 75% two years earlier.

394.   In June 2011, after Sandoz and Actavis had all but ceded the Nystatin ointment market, Perrigo implemented a large price increase—more than 300%.

395.   Five months later, Actavis ramped up production of Nystatin ointment. Rather than undercut Perrigo's elevated price in order to gain market share, Actavis hiked its list prices to nearly identical levels as Perrigo.  As part of the overarching "fair share" agreement and conspiracy among Defendants (and in contrast to the normal behavior in a competitive marketplace), the list prices and AWP price for Nystatin ointment remained virtually unchanged, even with the addition of a new seller in the marketplace.

396.   In the summer of 2012, this pattern repeated itself.  Sandoz ramped up its production of Nystatin ointment in June.  But rather than compete on price to regain its lost market share, Sandoz raised its list prices to nearly identical levels as Perrigo and Actavis.   Even with a third market participant prices remained the same, just as envisioned by Defendants' agreement.

397.   As depicted in the graph below, Defendants' list price increases for Nystatin ointment were virtually identical, and once in place, the prices remained stable and elevated:

**Figure 4**



Nystatin External Ointment: WAC per Unit

398.   As with Figure 3 (Nystatin cream), Figure 4 (Nystatin ointment) shows Defendants raising the price of this product by ***different amounts and different multiples*** to reach the same final price, which is consistent with collusion and inconsistent with the functioning of a competitive market.

399.   The graph shows that after a long period of relatively low and stable pricing for Nystatin ointment, Defendants implemented abrupt and virtually uniform price increases of approximately **300%** for Defendant Perrigo and by approximately **700%** for Defendants Actavis and Sandoz/Fougera.  AWP prices for these products also were elevated to nearly identical levels.

400.   No product shortages or other market changes can explain Defendants' price increases. The pricing conduct here is not consistent with competitive behavior. As multiple sellers enter the market, economic theory predicts that prices should decline. Yet, Nystatin ointment prices remained unchanged, which suggests an anticompetitive agreement among Defendants.

401.   Again, Defendants had the opportunity to discuss pricing of Nystatin external ointment at numerous industry events during the relevant period.  For example, in addition to other meetings, all Defendant manufacturers of Nystatin ointment attended the ECRM Retail Pharmacy Conferences and the NACDS Annual Meetings in 2011 and 2012.  *See* Exhibit 1.

402.   The elevated prices of Nystatin ointment that resulted from Defendants' anticompetitive conduct have injured Plaintiffs caused them to pay more than they would have paid in a free and fair market.

403.   The unlawful agreement between Actavis, Perrigo and Sandoz regarding Nystatin ointment was part of all Defendants' overarching conspiracy to unreasonably

restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### 3.     Nystatin Tablets

404.    In 2010 and 2011, the Nystatin oral tablet market was split between Teva and Sun.  Teva held approximately 60% of the market, while Sun held 40%.  During that time, Teva and Sun had nearly identical list prices for their Nystatin tablets.  Sun marketed and sold Nystatin tablets during the relevant period at least in part through its subsidiary, Mutual.

405.    In the summer of 2012, Heritage entered the market.  Rather than price its Nystatin tablets below that of the incumbent sellers, Heritage identically matched the list prices of Teva and Sun, consistent with the "fair share" agreement between them.

406.    As Heritage ramped up production, it reached out to Teva and Sun, and in April of 2013, Sun, Heritage, and Teva began discussing pricing for Nystatin tablets. By this point in time, Sun had accumulated a larger share of the market. Defendants therefore devised a plan to reallocate the shares:  Sun would implement a large price increase.  After Teva and Heritage obtained their "fair share" of the market, they would join Sun's price increase.

407.    On April 15, 2013, Defendants put their plan into action: Sun more than doubled its price for Nystatin tablets.  Sun, Teva, and Heritage had ongoing communications before, during, and after this increase. The day after Sun increased its

Nystatin prices, Sun Sr. Sales Manager Knoblauch called Heritage's NAM Sather and they spoke for approximately 40 minutes.

408.   Knoblauch and Sather regularly communicated throughout the summer of 2013.  For example, both Sather and Knoblauch attended the NACDS Total Store Expo in August 2013.  This trade association meeting, which also was attended by representatives from most U.S. Defendants except Mayne, provided an opportunity to meet in person and exchange competitive information.  *See* Exhibit 1.

409.   In June of 2013, Teva began internally discussing price increases for Nystatin tablets, contemplating when would be the appropriate time to join Sun's elevated prices.  But Teva needed to co-ordinate with Heritage.  Accordingly, on July 9, 2013, Teva's Patel called Heritage's Malek and they spoke for approximately 21 minutes. Malek knew Patel from her previous work at AmerisourceBergen. They spoke throughout July—with a nearly 10-minute call on July 23 and two calls on July 30. The second call on July 30 lasted almost a quarter of an hour.

410.   While Heritage's Malek was speaking with Patel at Teva, Heritage remained in contact with Sun. On July 30—the same day Malek spoke with Teva's Patel twice—Malek also spoke to Sun, for approximately 11 minutes.

411.   As these conversations continued, in late July of 2013, Teva placed Nystatin tablets on its list of potential price increases.

412.   Similarly, throughout the next month (August, 2013), Malek sent internal Heritage e-mails discussing drugs targeted for a price increase.  Nystatin tablets were

identified as one of those drugs.

413.    However, discussions between Heritage and Teva about a Nystatin price increase were temporarily tabled when Teva's Patel went on maternity leave on August 12, 2013.

414.    On February 4, 2014, Teva's Patel was back from maternity leave and contacted Heritage's Malek.  Malek returned her call the next day and the two spoke for more than an hour.  Upon information and belief, they discussed a price increase for at least the drugs Nystatin and Theophylline.  Teva had been considering price increases for both drugs since early 2014.

415.    Three days after that, on February 7, an unidentified employee of either Heritage or Teva created a spreadsheet identifying Nystatin and Theophylline as candidates for price increases.  Heritage's Malek and Teva's Patel continued discussing the possibility of such increases.

416.    Throughout February and March of 2014, Heritage's Malek and Teva's Patel had a series of phone calls discussing price increases for multiple drugs, including at least the pricing of Nystatin and Theophylline.

417.    Following these discussions, Teva implemented a price increase for Nystatin tablets with an effective date of April 4, 2014.  The increase more than doubled Teva's list price to a price nearly identical to Sun's.  Concurrent with this increase, Teva also implemented price increases for Theophylline.

418.    The early success in co-ordinating with Sun and Teva on Nystatin further

encouraged Malek.  During the week of April 14, 2014, he met with two Heritage employees and asked them to start analyzing the impact of price increases for numerous generic drugs, including at least thirteen Drugs at Issue:  Acetazolamide, Doxycycline Monohydrate, Fosinopril-HCTZ, Glipizide-Metformin, Glyburide,  Glyburide-Metformin,  Leflunomide,  Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline and Verapamil.

419.   In another example of the wide-ranging nature of Defendants' cartel agreement, where co-operation on one drug product was rewarded with co-operation on unrelated products (and, conversely, defection from the cartel's "rules of the road" on one product was punished with price-cuts on unrelated products), Heritage's Malek discussed all of this with Patel at Teva before introducing these market-wide price increases to the rest of his sales team.  For example, on April 15, 2014, Malek had a 17-minute phone conversation with Patel, discussing at least seven different Drugs at Issue: Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline.

420.   As Malek and Patel had already agreed in February, Teva would lead the price increases for Nystatin and Theophylline.

421.   During their conversation, Malek and  Patel  agreed that if Heritage increased prices for the other five Drugs at Issue—Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, and Leflunomide—Teva would increase its prices for these drugs, or at a minimum, would not offer lower prices to any of

Heritage's customers.

422.   Heritage's Malek and Teva's Patel spoke several times over the next several months to confirm their agreements on Nystatin and other drugs.  Malek also kept Patel updated on the progress of Heritage's proposed price increases.

423.   And, in addition to Heritage and Teva, these seven Drugs at Issue also were marketed and sold during the Relevant Period by Defendants Actavis, Apotex, Aurobindo, Citron, Mylan, Sun and Zydus, each of which was brought into the relevant drug-specific agreements.  This agreement by multiple manufacturers across numerous drugs was typical of the overarching conspiracy among all Defendants.  As demonstrated in the *quid pro quo* arrangements between Heritage and Teva, the various drug-specific agreements were interrelated and part of an overarching agreement to eliminate competition for the Drugs at Issue.

424.   On April 22, 2014, Heritage's Malek held a teleconference with his sales team.  On the call, Malek dictated a price increase strategy for the 13 Drugs at Issue identified above to Heritage's NAM's.  Prior to the conference call, Malek circulated a spreadsheet to his sales team, which identified each drug slated for a price increase, the competitors for each drug, and their respective market shares.

425.   This call was the start of additional pricing and market allocation discussions among Defendants and helped co-ordinate additional drug-specific agreements.  Members of Heritage's sales team were assigned to specific competitors for whom they had primary, but not exclusive, responsibility for communicating about

pricing and market share.  Malek took personal responsibility to communicate with Defendants Teva and Zydus, as well as co-conspirator Ascend.

426.    Anne Sather was assigned to Sun to reaffirm the agreement on Nystatin. Sather also spoke with Sun about Paromomycin and spoke with Actavis to confirm agreements on Glyburide-Metformin and Verapamil and with Lannett to confirm agreements on Doxy Mono.  She also was assigned Actavis and Lannett.  Her Heritage colleagues (Matt Edelson, Daniel Lukasiewicz, and Neal O'Mara), were responsible for pricing discussions with four other Defendants.

427.    On April 22, 2014, the same day Heritage held an internal meeting with its sales team to discuss a number of prices increases, Sather and Sun's Knoblauch spoke for more than 45 minutes and agreed to increase the prices of numerous drugs, including, Nystatin tablets.

428.    With respect to Nystatin, by this time, Sun already had raised its price and Teva had just announced that it was matching that price increase.  Sather and Knoblauch reaffirmed that Heritage, too, would follow the Nystatin price increase.

429.    Sather e-mailed Heritage's Glazer, Malek, Edelson, Rich Smith, and O'Mara immediately after her conversation with Knoblauch to report the agreements with Sun.  Glazer immediately responded to Sather, instructing her not to put this type of information in writing.  He then contacted her using his cell phone.

430.    During this time frame, Glazer directed Malek to call G.P. Singh, the President of Sun, to get further confirmation of Sun's pricing intentions. Ultimately,

Malek decided not to reach out to Singh, whom he had never met.

431.    Four days later, however, on April 26-29, 2014, Glazer attended the NACDS Annual Meeting where he had the opportunity to meet in person with G.P. Singh from Sun, as well as with representatives from Teva and nearly every other U.S. Defendant.  *See* Exhibit 1.

432.    On or about May 8, Malek requested an update on the status of Sather's negotiations with competitors. Sather confirmed her agreement with Sun.  The next day, Heritage had an internal call to discuss the status of the proposed price increases. Nystatin tablets were slated for a 95% increase.

433.    On June 23, the Heritage sales team had a meeting where they discussed the specific percentage amounts they would seek to increase on certain Drugs at Issue and their strategy for doing so.  Malek proposed the increases listed below for at least the following drugs:

(a)     Acetazolamide—75%.

(b)     Fosinopril-HCTZ—200% effective July 1, 2014.

(c)     Glipizide-Metformin—100% effective July 1, 2014.

(d)     Glyburide—200% effective July 1, 2014.

(e)     Nimodipine—48%.

(f)     Nystatin—95%.

(g)     Paromomycin—100%.

(h)     Theophylline—150%.

434.   One Heritage employee's notes about the June 23 call indicated that Heritage needed to promptly increase its Nystatin WAC price because Teva already had done so.

435.   Heritage had one final internal call to discuss price increases, including the price of Nystatin tablets, on June 25, 2014. While still participating in this internal call about pricing, Heritage's Sather exchanged text messages with Sun's Knoblauch, informing her of the details of Heritage's anticipated price increases.

436.   Similarly, on the same day, June 25, Malek had a 14-minute call with an individual—likely Teva's Patel—in which he reported that Heritage's price increase notices would be mailed on June 26 for Nystatin tablets and several other drugs for which Heritage and Teva had agreed to raise prices.

437.   On June 26, 2014, Heritage began telling its customers that it was increasing its prices for a variety of drugs, including Nystatin tablets.  Heritage issued prices increase letters for at least:

(1) Acetazolamide;

(2) Fosinopril-HCTZ;

(3) Glipizide-Metformin;

(4) Glyburide;

(5) Leflunomide;

(6) Nimodipine;

(7) Nystatin;

(8) Paromomycin; and

(9) Theophylline.

438.    By July, among the other price increases it implemented, Heritage increased its Nystatin oral tablet list prices to the identical level of Teva (and nearly identical to Sun). This affected Heritage's customers nationwide, including Plaintiffs.

439.    In accord with their agreement, Teva did not undercut Heritage's prices, even when approached by large potential customers. For example, on July 8, 2014, a large retail customer e-mailed a Teva representative, asking for a quote for Nystatin tablets because it recently was notified of a large price increase from its current supplier. Teva either did not provide a bid or provided a cover bid that allowed Teva and Heritage to maintain their anticompetitive agreement.

440.    The price increases of approximately 100% initiated by Sun and joined by Teva and Heritage occurred after a long period of relatively low and stable pricing for Nystatin tablets. The AWP prices for Defendants' products also were elevated to nearly identical levels. These prices remained stable and elevated above competitive levels thereafter.

441.    No product shortages or other market changes can explain Defendants' abrupt and nearly identical price increases.

442.    The elevated prices of Nystatin oral tablets that resulted from Defendants' anticompetitive conduct have injured Plaintiffs caused them to pay more than they would have paid in a free and fair market.

443.   The unlawful agreement between Teva, Sun and Heritage regarding Nystatin tablets was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### B.   Clonidine TTS Patch and Doxazosin Mesylate

444.   Doxazosin mesylate ("Doxazosin"), also known by the brand names Cardura® and Carduran®, is a quinazoline compound used to treat high blood pressure and urinary retention associated with benign prostatic hyperplasia.

445.   The Clonidine TTS Patch ("Clonidine-TTS"), also known by the brand name Catapres-TTS®, is a transdermal patch that administers such medicines to treat high blood pressure.

446.   Teva began marketing Clonidine-TTS in 2010, after brand manufacturer Boehringer Ingelheim's patent on Catapres-TTS had expired.

447.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Doxazosin and the Clonidine TTS Patch as follows:

448.   As of September, 2011, Mylan and Teva were at rough parity in the market for generic Clonidine-TTS, with Mylan having approximately 48.4% market share and Teva having approximately 44.4% market share.  At the end of 2011 and beginning of 2012, however, that relationship was changing.

449.   In November of 2011, Walgreens solicited Teva to provide a bid for its Clonidine-TTS business.  Teva was successful and took the Clonidine-TTS account at Walgreens from Mylan.  Two months later, in January of 2012, Cardinal Health, Inc. ("Cardinal") solicited a bid from Teva for a one-time-buy to cover what Teva assumed was a short-term supply issue that Mylan was experiencing.  A few days after Teva submitted its offer to Cardinal for the one-time-buy, Cardinal asked Teva to become Cardinal's primary supplier for ClonidineTTS.  Because Teva believed that Cardinal's request was prompted by Mylan having supply issues, Teva accepted and took over the primary position at Cardinal for Clonidine-TTS.  This would not have been a breach of the "rules of the road" of Defendants' cartel because Teva's bid did not erode prices and supplying a customer if their incumbent supplier was unable to do so was acceptable, so long as the cartel's prices were maintained.

450.   With the Walgreens and Cardinal business, Teva now had 65-70% of the Clonidine-TTS market; on February 10, 2012, a senior sales and marketing executive at Teva, who will be referred to in this complaint as K.G., told his colleagues to find out the extent of Mylan's supply issues.  Following these orders, that same day, David Rekenthaler ("Rekenthaler"), then Vice President of Sales for US Generics at Teva, called a senior national accounts executive at Mylan, who will be referred to in this Complaint as B.P., to find out about Mylan's supposed supply issues.

451.   Later that day, Rekenthaler reported back to his Teva colleagues that Teva's assumptions were incorrect and cautioned that Mylan might retaliate against Teva for taking more than its "fair share."

452.   Sure enough, shortly thereafter, Mylan challenged Teva's Clonidine-TTS business at McKesson Corp. ("McKesson")   To de-escalate the situation, Teva ultimately conceded the business – but this was not enough to bring Teva back into compliance with the "fair share" aspect of Defendants' overarching conspiracy, so in April, Mylan challenged Teva's Clonidine-TTS business at CVS to gain back additional market share and further signal its displeasure with Teva for taking the Cardinal business, a signal that Teva understood:   Teva backed off and conceded the CVS account to Mylan.

453.   But as shown throughout this Complaint, Defendants' overarching conspiracy was not limited to any single drug; rather, it spanned Defendants' entire portfolio of generic products.  As a result, misconduct from Defendants' cartel in one product line could be punished – or atoned for – in another.

454.   On May 4, 2012, just a few days after ceding CVS's Clonidine-TTS account to Mylan, Cardinal approached Teva about a different drug, Doxazosin. At the time, Mylan was the primary supplier for Doxazosin at Cardinal.   Cardinal representatives told Teva that Mylan was on backorder for one of the four Doxazosin dosage strengths until the end of June, but Cardinal wanted to move the entire Doxazosin line to Teva.

455.   Further illustrating this aspect of Defendants' overarching conspiracy, K.G. cautioned his colleagues that doing so would be a bad idea.   Rather than underbidding Mylan and taking this business, and thus eroding Doxazosin pricing towards the competitive level, Teva left Cardinal's Doxazosin business with Mylan.

456.   On the morning of September 28, 2012, Mylan's Jim Nesta and Teva's then-Director of National Accounts, Kevin Green ("Green") spoke by phone at least twice, once for four minutes and once for approximately a quarter of an hour.   On those calls, Nesta informed Green of Mylan's impending temporary exit from the Clonidine-TTS market.

457.   As expected, later in the day, Teva began getting solicitations from Mylan customers, such as Wal-Mart and CVS, seeking a bid from Teva for Clonidine-TTS because Mylan had just issued a temporary discontinuation notice.

458.   Mylan's temporary hiatus from the Clonidine-TTS market gave Teva the opportunity to raise prices and collusively reallocate the market at these inflated prices when Mylan re-entered the market.

459.   For example, in April, 2012, before Mylan had challenged Teva's Clonidine-TTS account at CVS, Teva's direct invoice price to CVS for the 0.1mg, 0.2mg, and 0.3mg Clonidine TTS was $22.13, $37.81, and $54.41, respectively.   Mylan's retaliation against Teva drove the prices for CVS down to below $10.49, $18.17, and $26.51 for those dosages, respectively.   Because of Mylan's exit from the market, however, in October of 2012 when Teva took back the CVS business back, Teva

charged CVS a direct invoice price of $33.28, $56.08, and $80.76, respectively –
significant increases not only above the competitive price, but above the original cartel
pricing that Teva was charging at the start of the year.

460.   Mylan and Teva maintained regular contact as former Mylan customers
came to Teva because of Mylan's supply issues with Clonidine-TTS. For example, Teva
submitted bids to CVS and Wal-Mart – which were ultimately accepted by those
companies – on October 4 and 5, 2012, respectively.  In the days leading up to those
bids, Teva and Mylan spoke repeatedly to ensure there were no misunderstandings that
could lead to competition and price cuts (as had happened earlier in the year), including
a one-minute call between Rekenthaler and B.P. and a five-minute call between Nesta
and Green, both on Oct. 1, and then on October 4, the day Teva submitted its CVS
bid, Nesta and Green spoke again, this time for 11 minutes.

461.   This time, there were no misunderstandings or harmful (to Defendants'
cartel) competitive bids for other cartel members' customers.  Instead, when, Mylan
relaunched Clonidine-TTS early the following year and began seeking its former market
share, Teva steered clear – of underbidding, but not of communicating with Mylan.
Instead, Teva remained in constant contact with its partner in crime.  In February and
March of 2013 alone, Teva and Mylan representatives called each other at least 33
different times and spoke for a total of nearly 2 hours and 45 minutes.

462.   For example, in early March of 2013, Mylan sought to secure the
Clonidine-TTS business at Econdisc. Rather than competitively bid for the business,

Teva chose to cede the Econdisc account to Mylan. By April, Teva had also retroceded McKesson back to Mylan, as well – at Teva's increased pricing, of course.

463.   A similar chain of events occurred with the CVS Clonidine-TTS account, as well.  While Teva ultimately retained the CVS account, there was no competitive bidding to lower the prices described above.

464.   Because Teva had been able to increase the price at CVS following Mylan's exit, Mylan gave a bid to CVS that was higher than Mylan's previous pricing.  CVS pushed Mylan to lower its bid in light of its prior prices, but Mylan, confident that its brinkmanship would work because it knew (through the constant communication just described) that Teva would co-operate with the cartel's agreement, Mylan refused to budge. Ultimately, CVS declined Mylan's bid because of Mylan's refusal to lower its bid in light of its prior pricing.  Nonetheless, because Mylan's bid to CVS was not competitive – but rather an effort to allocate the market without eroding price – Teva was able to maintain its artificially higher prices at CVS.

465.   The conspiracy did not stop there:  on April 8, 2013, J.L., a marketing manager at Teva, reported internally to his Teva colleagues, including Rekenthaler, that Mylan had agreed to raise prices.  In addition, Green and Nesta spoke twice that day, for one minute and for nine minutes, and the next day, they spoke again for eleven minutes, reconfirming Teva's and Mylan's agreement to implement increased prices – which they did shortly thereafter.

466.   Teva and Mylan were not the only members of Defendants' cartel who were involved with its Clonidine-TTS aspect.  Aptly illustrating Defendants' frequent entry and exit from various product markets, early the following year, on May 6, 2014, Actavis was granted FDA approval to market Clonidine-TTS.

467.   That day, as was standard practice among members of Defendants' cartel, Teva and Actavis immediately discussed price and market share.  Rekenthaler spoke by phone three times (for fifteen minutes, one minute, and three minutes) with Marc Falkin, who was Actavis's Vice President of Marketing, Pricing and Contracts ("Falkin") until Actavis was acquired by Teva in August, 2016.

468.   During his employment at Actavis, Falkin was a prolific communicator and had established relationships with executives at many of the Defendants. For example, between August, 2013 and July, 2016, Falkin exchanged at least 2,562 phone calls or text messages with his contacts at Defendants Zydus, Teva, Glenmark, Lannett, Aurobindo, Mylan, Lupin, Par, Greenstone, Apotex, Taro, Amneal, Sandoz, and Wockhardt, including over 430 calls or text messages with Rekenthaler during that time period, at least 410 calls or text messages with Maureen Kavanaugh at Teva; 270 calls or text messages with Jim Brown at Glenmark; 78 calls or text messages with Jim Nesta at Mylan; 52 calls or text messages with David Berthold at Lupin; 41 calls or text messages with Jill Nailor at Greenstone; and at least 21 calls or text messages with Ara Aprahamian at Taro.

469. On May 7, 2014, the day after speaking to Falkin about Clonidine-TTS, Rekenthaler announced to his colleagues that Actavis was entering the market. K.G. of Teva responded by requesting that Patel come up with a recommendation as to which customers Teva should concede to Actavis. At the same time, Teva employees bemoaned Actavis's so-called "ridiculous[ly]" low pricing.

470. Teva personnel (successfully) worked to convince Actavis to increase its pricing for Clonidine-TTS in the cartel's usual way, by co-ordinating the incumbent supplier's (Teva) withdrawal from enough customers to give the newcomer its so-called "fair share" of the market.

471. The next day, May 8, Rekenthaler spoke to Falkin three more times (5-, 10-, and 8-minute calls), and Patel spoke with Rick Rogerson ("Rogerson"), Actavis's Executive Director of Pricing and Business Analytics. Shortly after her last call with Rogerson, Patel instructed her Teva colleagues to "Please concede Ahold and HEB," two of Teva's then-current customers, and the following day, May 9, 2014, Patel called Rogerson three times.

472. Unsurprisingly, the agreement and inducements of Defendants' overarching conspiracy held, and Actavis raised its Clonidine-TTS pricing while Teva quietly surrendered market share: shortly after those phone calls, Patel conveyed to her boss, K.G., that "I just found out that Actavis rescinded their offer." Shortly after that, Patel also learned that Actavis had "resent all of their offer letters at pricing that is higher than our [*i.e.*, Teva's] current [prices]." In addition, Patel informed her colleagues

that Actavis wanted 25% of the market and expected that 10-15% of that share to come from Teva.

473.   Rekenthaler was concerned that Actavis might thereafter defect from Defendants' cartel agreement by competing for market share, but T.C., a senior sales executive at Teva, rebuked him, writing in an e-mail:  "now, now Mr. Rekenthaler play nice in the sand box .... If history repeats itself[,] activist [*sic*] is going to be responsible in the market..." – "be responsible in the market" being a euphemism that meant Actavis would stand by the cartel's arrangement and, in return for the Clonidine-TTS market share that it was given, Actavis would not cut its pricing below the cartel level.

474.   On May 14, 2014, for example, Patel told colleagues that Teva must be "responsible" and concede a particular wholesaler's account to Actavis, which Teva did a few days later.  On May 20, Patel again declined to bid at another customer due to the new entrant, Actavis, stating that "We are trying to be responsible with share and price."

475.   Mylan's brief supply issues described above cannot explain Defendants' price increases for Clonidine-TTS during the Relevant Period, in whole or in part, and no other shortages or other market features can explain Defendants' elevated pricing and price increases for Doxazosin and Clonidine-TTS during the Relevant Period.

476.   The elevated prices of Clonidine-TTS and Doxazosin that resulted from Defendants' anticompetitive conduct have injured Plaintiffs caused them to pay more than they would have paid in a free and fair market.

477.    The unlawful agreements among Teva, Mylan, and Actavis regarding Clonidine-TTS and Doxazosin were part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### C.    Irbesartan

478.    Irbesartan is a drug used in the treatment of hypertension.  It prevents narrowing of blood vessels, thus lowering a patient's blood pressure. Irbesartan is also known by the brand name Avapro®.  Teva received approval to manufacture generic Irbesartan in March of 2012.

479.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Irbesartan as follows:

480.    On March 6, 2012, Kevin Green's boss at Teva, K.G., polled the Teva sales team seeking information about competitors in the Irbesartan market.  Later that morning, in response, Green called Berthold at Lupin and they spoke for over a quarter-hour; at 12:26 pm, within hours of K.G.'s request for sensitive commercial information *from ostensible competitors*, Green sent an answer to the team, including Rekenthaler and Maureen Cavanaugh that "Lupin is looking for a 15% share.  They already have ABC [Amerisource Bergen Corp].  Confirmed Zydus is out," but was unable to get information on other players in the market.  A senior commercial operations executive at Teva responded via e-mail that afternoon, "Then work

harder…." (ellipsis in original).

481.    Because the cartel's standard procedure was to pass information indirectly from one ostensible competitor to another via intermediaries, who were sometimes cartel members and sometimes customers who were friendly to the cartel (as well as directly, from time to time), Green called Berthold back at next morning, March 7, to get the requested information.  The two spoke for just over seven minutes, around 10:54 am, but that was all the time that was needed for Berthold to pass on the requested sensitive competitive information, which Berthold did.

482.    A little over an hour later, at 12:20 pm, K.G., Green's boss at Teva shared with the sales team the competitively sensitive information he had obtained, including the details Berthold gave Green regarding who was and who was not launching the drug, and which customers had received offers.  K.G. stated that Teva was in a position to take up to a 40% market share when it launched Irbesartan a few weeks later, on March 30 – a comment that would make little sense in a competitive market, where a supplier would want to try to take as much of the market as it could supply, but a comment that was entirely sensible in the context of Defendants' overarching scheme to provide market share to each market participant, in order to prevent price competition.

483.    No shortages or other market features can explain Defendants' elevated prices for Irbesartan during the Relevant Period.

484.   The elevated prices of Irbesartan that resulted from Defendants' anticompetitive conduct have injured Plaintiffs caused them to pay more than they would have paid in a free and fair market.

485.   The unlawful agreement between Teva and Lupin regarding Irbesartan was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### D.   Nimodipine

486.   Nimodipine, also known by the brand name Nymalize®, is a calcium channel-blocker that reduces problems caused by bleeding blood vessels in the brain.

487.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Nimodipine as follows:

488.   Teva marketed and sold Nimodipine during the relevant period at least in part through its subsidiary, Barr.

489.   Sun marketed and sold Nimodipine during the relevant period at least in part through its subsidiary, Caraco.

490.   In June of 2012, Teva was preparing to exit the market for Nimodipine. This exit would leave Heritage and Sun as the only manufacturers of Nimodipine. Heritage wanted to use Teva's exit as a cover to raise Nimodipine prices.

491.   Pricing discussions with competitors were part of Defendants' "toolkit"

for achieving and maintaining elevated prices on Drugs at Issue, and Defendants understood that to maintain market share and increase prices, they needed to "play fair." With this in mind, Heritage devised a plan to approach Sun.

492. Heritage's Malek wanted to "socialize" increased Nimodipine prices with competitors, by which he meant direct outreach to other Defendants to co-ordinate and implement a market-wide price increase. To do so, Malek instructed his NAM Sather to reach out to Sun to discuss raising prices.

493. At Malek's direction, Ann Sather contacted someone at Sun, likely Knoblauch. Heritage's Sather exchanged numerous text messages and had multiple phone calls with her contact at Sun throughout June, 2012. These conversations between Heritage and Sun were successful. The ostensible competitors reached an agreement not to compete; their goal was to raise prices.

494. Ultimately, Teva never completely exited the market for Nimodipine, yet it did reduce sales to a very small share, ceding the market to Sun and Heritage.

495. Sather kept Malek apprised of her negotiations with Sun, including through a June 28, 2012, e-mail discussing the status of the agreement on Nimodipine between Heritage and Sun.

496. That same day, Sather sent an analysis of a Cardinal RFP to Malek, Glazer, and other Heritage employees. Sather noted that Heritage would submit a bid at an artificially high price, which would allow Sun to retain Cardinal's business. Heritage informed Sun about the pricing before submitting to Cardinal. This information

allowed Sun to retain Cardinal's business at a price that was significantly higher than it would have been in a competitive market.

497.   On July 20, 2012, another employee at Heritage circulated proposed pricing in response to the Cardinal RFP, which, upon information and belief, quoted pricing at a level lower than Sun.  Malek responded the same day and exchanged emails with a Heritage employee (possibly Keith Fleming) about Heritage's pricing on Nimodipine and Heritage's agreement on pricing with Sun.  Around the same time, Sather and her contact at Sun were also discussing at least Nimodipine.

498.   Heritage's Sather and Sun's Knoblauch communicated by text and phone over the next few weeks. They also met in person at an industry event.  Through these communications, at the end of July, Heritage and Sun reaffirmed their agreement to raise prices and allocate the market for Nimodipine. As part of this understanding, as it had in June, Heritage again agreed to provide a cover bid to Cardinal.

499.   As a result of Heritage's cover bid, Sun retained its business with Cardinal, and both Heritage and Sun were able to maintain Nimodipine prices above the competitive level.

500.   In September, 2012, after Cardinal awarded Sun its Nimodipine business, Sun began to experience supply issues with its Nimodipine.

501.   In October of 2012, Cardinal approached Heritage, asking for a new bid because it was concerned about Sun's supply chain. Although Sun never fully exited the market, its sales of Nimodipine declined to a small share.

502.    Sather immediately e-mailed Heritage's Malek, Glazer and Fleming to apprise them of Cardinal's request.  Given the circumstances, Sather felt responding to Cardinal's request for an RFP did not violate Heritage's agreement with Sun because Cardinal was coming directly to Heritage, because of Sun's supply issues – and most importantly, because Heritage was not going to underbid Sun on price.

503.    Consistent with a price increase Heritage had recently imposed on a different wholesaler, Sather proposed that Heritage respond to Cardinal's request. Sather believed that Heritage could offer a higher price and still win the business from Cardinal because she had received Sun's Cardinal pricing from her contact at Sun. Sather also shared information she had learned at the earlier trade conference, which, consistent with Defendants' cartel agreement and industry practice, likely involved competitive market information.

504.    When she spoke with Sun's Knoblauch for 38 minutes the next day, Sather confirmed her understanding that Heritage could submit a bid to Cardinal without violating its agreement with Sun.

505.    Heritage continued to communicate with Sun to monitor when Sun would re-enter the Nimodipine market.  Malek e-mailed Sather on December 17, 2012, about Sun's supply issues.  In response to Malek's e-mail, Sather reached out to her contact at Sun and kept Malek informed about her conversations.  During this same time period, Sun (along with Actavis and West-Ward) increased prices on Doxycycline.

506.   On April 16, 2013, Sather reported to Malek that Sun was not pursuing Nimodipine customers because it did not know when its product would be available. Heritage's Malek responded to this information by expressing his willingness to continue Heritage's pricing and market allocation agreement with Sun when Sun re-entered the Nimodipine market.

507.   Heritage's Sather continued speaking with Sun's Knoblauch to assess when Sun might re-enter the Nimodipine market.  When they spoke on May 23, 2013, Sather learned that Sun might be returning to the Nimodipine market in June or July. Sather immediately reported this development to Malek, and the two exchanged e-mails about pricing for Nimodipine.

508.   Ultimately, Sun decided not to re-enter the Nimodipine market. In the spring of 2013, Heritage more than doubled the price of Nimodipine capsules and maintained this inflated price for the duration of the Relevant Period.

509.   When Heritage's Malek learned that Ascend was planning to enter the Nimodipine market in April of 2014, he immediately began the process of trying to contact Ascend and bring them into the "fair share" agreement.

510.   On April 8, 2014, Malek informed his staff that Ascend would be entering the Nimodipine market and personally took responsibility for co-ordinating with Ascend.  Malek had met John Dillaway, the Executive Vice President of Ascend, in February of 2013, and he used that connection as a way to reach out to Dillaway through

LinkedIn. The two executives communicated frequently through LinkedIn in the weeks leading up to April 22, 2014.

511.   During an internal Heritage teleconference on April 22, 2014, Malek identified numerous drugs that were slated for a price increase, including Nimodipine. That same day, Dillaway and Malek spoke on the phone about Ascend's entry into the Nimodipine market for almost 20 minutes.

512.   Concurrently with Malek's discussions with Ascend, Malek and the rest of Heritage's sales teams were involved in large-scale outreach to Defendants to increase prices for numerous generic drugs.

513.   As part of an internal Heritage conference call on May 9, 2014, about industry-wide price increases for at least nine drugs (including Verapamil, Theophylline, Paromomycin, Nystatin, Nimodipine, Leflunomide, Glyburide-Metformin, Fosinopril-HCTZ, and Glyburide), the Heritage team discussed allocating customers to co-conspirators as part of their agreement, including, but not limited to, the potential allocation of certain customers to Ascend as part of the efforts to raise and/or maintain prices on Nimodipine.

514.   On June 6, 2014, Heritage's Malek e-mailed Ascend's Dillaway, trying to arrange a phone call to discuss Nimodipine. They were unable to connect by phone but agreed to meet in person several weeks later, at the NACDS Total Store Expo in Boston, to solidify their agreements.

515.   As discussed above, during an internal conference call on June 23 with the Heritage sales team, the targeted percentage price increases for eight drugs were discussed, including Nimodipine, which was slated for a 48% increase.

516.   Three days later, on June 26, Heritage began telling customers that it was increasing prices for nine different drugs, including Nimodipine. Price increase notices were issued on the same date.

517.   Although Ascend ultimately did not enter the Nimodipine market, Defendants did not have to price in the anticipated effects of Ascend's threatened market entry because had it done so, it would have entered at the collusive price agreed upon with Heritage.  Further, in accordance with the terms of Defendants' overarching conspiracy, Heritage would have walked away from certain customers to allow Ascend to build its market share.

518.   Sun's supply issues cannot explain Defendants' price increases for Nimodipine during the Relevant Period, in whole or in part, and no other shortages or other market features can explain Defendants' elevated pricing and price increases for Nimodipine during the Relevant Period.

519.   The elevated prices of Nimodipine that resulted from Defendants' anticompetitive conduct have injured Plaintiffs caused them to pay more than they would have paid in a free and fair market.

520.   The unlawful agreement between Heritage and Sun regarding Nimodipine was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### E.   Levonorgestrel/EE

521.   The combination of Levonorgestrel/Ethinyl Estradiol ("Levonorgestrel/EE"), also known under the brand names Seasonale® and Nordette®, is hormonal birth-control.  During the relevant time period, both Teva and Sandoz marketed Levonorgestrel/EE under multiple names, including both Portia and Jolessa.

522.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Levonorgestrel/EE, as follows:

523.   In or around May of 2012, Teva had a much higher market share than Sandoz for both Portia and Jolessa.  Teva's market share for Portia was 37% compared to Sandoz's 17%, while Teva's market share for Jolessa was 43% compared to Sandoz's 11%.

524.   On May 11, 2012, Walmart contacted Teva with a right of first refusal and explained that another supplier had made an offer for the sale of four drugs, including Portia and Jolessa. T.C., a senior sales executive at Teva asked who the new supplier was, and the customer responded that it was Sandoz.

525.   On May 16, Teva sent an offer to Walmart for the sale of three drugs, including Portia and Jolessa, and sent an even better offer on May 18.

526.   T.C. had initially been very reluctant to let Sandoz have the business, but there was the matter of Defendants' cartel to consider.  So, on May 22, 2012, Teva's Green spoke on the phone with a sales and marketing executive at Sandoz, who will be referred to in this Complaint as CW-2, for five minutes to discuss, *inter alia*, the Levonorgestrel/EE market.   Teva agreed to withdraw the offer to Walmart.   The decision to concede the Walmart business to Sandoz led to a more equal share split of the Levonorgestrel/EE market between Sandoz and Teva.  The next day, May 23, Teva abruptly backtracked and removed Portia and Jolessa from its Walmart offer.

527.   Sandoz and Teva continued to co-operate so that Sandoz could achieve its "fair share" of the markets for both Portia and Jolessa.  For example, over a year later, on July 2, 2013, another customer contacted Teva, stating that it had received bids on Portia and Jolessa and in order for Teva to retain the business, Teva would need to submit its best offer as a counter-proposal.

528.   On July 9, 2013, a different sales and marketing executive at Sandoz, who will be referred to in this Complaint as CW-1, called Patel and left a voicemail.  Shortly thereafter, they connected for a phone call that lasted approximately a quarter of an hour.

529.   The next day, at 12:16 pm, Rekenthaler forwarded an e-mail to Patel, asking about this.  Due to the desire of all of Defendants' employees identified in this

Complaint to minimize electronic records of their conspiracy and the close proximity of their offices in the same building, Patel likely told Rekenthaler orally about Patel's conversation with CW-l.

530.   An hour later, at 1:26 pm that day, Rekenthaler called his own counterpart at Sandoz, CW-2, and they spoke for two minutes. CW-2 called Rekenthaler back a few minutes later and they spoke again for nine minutes.  CW-2 and Rekenthaler spoke a third time that day, at 4:48pm, for seven minutes, all to discuss, *inter alia*, allocating market share in the Levonorgestrel/EE market.

531.   Later that same evening, Teva submitted a cover bid to the customer for Portia and Jolessa, which was higher than Sandoz's bid. Teva intentionally submitted an inflated bid for the two drugs in order to ensure that Sandoz obtained the primary award with the customer.

532.   No shortages or other market features can explain Defendants' elevated pricing for Levonorgestrel/EE during the Relevant Period.

533.   The elevated prices of Levonorgestrel/EE that resulted from Defendants' anticompetitive conduct have injured Plaintiffs caused them to pay more than they would have paid in a free and fair market.

534.  The unlawful agreement between Teva and Sandoz regarding Levonorgestrel/EE was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## F.      Valsartan HCTZ

535.    Valsartan HCTZ ("Valsartan"), also known under the brand name Diovan®, is used to treat high blood pressure.  Diovan was a so-called "blockbuster" drug that had sales in the United States of, for example, approximately $1.6 billion for the 12 months ending June 30, 2012.

536.    Mylan was the first to file an abbreviated new drug application (ANDA) to market the generic version – Valsartan HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity.  Sandoz manufactured the authorized generic. This meant that Sandoz and Mylan would be the only two manufacturers of the generic version of the drug for six months once Mylan entered the market.

537.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Valsartan, as follows:

538.    Mylan and Sandoz launched Valsartan HCTZ on the same day – September 21, 2012.  Over the preceding three weeks, leading up to the launch, employees of Defendants Mylan and Sandoz spoke multiple times by phone during which they discussed, *inter alia*, allocating market share for this product.

539.    In August and September of 2012, a senior sales executive at Sandoz, who will be referred to in this Complaint as CW-4, was concerned about her job security there and sought to network with executives at competing companies in the hope of

obtaining new employment.  CW-4 contacted Mylan's Jim Nesta in part because she was interested in potentially working at Mylan.

540.   On September 6, the Thursday immediately following the Labor Day holiday that year, Nesta called CW-4, but it was not to discuss employment.  Instead, Nesta – representing the incoming generic – wanted to, and did, discuss market allocation with his opposite number at Sandoz.  They spoke for 20 minutes; then, CW-4 called him back but missed him; then Nesta called CW-4 back, but missed her; then CW-4 called Nesta back and they spoke for just over one minute; then Nesta returned CW-4's call, and they spoke for five minutes.

541.   This is just one of the many examples of Defendant's employees playing telephone tag and calling each other multiple times back and forth in the same day.  The reason their communications followed this unusual pattern is that they did not want to leave permanent records of their communications – even of communications simply setting up telephone calls – in part because Nesta and CW-4 were not friends; their only connection was implementing Defendants' cartel in this case.

542.   As a result, virtually all of their communications were via telephone. Rather than leave an e-mail or voice-mail with a permanent record of the substance of their communications (which could be found in, for example, a document production of Defendants' e-mail servers), Defendants employees, including both Nesta and CW-4, would repeatedly telephone each other, often on the same day, until they connected by phone.  They did this because it meant the substance of their communications would

not be retained, and the only way to trace the fact that they communicated at all was via obtaining records from telephone companies, which is significantly more challenging, including requiring matching telephone number(s) to the corresponding participant in the scheme.

543.    To help hide Defendants' overarching conspiracy (and because they knew what they were doing was illegal), even when Defendants' employees e-mailed each other within the same company, they were circumspect about what was occurring and transmitted much information orally; e-mail was used simply to alert the recipient that there was news to communicate.

544.    For example, among the many other illustrations in the complaint, one occurred on Friday, February 7, 2014 when Teva received notice from a customer that it had received a competitive challenge from Par on the drug Labetalol HCL Tablets. Rather than spell out in detail that she wanted T.S. to ask Par about the details, Patel simply forwarded the e-mail to T.S. with three question marks: "???" T.S. responded shortly thereafter: "left message." The message that T.S. had left was for R.K. at Par, and the two executives played phone tag five times that same day. After the last of these calls with R.K., T.S. responded back to Patel in writing an e-mail, transmitting the need to communicate but no actual, substantive information: "Let's speak on Monday. Just received call back with more information."

545.    Similarly, on Friday, September 7, 2012, Nesta called CW-4 for less than a minute; then Nesta called CW-4 and they spoke for approximately 11 minutes; then CW-4 called Nesta back for one more minute.

546.    The following week, Nesta called CW-4 back and they spoke for approximately 20 minutes on September 12; then, the same day, CW-4 called Nesta back for a minute and a half.  The next day, September 13, there were five calls between them, including one for approximately eleven minutes; finally, the week ended with a seven-minute call on Friday, September 14.

547.    The next week was the week of both companies' Valsartan launch, and Nesta and CW-4 spoke multiple times on that Monday and Wednesday, September 17 and 19.

548.    Via these phone calls, Sandoz and Mylan – through CW-4 and Nesta – agreed to divide up the market for at least Valsartan without cutting prices, so that each "competitor" obtained a roughly 50% market share.

549.    Throughout this time, CW-4 also kept her boss (Sandoz's Director of Pricing and Contracts, Armando Kellum) ("Kellum") up to date on her discussions with Defendant Nesta and met with Kellum in person to discuss her customer accounts, including a meeting on September 14, 2012.

550.    In addition, on September 25, 2012 – only four days after the Valsartan HCTZ launch – since there was a new entrant to the market, who in a competitive market would have sought increased market share via price compeition, Amerisource

Bergen Corp ("ABC") contacted Sandoz seeking a price reduction.  S.G. forwarded the request to CW-1 and Kellum, asking for guidance.  Kellum replied, "No price change."

551.   In November, 2012, Sandoz employees were e-mailing regarding the possibility of seeking additional busines.   Following the rules of the road for Defendants' overarching conspiracy, Kellum responded, "I'm concerned we are going to disrupt the market.  I understand the need for additional sales but we need to be thoughtful here."   R.T. then directed the Sandoz team, "Do not approach new customers, with[out] me or Armando [Kellum]'s consent."  R.T. did this to ensure that Mylan retained its so-called fair share without competition for market share between Sandoz and Mylan eroding prices.

552.   No shortages or other market features can explain Defendants' elevated pricing for Valsartan during the Relevant Period.

553.   The elevated prices of Valsartan that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

554.   The unlawful agreement between Mylan and Sandoz on Valsartan was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### G.   Doxycycline Hyclate

555.   Doxycycline Hyclate is a tetracycline-class antibiotic used to treat a variety of bacterial infections.  This medication is also used to prevent malaria. Doxycycline

Hyclate is produced in a regular-release formulation ("Doxy RR") and in a delayed-release formulation ("Doxy DR").

556.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Doxycycline Hyclate as follows:

### 1.   Doxy RR

557.   Sun, Actavis, and West-Ward, as well as late entrants Mylan and Par, were the dominant market players for Doxy RR during the Relevant Period.

558.   Throughout 2012, Sun, Actavis, West-Ward, Par, and Mylan attended a number of trade events where they met and discussed the pricing of Doxycycline Hyclate.

559.   In late 2012, during the period in which Heritage and Sun were intensely communicating and co-ordinating pricing for Nimodipine (as discussed above), including at trade events, Sun imposed dramatic price increases on its Doxy RR products.  West-Ward and Actavis quickly followed suit.

560.   These price increases were abrupt, very substantial, nearly identical, and nearly simultaneous. Within a two-week period, Sun, West-Ward and Actavis raised the list (WAC) prices on their Doxy RR products by more than 2000%.

561.   The dramatic price increases followed a period of relatively low and stable pricing for Doxy RR.   No shortages or other market changes can explain the extraordinary price increases imposed by Sun, West-Ward and Actavis.

562.   Defendant manufacturers of Doxycycline Hyclate continued to meet regularly at trade events after the initial price hikes.  *See* Exhibit 1.

563.   When Defendants Par (through DAVA) and Mylan entered the market, rather than trying to gain market share by undercutting the pricing of the incumbent manufacturers (as would have happened in a competitive market), they priced their Doxy RR at similarly elevated prices because of Defendants' "fair share" agreement.

564.   No shortages or other market features can explain Defendants' price increases for Doxy RR during the Relevant Period.

565.   The elevated prices of Doxy RR that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

566.   The unlawful agreement between Sun, Actavis, West-Ward, Mylan, and Par regarding Doxy RR was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### 2.   Doxy DR

567.   Mylan and Heritage were the dominant market players for Doxy DR during much of the Relevant Period.  Heritage began selling Doxy DR on July 2, 2013. At the time, Mylan was the only other seller of generic Doxy DR.  Mayne entered the Doxy DR market in 2014.

568.   Even before entering the market, Heritage contacted Mylan about refraining from price competition.  Heritage did not want Doxy DR prices to erode when it entered the market. Mylan also wanted to maintain its prices.  Consistent with their overarching "fair share" agreement, both Heritage and Mylan understood that co-operation and co-ordination was required to maintain Doxy DR prices.

569.   In April of 2013, Heritage's Malek and its CEO Glazer traveled to India to meet their bosses at Heritage's Indian-based corporate parent, Emcure:  Emcure CEO Mehta and Emcure President Thapar.  The purpose of the trip was to discuss the workings of Heritage's plans to enter the Doxy DR market.  These meetings included discussions about how to co-ordinate with Mylan so as to minimize the competition between the two companies for Doxy DR.

570.   During these discussions, it was decided that in order to work out an agreement between Heritage and Mylan relating to (at least) Doxy DR, Mehta would reach out to Rajiv Malik, a high-level counterpart at Defendant Mylan, in order to facilitate communication between Glazer and Malek and their Mylan counterparts.

571.   After returning to the U.S., on or about May 3, 2013, Heritage's Malek tried to set up a call with the Vice-President of Sales at Mylan.  Malek learned, however, that the Vice-President of Sales had little to do with National Accounts and was instead directed to the person at Mylan who did have responsibility for such accounts.  On information and belief, that person was Jan Bell, who was a Senior Key Account

Manager at Mylan from September of 2010, to January, 2013, and served thereafter as Director of National Accounts at Mylan.

572.    Malek promptly contacted Bell through LinkedIn.   Malek and Bell communicated by phone on multiple occasions and continued to communicate about various drugs, including Doxy DR.

573.    While Malek was in contact with Bell, other Heritage employees began reaching out to their counterparts at Mylan to discuss Doxy DR and other drugs. For example, beginning on or about May 7, 2013, Glazer e-mailed Mylan's President and Executive Director, Malik. He copied both Mehta and Thapar at Emcure on the e-mail.   Malik responded to Glazer's e-mail with a phone number where he could be reached in England, and the two spoke the next day, when they confirmed their agreement to refrain from competing in the Doxy DR market.

574.    Glazer told Malik that Heritage intended to pursue two of Mylan's large Doxy DR customers (wholesaler McKesson and retail pharmacy CVS), who collectively made up 30% of the market.   Glazer further told Malik that Heritage wanted to gain market share without lowering the pricing of Doxy DR.

575.    In accordance with the terms of Defendants' overarching conspiracy, Malik agreed with Glazer that Mylan would give up its accounts with McKesson and CVS, while Heritage would work with Mylan to keep the prices of Doxy DR elevated.

In the course of these communications with Glazer, Malik made clear that Mylan was willing to enter into this agreement relating to Doxy DR because Heritage had, in the past, abided by its "fair share" agreements with Mylan on other drugs.

576.  Malik told Glazer that he would inform others at Mylan about their agreement.  Glazer also kept Heritage's Malek informed about his conversations with Mylan.  In the months following Malik and Glazer's agreement, Mylan surrendered the McKesson and CVS accounts to Heritage.

577.  By allocating the McKesson and CVS accounts in the Doxy DR market, Mylan and Heritage were able to artificially maintain Doxy DR prices across the market. In a competitive market, Heritage's entry would have spurred price competition across all customers, which would have lowered market prices.  By foregoing this competition, Mylan and Heritage kept Doxy DR prices higher than they otherwise would have been.

578.  As discussed above, beginning in July of 2013 and continuing through July of 2014, Heritage had at least 513 different contacts with various generic drug manufacturers about the pricing of Drugs at Issue, including Doxycycline Hyclate.  In addition, Defendants had the opportunity to discuss Doxy DR and other drugs while attending industry meetings.  *See* Exhibit 1.

579.  Following a number of spring and summer trade meetings in 2013, a series of inter-competitor communications led to anticompetitive agreements relating to multiple Drugs at Issue.

580.    For example, on June 11, 2013, an employee from Mylan (possibly Aigner or Nesta) called an employee at Heritage (likely O'Mara).  They spoke for about 10 minutes.  Immediately after the telephone call, the Heritage employee called Malek and left a voicemail providing a report.  Malek called the employee back fifteen minutes later and they spoke for approximately seven minutes.

581.    That same day, Heritage was also in contact with other generic drug manufacturers, who in turn communicated with other Defendants, including Par and Mylan.  The next day, June 12, 2013, while Defendants were also discussing pricing for at least Doxy DR, Defendant Lannett increased the prices for Doxy Mono, consistent with Defendants' conspiracy to raise and maintain prices.

582.    On June 18, 2013, a senior manager at Wholesaler A (likely McKesson) contacted a Mylan employee to inform him that Wholesaler A received an unsolicited bid for Doxy DR from a new entrant (Heritage). Mylan was asked to submit a bid by the close of business on June 21, 2013, to retain the business with the wholesaler. Consistent with its agreement to cede its Doxy DR business to Heritage, Mylan failed to submit a counterbid.

583.    On June 27, 2013, following Mylan's failure to bid, Heritage entered into a distribution agreement with Wholesaler A for Doxy DR.

584.    The conversations among Defendants continued throughout 2013.  A few weeks later, in July, when Heritage began selling Doxy DR, Heritage contacted Mylan

three times and Sun once. Heritage spoke with Mylan once and Sun twice in August; spoke with Sun once in October; and with Mylan once in November.

585. On July 8, 2013, Heritage submitted a proposal to a pharmacy (likely CVS) to obtain Doxy DR business. The next day, the pharmacy rejected the proposal as being too high. Heritage submitted a revised bid to the pharmacy on July 11, 2013. During this time, Heritage and its parent, Emcure, continued to communicate with Mylan to make sure Mylan was committed to their Doxy DR agreement.

586. As part of this effort, Heritage CEO Glazer's boss at Emcure, CEO Mehta, spoke to Malik, Mylan's President and Executive Director, on July 18, 2013. Information about the call was communicated to Glazer by an Emcure employee shortly after Mehta and Malik spoke.

587. In response, Glazer e-mailed Mylan President and Executive Director Malik trying to schedule a phone call that day. Malik told Glazer they could speak in the evening, and later that evening, Malik left Glazer a voice-mail. Fifteen minutes later, Glazer returned Malik's call and they spoke for approximately four minutes. During the call, Glazer informed Malik of Heritage's strategy with respect to at least Doxy DR and its bid to the pharmacy.

588. In response to this conversation, Malik immediately spoke to certain Mylan employees, and ultimately, Mylan walked away from the pharmacy customer in order to avoid price erosion.

589.   The following month, in August, 2013, Mylan was contacted by an executive at the pharmacy and was told that the pharmacy had received an unsolicited bid for Doxy DR. Mylan was given a chance to submit a counterbid.  In response, Mylan submitted a bid with pricing that it knew would be too high to retain the business. When Mylan was given a second opportunity to lower its pricing, Mylan failed to submit a revised bid, consistent with its agreement with Heritage.  A month later, in September of that year, the pharmacy gave its Doxy DR business to Heritage.

590.   The business obtained from Wholesaler A and the pharmacy accounted for more than 80% of Heritage's Doxy DR business.  Heritage maintains that business to this day.

591.   After Heritage obtained the pharmacy's business, on several occasions Heritage walked away from other Mylan customers in accordance with their agreement with Mylan and the terms of Defendants' overarching conspiracy.

592.   For example, in November of that year (2013), Heritage did not pursue a certain large account (likely Walmart) because the large account was Mylan's customer and was not allocated to Heritage.

593.   The anticompetitive conversations and agreements continued, including when Mayne prepared to enter the Doxy DR market a couple of months later.  On January 7, 2014, about a month before Mayne's entry into the Doxy DR market, a Heritage employee (likely Sather) and an employee at Mayne had a 12-minute telephone conversation about agreeing not to compete in the market for Doxy DR.

594.   These conversations continued throughout 2014, with the Heritage employee, likely Sather, continuing to communicate with the Mayne employee, likely Gloria Peluso-Schmid (Mayne's Director of National Accounts at that time), via text messages, e-mail, and including telephone conversations on March 13 and 17. The Heritage employee e-mailed and texted Malek, providing him with the information on Mayne's market share and strategy that she had obtained. The shared goal of Heritage and Mayne was to maintain pricing within the Doxy DR market.

595.   After Mayne entered the market, it initially avoided competing with Heritage and instead targeted customers of Mylan. In one such instance, Mayne made a bid to a large wholesaler where Mylan was the incumbent provider and the wholesaler asked Heritage to also submit a bid. Heritage declined, honoring its on-going agreement with Mylan, and provided a false, pretextual reason (inadequate supply) to the wholesaler. Malek knew Heritage had sufficient supply of Doxy DR to fulfill a bid, but instructed Heritage not to submit a bid in order to honor Heritage's agreement with Mylan.

596.   Two months later, in March of 2014, Sather continued to communicate with her contact at Mayne about Doxy DR, communicating via telephone on March 13, briefly, and on March 17 for 17 minutes.

597.   At the end of March, Mayne presented a bid to one of Heritage's nationwide pharmacy accounts. This led to telephonic, e-mail and text discussions between Mayne and Heritage over the next several months, including on April 1, 2014,

when Heritage's Sather and a Mayne employee spoke for approximately 27 minutes. After the call, Sather and Malek exchanged text messages, likely about the substance of the conversation.

598.   Sather and a Mayne employee spoke again the next day for 11 minutes. The same day, Malek e-mailed CEO Glazer to provide an update on negotiations with Mayne.  Sather and a Mayne employee spoke for three minutes on April 9, 2014, and the next day exchanged multiple text messages. Sather reported these conversations to employees of Heritage, including at least Malek.

599.   Ultimately, because of the agreement between Heritage and Mayne not to compete in the market for Doxy DR, Heritage was able to retain the pharmacy customer at prices that were significantly higher than they would have been in a competitive market.

600.   In May, 2014, it was Mayne's turn.   Instead of competing on price, Heritage walked away from a customer being pursued by Mayne.

601.   Likewise, in August, 2014, consistent with its agreement with Mylan, Heritage again refused to bid on an RFP issued by a Mylan customer.

602.   In November of 2014, Mayne made offers to the One Stop Program of McKesson Corporation ("McKesson") (a wholesaler) and Econdisc Contracting Solutions ("Econdisc") (a group purchasing organization ("GPO") that includes Express Scripts, Kroger, and Supervalu).   Malek contacted personnel at Mayne to discuss the situation and raised the idea that Heritage and Mayne could allocate

customers by having Mayne withdraw its offer to McKesson. Malek worked out an agreement with Mayne by November 25, 2014, which Glazer subsequently confirmed. Follow up communications occurred in December of 2014 by text message and an in-person meeting at a conference of the American Society of Health-System Pharmacists held on December 9, 2014.

603.   The agreement resulted in higher prices for Doxy DR. When Econdisc put its business out for bid again in January, 2015, Heritage deliberately bid a higher price than Mayne, fulfilling its agreement to walk away from the Econdisc business. Likewise, when Heritage was requested to submit a bid by a large nationwide pharmacy chain in September of 2015, it declined to do so after learning that Mayne was the incumbent supplier.

604.   The agreements between Mylan, Heritage and Mayne described herein caused prices for Doxy DR to be higher than they would have been in a competitive market and prevented price erosion that would have occurred in such a market.

605.   No shortages or other market features can explain Defendants' elevated pricing for Doxy DR during the Relevant Period.

606.   The elevated prices of Doxy DR that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

607.    The unlawful agreement between Heritage, Mayne, and Mylan regarding Doxy DR was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### H.    Doxycycline Monohydrate

608.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Doxycycline Monohydrate as follows:

609.    Like Doxy RR and Doxy DR, Doxycycline Monohydrate ("Doxy Mono" also known, *inter alia*, by brand names Acticlate® and Monodox®) is a tetracycline antibiotic and is used in treating a variety of bacterial infections, and also to prevent malaria.

610.    During the Relevant Period, Heritage, Lannett, Mylan, and Par were the dominant market players for Doxy Mono tablets.

611.    In February, 2013, Heritage believed that demand for some doxycycline products was increasing, and wanted to use this as a pretext to raise the price of Doxy Mono.  In accordance with their anti-competitive agreement, Heritage began reaching out to Lannett, Mylan, and Par to institute a price increase for Doxy Mono.  These pricing discussions occurred at the same time as Heritage and Dr. Reddy's were discussing pricing and market share for Zoledronic Acid and Meprobamate, as discussed below.

612.    Starting in March of 2013, Heritage's Sather began communicating with Lannett about pricing for at least Doxy Mono.  On March 7, 2013, Heritage's Sather spoke to Lannett's Sullivan for 14 minutes about an opportunity Heritage had at Cardinal (a large purchaser).

613.    Six days later, on March 13, 2013, Sather sent an e-mail to Sullivan (at Lannett) about pricing for at least Doxy Mono. They spoke for five minutes later the same day, again about pricing.

614.    On March 21, 2013—the same day that Malek instructed O'Mara and Edelson to seek a price increase on Meprobamate from Dr. Reddy's (discussed below)—Malek decided he also wanted to increase the price of Doxy Mono by four times the current price. He consulted with Glazer about the price increase.

615.    On March 25, 2013, a Lannett employee – likely Tracy Sullivan – sent an e-mail to her boss at Lannett to provide an update on her conversations with Heritage about price increases for certain drugs, including Doxy Mono.  Lannett's Sullivan and Heritage's Sather communicated about Doxy Mono by phone, text message, and in-person meetings over the next several months.

616.    That same day, March 25, 2013, Malek sent an email to his sales team discussing Heritage's price increases for at least Doxy Mono and another drug—likely Meprobamate or Zoledronic Acid.

617.    Heritage's Sather continued to "socialize" the idea of a Doxy Mono price increase; for example, she called Lannett's Sullivan and left a message on April 25, 2013. Sullivan returned her call the next day; they spoke for about eight minutes.

618.    As discussed above, while Heritage's NAM's were speaking with competitors about Doxy Mono, in April of 2013, Heritage's Malek and CEO Glazer were in India meeting with their bosses at Heritage's corporate parent, Emcure: Emcure's CEO Mehta and President Thapar discussing, among other things, how Heritage and Mylan could minimize competition and avoid price erosion when Heritage entered the Doxy DR market.  And as discussed above, Emcure's CEO Mehta decided to reach out to Mylan's President and Executive Director ("ED") Malik to facilitate subsequent communications between Glazer and Malek and their Mylan counterparts.

619.    Consistent with how the overarching conspiracy operated, throughout the rest of 2013, Heritage spoke with its competitors about pricing for a number of drugs, including Doxy Mono.  These communications often overlapped with trade association meetings.  For example, on May 14, 2013, the day after Lannett's Sullivan and Heritage's Sather spoke for a few minutes, the two attended a conference together where they spoke in person and exchanged text messages discussing at least Doxy Mono.

620.    On June 4, 2013, Sather called and texted an employee at Lannett, likely Sullivan.  While Sather was exchanging text messages with this Lannett employee, she was attending the HDMA's June 2-5, 2013, Business and Leadership Conference in Orlando, Florida.  That conference was attended by key executives for generic sales and

pricing from at least Actavis, Apotex (including Hamilton), Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage (including O'Mara and Sather), Lannett (including Sullivan), Mylan (including Bell, Nesta and Aigner) Par, Sandoz, Sun, Teva, West-Ward and Zydus. *See* Exhibit 1.

621.    Defendants agreed to implement price increases for Doxy Mono in the late spring and summer of 2013.   In the lead up to the price increases, the four competitors selling Doxy Mono—Par, Lannett, Heritage, and Mylan—were in frequent communication.

622.    For example, on June 11, 2013, the day before Lannett's price increase, a Heritage employee (likely O'Mara) spoke with a Mylan employee (believed to be either Aigner or Nesta) for nearly ten minutes. During this same time period, a Lannett employee was communicating with an employee at Par. In turn, this Par employee frequently communicated with a Mylan employee. The Lannett and Par employees were friends and frequently spoke in person at trade association conferences, including about competitive information.

623.    In fact, these employees from Mylan and Par spoke numerous times between June and July 2013.  They had several calls on June 7, 2013 and June 13, 2013— the day after Lannett confirmed that it would increase its prices for Doxy Mono.  Mylan and Par both increased their prices of Divalproex shortly after these calls, on June 14 and June 26, respectively.

624.   Further, an employee at Lannett exchanged 9 text messages with a competitor on June 11-12, 2013.

625.   Heritage was concerned about supply issues for Doxy Mono in 2013, and thus was cautious about the Doxy Mono price increases.  In a competitive market, supply challenges for one supplier create competitive opportunities for other suppliers. But Defendants' "fair share" agreement aimed to mitigate these risks of competition and disruption.  Accordingly, Sather kept in frequent communication with Lannett during this period to stay abreast of any developments, and to reaffirm Heritage's commitment to their agreement.

626.   Sather also met with a Par employee while at a conference in Arizona on August 1 and 2. Following Sather's meeting with Par in Arizona, there was a flurry of communications between Par, Mylan, Lannett, and Heritage about at least the pricing of Doxy Mono.

627.   The NACDS Total Store Expo in Las Vegas, Nevada, on August 10-13, 2013, was attended by numerous Defendants, including those known to have exchanged pricing and customer information throughout the relevant period, including: Apotex (Hamilton), Aurobindo (Cunard), Citron, Dr. Reddy's, Glenmark,  Heritage (Glazer, Malek, O'Mara, and Sather), Lannett (Sullivan), Mylan (Nesta, Aigner), Par, Perrigo, Sandoz, Sun (Knoblauch), Taro, Teva, West-Ward and Zydus (Lukasiewicz).

628.   Just as their convergence at the HDMA trade show in June led to many anticompetitive, inter-competitor communications, Defendants' attendance at the Total

Store Expo facilitated discussions about market allocation and pricing for the Drugs at Issue.

629.   For example, when Malek asked Sather to obtain specific information about Lannett's price increase for Doxy Mono, Sather used the Total Store Expo as an opportunity to meet in person with Lannett's Sullivan.

630.   On August 12, 2013, after meeting in person at the conference, and in response to a directive from her boss Malek, Heritage's Sather sent a text message to Lannett's Sullivan.

631.   The next day, August 13, 2013, while still at the Total Store Expo, Sather and Sullivan texted again.  Sather also exchanged several text messages and phone calls with another employee at Lannett.  In addition, a Lannett employee also sent a text message to an employee at Par.

632.   Later in the evening of August 13, an employee at Par sent an internal e-mail, which was then circulated at Par.  The e-mail included information about pricing agreements on the prices of Doxy Mono and other drugs.

633.   A week after Par's internal discussion, on August 20, 2013, Heritage's Sather e-mailed Malek and confirmed Lannett's agreement related to the pricing of Doxy Mono.

634.   By March of 2014, Heritage increased its Doxy Mono price to at least one customer and was working on a much larger across-the-board price increase on Doxy Mono, as well as price increases on several other drugs.

635.   As discussed above, on April 22, 2014, Malek held a teleconference with Heritage's sales team to discuss the strategy for implementing price increases for numerous drugs, including Doxy Mono.

636.   Malek and the Heritage NAM's took responsibility for communicating with specific Defendants about specific drugs, including Sather, who, among her other assignments, was responsible for communicating with Lannett about Doxy Mono.

637.   Right after the Heritage conference call on April 22, Sather had a half-hour phone conversation with Lannett's Sullivan about pricing for Doxy Mono and calls with two other competitors on the same topic.  Through these discussions, Sather reached a number of pricing agreements covering Doxy Mono and at least four other drugs, including Glyburide-Metformin, Verapamil, Nystatin, and Paromomycin.

638.   Similarly, on April 23, O'Mara, the employee at Heritage who was primarily responsible for communicating with Mylan, contacted a counterpart at Mylan (likely either Aigner or Nesta) and obtained an agreement to raise prices on Doxy Mono (as well as Glipizide-Metformin and Verapamil).  Immediately after speaking with Mylan, O'Mara sent an e-mail to Malek, advising Malek of O'Mara's discussions with Mylan.

639.   On May 8, 2014, Malek requested an update on discussions with competitors.  Sather responded to Malek's e-mail, providing an update on her communications with three Defendants about five drugs, including her conversations with Sullivan at Lannett about Doxy Mono.

640.    Shortly thereafter, on May 14, 2014, Sather attended the MMCAP National Member Conference where she was able to confirm, among other agreements, an agreement with Lannett on Doxy Mono pricing.  Sather also secured agreements with at least Aurobindo on Glyburide, Glyburide- Metformin, and Fosinopril-HCTZ, and with Sandoz on Fosinopril-HCTZ.

641.    No shortages or other market features can explain Defendants' price increases for Doxy Mono during the Relevant Period.

642.    The elevated prices of Doxy Mono that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

643.    The unlawful agreement between Heritage, Lannett, Mylan and Par regarding Doxy Mono was part of Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**I.     Zoledronic Acid**

644.    Zoledronic Acid belongs to a class of drugs known as bisphosphonates. It is used to treat high blood calcium levels (hypercalcemia) that may occur with cancer. Zoledronic Acid is also used with cancer chemotherapy to treat bone problems that may occur with multiple myeloma and other types of cancer (such as breast, lung) that have spread to the bones.  It is sold in two formulations:  a 5mg injection and a 4mg injection.

645.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Zoledronic Acid as follows:

646.   In early 2013, Heritage began preparing to launch a generic version of the 5mg injection.  It planned to be the first generic entrant in the Zoledronic Acid market.

647.   Dr. Reddy's was positioned to enter the Zoledronic Acid market shortly after Heritage.

648.   Par, which did not have an ANDA for Zoledronic Acid, eventually was able to obtain the rights to market and sell Zoledronic Acid using an ANDA obtained by MDL Defendant Breckenridge Pharmaceutical, Inc.   Par entered the market approximately 8 months after Heritage and Dr. Reddy's.

649.   Being the first generic to the market was atypical for Heritage, and Heritage wanted to work with its competitors so that it could enter the market at a price that would not be challenged by subsequent market entrants.  For that reason, on January 21, 2013, Heritage's Malek instructed O'Mara to reach out to his contact at Dr. Reddy's, VP of Sales and Marketing John Adams, to discuss market strategy and to "socialize" the idea of keeping prices elevated above a competitive level.

650.   O'Mara attempted to call Dr. Reddy's Adams the next day, but Adams was on a conference call.  When O'Mara informed Malek that Adams was going to call him back later that morning, Malek outlined exactly what he wanted O'Mara to say

when he did speak with Adams, including providing O'Mara with a list of questions to ask.

651.    Dr. Reddy's Adams called Heritage's O'Mara after his conference call on January 22, 2013, and they spoke for ten minutes.

652.    After the call, O'Mara reported to Malek the substance of the call:  O'Mara had learned that Dr. Reddy's would launch a 4mg product on the first day it could produce a generic, but it was not certain if it would launch on the 5mg formulation.  Dr. Reddy's ultimately did launch the 5mg formulation.   O'Mara also reported that Dr. Reddy's wanted its "fair share" of the market. As discussed above, "fair shares" were allocated to Defendants across Drugs at Issue and within a particular drug market based upon the number of competitors in the market and the timing of their entry into the market.  If Dr. Reddy's entered the Zoledronic Acid market first—consistent with fair share agreements that had long existed in the generic pharmaceuticals market—it expected a 60% share of the market. If Heritage entered the market at the same time as Dr. Reddy's, the expectation was that the market share would be split evenly.

653.    Less than an hour after they first spoke on January 22, 2013, Heritage's O'Mara and Dr. Reddy's Adams spoke again for approximately ten minutes and discussed a plan to keep the pricing of Zoledronic Acid elevated above competitive levels. O'Mara and Adams spoke for approximately 24 minutes again on January 24.

654.    While these conversations with Dr. Reddy's were occurring, Heritage, Lannett, Mylan, and Par were also discussing pricing for Doxy Mono.

655.    Heritage knew that Dr. Reddy's was going to enter the market, but Heritage's Malek did not want to take any chance of other competitors disrupting Heritage's cozy relationship with Dr. Reddy's, and in March of 2013, Malek set out to confirm that there would be no other entrants to the market.

656.    Malek instructed another Heritage employee (likely Sather) to reach out to competitors and large customers in an effort to confirm that no other manufacturers were planning on entering the generic Zoledronic Acid market.  In his instructions to this employee, Malek provided the same list of questions he had provided to O'Mara for contacting Dr. Reddy's Adams.

657.    Prior to the launch, Heritage continued communicating with Dr. Reddy's to refine their agreement on market share and pricing.  For example, Heritage's O'Mara called his counterpart at Dr. Reddy's, Adams, on March 3, 2013, and left a message. Adams (or another individual from Dr. Reddy's) returned the call two days later and spoke with Heritage's O'Mara for approximately 15 minutes.

658.    While these conversations were occurring, Heritage's CEO Malek learned that Dr. Reddy's was threatening to disrupt Defendants' agreement by quoting low prices on Zoledronic Acid to customers, including Cardinal.  Malek e-mailed Sather and O'Mara on March 6 to express this concern and to ask about pricing.

659.    Malek also instructed O'Mara to speak with Dr. Reddy's Adams about Zoledronic Acid when they were both attending the same customer conference in

March of that year.  On March 12, 2013, the two spoke by phone twice and exchanged numerous text messages.

660.    The next day, Heritage's CEO Malek asked O'Mara for an update on Dr. Reddy's.  O'Mara responded with information about his conversation with Adams.

661.    A few weeks later, on April 3, 2013, Heritage's O'Mara spoke with Adams at Dr.  Reddy's, and confirmed that Dr. Reddy's had just begun shipping the 5mg product. Adams also provided information about its pricing. O'Mara and Adams spoke numerous times throughout the rest of April about customers and pricing for both Zoledronic Acid and Meprobamate.  At the same time, as discussed above, Sun and Heritage's Sather were discussing Nimodipine pricing and market share.

662.    Consistent with their agreement, in April of 2013, both Heritage and Dr. Reddy's entered the Zoledronic Acid market at a higher price than they otherwise would have absent their collusive pricing agreement.  Heritage and Dr. Reddy's announced list prices that were within a few percentage points of each other. They maintained these list prices through at least early 2016.  These list prices remained stable at this elevated, anticompetitive level even when a third manufacturer entered the market.

663.    After Zoledronic Acid launched, any disagreements about the allocation of customers between Heritage and Dr. Reddy's were resolved through direct communications between the two companies.

664.    Heritage's ability to contact Dr. Reddy's and obtain an agreement on the allocation of the market and the price of Zoledronic Acid would not have been possible

absent the existing "fair share" agreement among Defendants.  The discussions between Dr. Reddy's and Heritage make clear that they were not starting from zero in working out the details of their agreement on Zoledronic Acid, but were building on an existing understanding about "fair share" and the avoidance of competition across numerous drugs.

665.   Defendants were aware that their conversations were anticompetitive and illegal. For example, on April 19, 2013, Malek sent a text message to his entire sales team reminding them not to put their pricing discussions with competitors in writing.

666.   Defendants' ability to exchange information and negotiate pricing agreements was aided by the near constant ability of Defendants to meet in person at trade association meetings and conferences, *see* Exhibit 1, where they had the opportunity to, and in fact did, discuss and come to pricing agreements and discuss enforcing their agreements without leaving lasting electronic records of their illegal collusion.

667.   For example, shortly before Dr. Reddy's and Heritage's conversations in March of 2013, both Defendants attended two trade association meetings where they also had the opportunity to exchange information:  the GPhA Annual Meeting, held from Feb. 20-22, 2013, in Orlando, FL; and the ECRM Retail Pharmacy Generic Pharmaceuticals Conference, held from Feb. 24-27, 2013, in Dallas, TX.  Both of those trade shows were attended by most Defendants, including Dr. Reddy's and Heritage.

668.    Similarly, shortly before Par entered the market for Zoledronic Acid, its sales employees attended the NACDS Total Store Expo in Las Vegas, which also was attended by numerous Defendants (including people directly implicated in anti-competitive communications):  Apotex (Hamilton), Aurobindo (Cunard), Citron, Dr. Reddy's, Glenmark, Heritage (Glazer, Malek, O'Mara, and Sather), Lannett (Sullivan), Mylan (Nesta, Aigner), Sandoz, Sun (Knoblauch), Taro, Teva, West-Ward and Zydus (Lukasiewicz).

669.    When Par finally entered the market in late 2013, it announced list prices **_even higher_** than those of Heritage and Dr. Reddy's.  List prices for Dr. Reddy's, Heritage and Par remained elevated thereafter.  As it had done in the Doxy Mono market discussed above, Par sought to avoid price competition. Although it was the third generic manufacturer into the market, Par did not undercut the prices of Heritage and Dr. Reddy's in an effort to gain market share, as normally happens in a competitive market for a generic pharmaceutical product and would have happened here, but for Defendants' anticompetitive agreement.

670.    Instead, Par complied with the terms of Defendants' overarching conspiracy and imposed higher prices than a competitive market would have allowed and attempted prevented price erosion in the market for Zoledronic Acid.

671.    No shortages or other market features can explain Defendants' elevated prices for Zoledronic Acid during the Relevant Period.

672.   The elevated prices of Zoledronic Acid that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

673.   The unlawful agreement between Dr. Reddy's, Heritage, and Par regarding Zoledronic Acid was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### J.    Tizanidine

674.   Aptly illustrating the overlapping rings of the different subparts of Defendants' overarching conspiracy, in the same timeframe as Defendants Dr. Reddy's, Heritage, and Par were implementing the Zoledronic Acid part of Defendants' overarching conspiracy, Dr. Reddy's was simultaneously working with Defendants Sandoz and Mylan on a different drug that was also part of Defendants' overarching conspiracy: Tizanidine.

675.   Tizanidine, also known by the brand name Zanaflex®, is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

676.   Tizanidine had been on the market for years and its price had eroded signficantly.

677.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Tizanidine, as follows:

678.    As of May, 2013, Defendants Sandoz, Mylan, and Dr. Reddy's were sellers in the Tizanidine market.  At that time, Dr. Reddy's was dominant in the market with 59% market share – because it had the lowest prices and in a commodity market, such as generic pharmaceuticals generally and Tizanidine in particular, market share follows pricing – while Mylan had 24% and Sandoz had 17%.

679.    Dr. Reddy's led the increase on this product on Monday, May 13, 2013, increasing its Tizanidine WAC price and contract pricing **by a factor of ten.**

680.    Sandoz was thrilled when it learned that Dr. Reddy's was going to increase its price on Tizanidine by such a large multiple. On May 10, the Friday before the price increase, a national account executive at Sandoz ("S.G."), sent an internal e-mail noting this achievement by their nominal competitor.

681.    On the day Dr. Reddy's published its new WAC pricing for Tizanidine (Monday, May 13, 2013), Jim Nesta of Mylan called CW-4 at Sandoz and they spoke for 4 minutes.  Two days later, a senior sales executive at Sandoz, who will be referred to in this Complaint as CW-l, sent an internal e-mail to Kellum regarding this.

682.    Meanwhile, Mylan's Nesta and Sandoz's CW-4 continued their discussions regarding Tizanidine price increases, and Nesta brought a national account executive at Dr. Reddy's ("J.A.") into the loop on the discussions, as follows: on Monday, May 20, CW-4 (the one who was supposedly worried about her job security at Sandoz and had called Nesta the previous August and/or September under the guise of seeking employment at Sandoz) called Nesta for a few seconds, but to talk about

Tizanidine pricing, not her resume or employment. The next day, J.A. from Reddy's also called Nesta twice, but speaking for less than a minute each time, and perhaps not speaking at all the first time.

683. On Thursday, May 23, Sandoz's price increase was imminent, and CW-4 called Mylan's Nesta again, also for less than a minute; Nesta returned that call, the two spoke for a minute and a half, and then Nesta sent two text messages to J.A. at Dr. Reddy's.

684. The next day, Friday, May 24 – less than two weeks after Dr. Reddy's astronomical price increase – Sandoz matched Dr. Reddy's increased Tizanidine pricing, and in one formulation, actually exceeded it. Nesta called J.A. one more time that day, and then they did not speak again until August.

685. Notably, however, while the resulting pricing was the same as Dr. Reddy's, because Sandoz's pre-increase pricing was higher than Dr. Reddy's, Sandoz's increases had to be by lower amount, and lower percentages, as Dr. Reddy's, to get to the same final price.

686. As a result, Sandoz's increases were "merely" between 248% and 344% – still outrageous and significant, but noticeably less than Dr. Reddy's 900% increase. The reason the price increases were sudden, dramatic, almost simultaneous, but by very materially different amounts and percentages, is because they were the result of Defendants' overarching conspiracy, rather than from external market conditions – and Defendants wanted identical, inflated prices on their products.

687.   Mylan followed with similar pricing a month later, on July 2.

688.   No shortages or other market features can explain Defendants' price increases for Tizanidine during the Relevant Period.

689.   The elevated prices of Tizanidine that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

690.   The unlawful agreement between Mylan, Dr. Reddy's, and Sandoz on Tizanidine was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### K.   Meprobamate

691.   Meprobamate, also known by the brand-names Miltown® and Equanil®, is a generic pharmaceutical drug used to treat short-term anxiety, tension, and insomnia.

692.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Meprobamate as follows:

693.   Early in the Relevant Period, the market for generic Meprobamate was dominated by its sole suppliers:  Heritage, Dr. Reddy's, and Actavis.  In 2013, Actavis exited the Meprobamate market, which left Heritage and Dr. Reddy's as the two remaining suppliers in the market.  Heritage wanted to use Actavis's exit from the market as a pretext for price increases.

694.   While Dr. Reddy's and Heritage were negotiating pricing and market share for Zoledronic Acid (as discussed above), they also were discussing pricing for Meprobamate.

695.   By March 21, 2013, O'Mara had already been discussing the pricing of Zoledronic Acid with Dr. Reddy's Adams for several months.  But on that day, Heritage's CEO Malek e-mailed O'Mara and Edelson, instructing them to communicate to Dr. Reddy's—the only remaining competitor in the Meprobamate market—that Heritage wanted to increase the price on Meprobamate.  Malek's proposed price increase was approximately four times the current price.

696.   On March 22, during the same time they were exchanging price information for Zoledronic Acid with Dr. Reddy's, Heritage's O'Mara spoke to Dr. Reddy's Adams for nine minutes about at least Meprobamate, and likely also Zoledronic Acid.  During that conversation, Dr. Reddy's and Heritage reached an agreement to, at a minimum, raise the price of Meprobamate. O'Mara confirmed the agreement in an e-mail to Malek that same day, stating, "Dr. Reddy's is on board."

697.   Three days later, on March 25, Malek emailed O'Mara about the agreement, and O'Mara responded again confirming that Dr. Reddy's would "follow suit" if Heritage raised the price on Meprobamate.

698.   In a competitive market, a supplier risks losing market share if it raises price, but Dr. Reddy's assurance to Heritage that it would "follow suit" eliminated that risk—and eliminated price competition in the market for Meprobamate.

699. During this period, Dr. Reddy's was having supply issues with Meprobamate, and Heritage's O'Mara reported that this "lack of inventory" kept Dr. Reddy's prices "stationary." As a result of these supply issues, on March 27, 2013, ABC asked Heritage to give a bid on both formulations of Meprobamate.

700. Malek immediately forwarded the RFP internally and discussed Heritage's proposed response. Malek's response to this internal discussion reflected a clear understanding and an intention to abide by the agreement between Heritage and Dr. Reddy's on pricing for Meprobamate. This agreement was confirmed in a short conversation between Heritage and Dr. Reddy's on March 29, 2013.

701. A few weeks later, in April of 2013, Dr. Reddy's approached Heritage to discuss obtaining additional Meprobamate market share and asked Heritage to give up a specific large pharmacy chain. Because of their agreement, Heritage gave up some of its market share to Dr. Reddy's.

702. Heritage sent an e-mail to the large pharmacy chain on April 24, 2013, and on May 17, Heritage's Malek provided Dr. Reddy's with clarifying information about precisely which business Heritage had agreed to give up to Dr. Reddy's.

703. Heritage's O'Mara called Adams, his counterpart at Dr. Reddy's, on May 17, 2013. The two subsequently spoke on May 21, 2013 for nearly seven minutes.

704. As a result of Heritage and Dr. Reddy's agreement, both raised Meprobamate prices across the board. Their price increases were nearly simultaneous. Heritage's price increase became effective in late April, 2013, and Dr. Reddy's price

increases became effective in early May.  Heritage and Dr. Reddy's imposed identical list prices for 200mg Meprobamate tablets (an increase of nearly 400%) and 400mg Meprobamate tablets (an increase of approximately 350%).  AWP prices for both products were also elevated.  Both list and AWP prices remained elevated above competitive levels thereafter.

705.   Dr. Reddy's supply issues with Meprobamate do not explain Defendants' abrupt, simultaneous, and identical price increases, in whole or in part, and no other product shortages or other market changes can explain Defendants' abrupt, simultaneous, and identical price increases.

706.   Dr. Reddy's and Heritage's Meprobamate pricing discussions happened nearly simultaneously with their pricing and market share discussions about Zoledronic Acid.

707.   Further, as discussed above, Defendants' ability to quickly reach agreement on market share and price increases was a function of their overarching conspiracy to fix prices across the markets for generic pharmaceuticals and was further aided by the prevalence of trade association meetings and conferences where the parties met in person.  Heritage, Dr. Reddy's, and representatives of other Defendants attended at least three such meetings when these price increases were being discussed.

708.   Heritage and Dr. Reddy's continued to discuss pricing for Meprobamate throughout the Relevant period.  For example, Meprobamate was identified during the

April 22, 2014 Heritage teleconference as one of the numerous drugs targeted for a price increase.

709.   On April 24, 2014, a Heritage employee—likely Matt Edelson—exchanged six text messages with his contact at Dr. Reddy's about pricing for Meprobamate, and likely other drugs, as well.  The two spoke briefly on May 6, 2014.

710.   On May 8, 2014, Malek e-mailed the Heritage sales team requesting an update on the status of agreements with competitors so that Heritage could move forward with the price increases discussed on April 22, 2014.  A Heritage employee (likely Edelson) responded to Malek that he was awaiting feedback from one competitor (believed to be Dr. Reddy's) about the drug Meprobamate.

711.   No shortages or other market features can explain Defendants' price increases for Meprobamate during the Relevant Period.

712.   The elevated prices of Meprobamate that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

713.   The unlawful agreement between Dr.  Reddy's and Heritage regarding Meprobamate was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**L.**     **Nabumetone, Pravastatin, Ranitidine, and Adapalene Gel**

714.    Nabumetone, also known by brand names such as Relafen, Relifex, and Gambaran, is a non-selective Non-Steroidal Anti-Inflammatory Drug (NSAID) used in the treatment of pain and inflammation.

715.    Pravastatin, also known by the brand name Pravachol, is a statin and is used to lower blood levels of lipids, including triglycerides and cholesterol.

716.    Ranitidine, also known by the brand name Zantac, among others, decreases stomach acid production, and is commonly used in treatment of peptic ulcer disease, gastroesophageal reflux disease, and Zollinger–Ellison syndrome.

717.    Adapalene Gel, also known by brand names such as Pimpal, Gallet, and Adelene, is a topical retinoid used primarily in treatmenting mild-to-moderate acne.

718.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Nabumetone, Pravastatin, Ranitidine, and Adapalene Gel as follows:

719.    In April of 2013, Teva took a major step toward implementing more significant price increases by, as mentioned above, hiring Nisha Patel as its Director of Strategic Customer Marketing.  Teva hired Patel specifically to identify generic drugs for which Teva could raise prices and then to conspire with the other Defendants to maintain those increased price, which Patel did.  This was a significant factor in her performance evaluations and bonus calculations and, as discussed more fully below, Patel was rewarded by Teva for doing it, including a bonus of over $30,000 – on almost

$1 billion per quarter in additional revenue and profits that Teva was able to unlawfully extract from the victims of Defendants' cartel, including Plaintiffs.

720.   In her position as Director of "Strategic" Customer Marketing, in addition to her other responsibilities, Patel would and did implement "strategic" decisions not to vie for certain customers' business because doing so would violate Defendants' overarching conspiracy.

721.   Among other things, Patel's job responsibilities included serving as the interface between the marketing (pricing) department and the sales force teams to develop customer programs; establishing pricing strategies for new product launches and in-line product opportunities; and, most importantly, identifying suitable generic drugs for significant price increases, which included  overseeing the customer bid process and product pricing administration at Teva.  Patel had 9-10 direct reports in the pricing department at Teva.

722.   Prior to joining Teva, Defendant Patel had worked for eight years at a large drug wholesaler, ABC, working her way up to Director of Global Generic Sourcing.  During her time at ABC, Patel had routine interaction with representatives from every major generic drug manufacturer, and developed and maintained relationships with many of the most important sales and marketing executives at Teva's competitors.

723.   Even before Patel started at Teva, she worked at enhancing Defendants' conspiracy by communicating with future "competitors" about her move to Teva and

new role there.  For example, she used to work with Ala Aprahamian ("Aprahamian"), the Vice President of Sales and Marketing at Defendant Taro, when they were both formerly employed by Teva's and Heritage's current customer ABC.

724.    Thus, prior to joining Teva, Patel told Aprahamian about her move to Teva and new role there, and in turn – on April 2, 2013, still nearly three weeks before Patel started at Teva – Aprahamian sent an e-mail to his boss, Taro's Chief Operating Officer ("COO"), about Patel's move to Teva.  The Taro COO believed that this move would help Defendants' overarching conspiracy.

725.    Once Patel began her employment at Teva, her communications with competitors became more systematic – and clustered around market events such as price increases, market entry, customer challenges, and loss of exclusivity.

726.    Once on board at Teva, Patel started to look very closely at Teva's relationships with its competitors to ensure close co-ordination as part of Defendants' overarching conspiracy.  Patel understood – and stressed internally at Teva – that it was very important to identify those competitors who were willing to share information about their price increases in advance, so that Teva would be prepared to follow quickly.  Conversely, it was equally important for Patel to be able to inform Teva's competitors of Teva's increase plans so those competitors could also follow quickly.  Either way, significant coordination was important for price increases to be as smooth – and, therefore, profitable – as possible.

727.   For example, in one of her earliest conversations after joining Teva with a senior sales executive at Sandoz, who will be referred to in this Complaint as CW-1, Patel told CW-1 that Patel had been hired by Teva to identify drugs where Teva could increase its prices.  She asked CW-l how Sandoz handled price increases. CW-1 told Patel that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after any price increase by Teva. Not surprisingly, Sandoz was one of Teva's highest "quality competitors."

728.   From this point on, for the remainder of the Relevant Period, Patel and Teva based many price increase (and market allocation) decisions on this understanding with Sandoz – one example of which, involving Nabumetone, Pravastatin, Ranitidine, and Adapalene Gel, was shortly about to occur.

729.   Patel had multiple means of communicating with competitors, including telephone, text, message functions on Facebook and LinkedIn, encrypted communication services like Snapchat, and, of course, in person.

730.   Through her communications with other Defendants, Patel learned about their planned price increases, which Teva agreed to follow with increases of its own, rather than gaining increased market share at Defendants' expense.

731.   For example, on May 2, 2013, Patel had phone calls with a senior sales executive at Glenmark, who will be referred to in this Complaint as CW-5, with CW-1 at Sandoz for a quarter-hour, and for a half hour with Actavis's Rogerson.

732.    Like Falkin, Rogerson stayed in his role at Actavis until it was acquired by Teva, in August of 2016.  Shortly thereafter, Rogerson moved on to Defendant Amneal as a Senior Director of Marketing and Business Analytics.  Between February, 2010, and July, 2016, Rogerson exchanged at least 635 phone calls or text messages with his contacts at Defendants Wockhardt, Teva, Dr. Reddy's, Sandoz, Lannett, Glenmark, Taro, and Zydus, including over 300 phone calls or text messages with K.A. at Wockhardt and over 150 phone calls or text messages with Nisha Patel at Teva.

733.    After one of her calls on that day with Glenmark's CW-5, Patel sent an e-mail to one her subordinates, directing him to add six different Glenmark drugs to Teva's price increase list, including Nabumetone, Pravastatin, Ranitidine, and Adapalene Gel.

734.    Two weeks later, on May 16, 2013, Glenmark raised its prices on these drugs and Teva followed with its own price increases shortly thereafter.

735.    No shortages or other market features can explain Defendants' price increases for Nabumetone, Pravastatin, Ranitidine, and Adapalene Gel during the Relevant Period.

736.    The elevated prices of Nabumetone, Pravastatin, Ranitidine, and Adapalene Gel that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

737.   The unlawful agreement between Teva, Sandoz, and Glenmark regarding Nabumetone, Pravastatin, Ranitidine, and Adapalene Gel was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**M.    Drospirenone/EE**

738.   Ethinyl Estradiol in conjunction with Drospirenone ("Drospirenone/EE"), also known by brand names such as Yaz®, Yasmin®, and Ocella®, provides hormonal birth-control.

739.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of generic Drospirenone/EE as follows:

740.   Barr    Pharmaceuticals    received    approval    to    market    generic Drospirenone/EE in 2008, and Teva continued to market the drug after the acquisition of Barr in 2011 under the name Gianvi®.

741.   In late 2012, Lupin received approval to market a generic Drospirenone/EE product.  By April 2013, Lupin was making plans for a summer 2013 entry into the market, so, in accordance with the established practices of Defendants' cartel, Lupin contacted Teva to initiate discussions on how the competitors would allocate fair share among themselves.  On April 24, 2013, Teva's Green received a call from David Berthold ("Berthold"), Lupin's Vice President of Sales.  The two spoke for over three minutes.

742.   This was far from Berthold's only communication advancing the conspiracy; as Lupin's Vice President of Sales, Berthold has relationships with individuals at many of the Defendants and is one of the most prolific communicators of all the conspirators identified herein.

743.   For example, between March of 2011 and October of 2018, Berthold exchanged at least 4,185 phone calls or text messages with his contacts at Defendants Aurobindo, Glenmark, Greenstone, Actavis, Wockhardt, Zydus, Teva, Breckenridge, Mylan, Sandoz, Dr. Reddy's, Amneal, and Lannet, including over 1,900 calls or texts with Jim Grauso during Grauso's time at Aurobindo and Glenmark, at least 791 calls or texts with R.H. at Greenstone, over 300 calls or texts with A.G. at Actavis, over 75 calls or texts with Nisha Patel at Teva, and over 240 calls or texts with Kevin Green during his tenure at Teva and, later, Zydus – including the three minute call just mentioned, which was followed by two additional calls the following day, April 25.

744.   Discussions intensified the following week among Teva, Lupin, and a third supplier, Actavis.  In preparation, on April 29, 2013, K.G. of Teva asked a colleague for current market share figures along with a list of Teva's generic Ocella customers.  The colleague responded with a customer list, estimating Teva's current market share at 70-75%.

745.   The next day, April 30, A.B., a senior sales and marketing executive at Actavis, and Teva's Rekenthaler spoke twice by phone. That same day, Teva's Patel also called A.B.

746.    The competitors' communications continued into early May.  On May 1, 2013, Patel sent A.B. four text messages.  On May 6, Patel and Berthold spoke twice by phone; the second call lasted twenty-two minutes. Green and Berthold also spoke that same day.  The next day, May 7, Patel and Berthold discussed Drospirenone/EE market share again, this time speaking for over 10 minutes. Patel also placed a call to Rogerson at Actavis.

747.    The day after that, May 8, Teva learned that Actavis had bid for one of Teva's customer's generic Ocella business – which, of course, as a new entrant, Actavis was entitled to do under the terms of Defendants' cartel, so long as each supplier ended up with its appropriate "fair share," but to reach that "fair share" without the sort of miscommunication that had marred Mylan's entry into the Clonidine-TTS market, co-ordination was important, so on the same day, Patel also spoke to Rogerson for approximately 20 minutes, and the following day, May 9, Green and Berthold also spoke for at least approximately 12 minutes.

748.    The day after that, on May 10, Rekenthaler received his requested analysis for how much it would cost to concede two of its major accounts, which he passed on to Patel.  With that information in hand, Patel then spoke to Berthold and Rogerson, for approximately a quarter of an hour and five minutes, respectively, to discuss Clonidine-TTS market share.

749.    A few days later, on May 14, 2013, Teva's K.G. recommended conceding those accounts; Rekenthaler agreed.

750.    On July 10, 2013, Green spoke to Berthold twice (for approximately than eight and two minutes); after the first of those calls, Green requested "the normal profitability analysis on all customers with pricing and market share[;] Lupin is entering the market" from a colleague to help him continue to negotiate with Lupin.

751.    Later that day, Green called and spoke to Patel for more than seven minutes, conveying what he had learned from Berthold.   During that call, the two decided that Patel would call Berthold back and confirm the agreement between Teva and Lupin.   Patel called Berthold shortly after and the two spoke for more than four minutes. They spoke again first thing the next morning, for nearly one minute.

752.    The next day, Patel e-mailed Green, saying:  "BTW, Ocella.  Check!" Green, confused by the e-mail, responded:  "Huh... you are calling....correct?" Patel confirmed that she had indeed called her counterpart at Lupin:  "Yes. I was saying it's all done."

753.    Discussions between Teva and Lupin continued on July 17, 2013 with a call between Green and Berthold that lasted twenty minutes.

754.    On July 29, 2013, Defendant Green announced to his colleagues:  "Lupin has entered and we need to evaluate."

755.    The lines of communication between competitors Teva and Lupin remained open and active over the next few months as they worked on the details of which company would take which generic Ocella accounts.  On September 5, 2013, for example, Rekenthaler conveyed to a colleague the importance of retaining a particular

customer's account, along with his understanding of Green's discussions with Berthold about Lupin's desired market share. Green spoke to Berthold by phone twice the following day to re-confirm the understanding between the two companies.

756.   On September 9, 2013, Teva's K.G. sent an internal e-mail to his colleagues, conveying his thoughts about Lupin's bid for a portion of another customer's generic Ocella business. He informed them that because Teva had secured two other significant customers, "we will likely need to give up some of our formulary position to this new market entrant."

757.   In mid-October of 2013, as Teva and Lupin finalized allocating customer accounts between them, K.G. reminded one of his colleagues to be careful before conceding large customers on a "bucket basis," rather than drug-by-drug, in order to "make sure we are not giving up volume on products where we do not have our fair share."

758.   No shortages or other market features can explain Defendants' elevated prices for Drospirenone/EE during the Relevant Period.

759.   The elevated prices of EE/ Drospirenone that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

760.   The unlawful agreement between Teva, Sandoz, and Glenmark regarding Drospirenone/EE was part of all Defendants' overarching conspiracy to unreasonably

restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## N.    Acetazolamide

761.    Acetazolamide, also known by the brand name Diamox®, among others, is used, *inter alia*, in treating glaucoma, epilepsy, periodic paralysis, and heart failure. Acetazolamide is sold in two formulations: tablets, manufactured by Taro and Lannett; and sustained release capsules, manufactured by Heritage, Zydus, and Teva.

762.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Acetazolamide as follows:

### 1.    Acetazolamide Tablets

763.    Taro and Lannett dominate the market for Acetazolamide tablets. Since at least the spring of 2012, Taro and Lannett have co-ordinated pricing and market share in this market.

764.    Acetazolamide tablets come in two dosages: 125mg and 250mg. Both Taro and Lannett make the 250mg dosage, which is the predominant form. Only Taro makes the 125mg dosage, yet it was included in the agreement between Taro and Lannett to elevate the prices of Acetazolamide.

765.    Prior to the spring of 2012, Taro and Lannett priced their Acetazolamide tablets similarly, but not identically. Small price increases in 2009 and 2010 were implemented by both manufacturers, but were not identical, nor were they

simultaneous. For example, when Taro implemented a price increase at the end of 2009, Lannett kept its prices unchanged for a year before implementing an increase. Market share between Taro and Lannett also shifted during this period.

766.    All of this began to change, however, in April-May of 2012.

767.    In April-May of 2012, Taro and Lannett imposed 40% to 50% list price increases, and brought their list prices for Acetazolamide 250mg tablets to identical levels.  Taro also increased the list price of 125mg tablets around this time.

768.    Thereafter, in early 2013, Taro made slight price increases to both of its tablets.  By the middle of 2013, Taro and Lannett appear to have worked out a remarkably stable split of the market, accounting for both 125mg and 250mg tablets.

769.    By the end of 2013, Taro and Lannett were ready to impose a large price increase.  Within weeks of each other, in November and December, Taro and Lannett imposed identical list prices for Acetazolamide 250mg tablets.  The increases were well over 200%.  Taro imposed a similarly large list price increase on 125mg tablets around this time.  AWP prices for both products also increased significantly.

770.    This graph shows Taro and Lannett's lockstep AWP pricing:

**Figure 5**



771.    The list and AWP prices for Acetazolamide tablets remained elevated above competitive levels thereafter.

772.    Throughout their co-ordinated price increases, Taro and Lannett captured remarkably stable shares of the 250mg tablet market, with Lannett claiming approximately 56% and Taro claiming 44%.

773.    The actual agreement, however, was an even split of the market, 50% to each manufacturer, because Taro (the only one to manufacture the 125mg tablets) had 100% of sales of that dosage.  As a result, the total dollar of sales across both products was virtually even, and remained remarkably stable. Lannett's larger share of 250mg tablets was offset by Taro's sales of 125mg tablets.  The graph on the following page shows the total value of combined market share (*i.e.*, total  dollar  sales) for Acetazolamide tablets:

**Figure 6**



774.    The lockstep price increases and nearly perfect market share split across multiple dosages by Taro and Lannett was a part of, and is consistent with, all Defendants' overarching "fair share" agreement.

775.    The pricing conduct of Taro and Lannett is not consistent with a competitive market. Manufacturers would not impose a large price increase absent some assurance that their competitor would do the same, lest they lose market share.

776.    No shortages or other market changes can explain the abrupt, simultaneous and large price increases by Taro and Lannett.

777.    The ability of Taro and Lannett to reach agreement on market share and price increases was a function of their overarching conspiracy to fix prices across the markets for generic pharmaceuticals and was further aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

778.   For example, in August, 2013, not long before the large price increases imposed by Taro and Lannett, employees of both Defendants (including Tracy Sullivan) attended the NACDS Total Store Expo.  *See* Exhibit 1.

779.   Two months later, in October, representatives from Taro and Lannett, among other Defendants, attended the GPhA Fall Tech Conference in Bethesda, Maryland, which provided another opportunity to discuss price increases for Acetazolamide.

780.   No shortages or other market features can explain Defendants' price increases for Acetazolamide tablets during the Relevant Period.

781.   The elevated prices of Acetazolamide tablets that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

782.   The unlawful agreement between Taro and Lannett regarding Acetazolamide tablets was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## 2.   Acetazolamide Capsules

783.   The vast majority of the Acetazolamide capsule market is captured by Heritage, Teva and Zydus, with Heritage and Teva combining for approximately 78% of sales.  Teva marketed and sold Acetazolamide capsules during the relevant period at least in part through its subsidiary, Barr.

784.   As discussed *supra*, during the week of April 14, 2014, Heritage's Malek met with two employees and asked them to start analyzing the impact of price increases for numerous generic drugs, including Acetazolamide.

785.   Before introducing the market-wide price increases to the rest of his sales team, Malek was communicating with Patel at Teva, the competitor on seven Drugs at Issue on Malek's initial list.  On April 15, 2014, Heritage's Malek spoke with Patel of Teva for approximately 17 minutes.  During that phone call, Patel agreed to support Heritage's price increase for Acetazolamide and a series of other drugs.   As also discussed *supra*, Patel had already secured Heritage's agreement to support Teva's price increases for Nystatin and Theophylline.

786.   Malek and Patel spoke several more times over the next several months to confirm their agreement to raise prices and to keep abreast of the progress of Heritage's price increases.

787.   On April 16, 2014, the day after Malek spoke to Patel, a Teva employee – likely Patel – then called an employee at Zydus to discuss the pricing of at least Acetazolamide.  The two spoke for approximately 20 minutes and spoke again the next day for approximately 12 minutes. Over the next several months, the two communicated often.

788.   As noted above, on April 22, 2014, Heritage's Malek held a telephone conference with the sales team and dictated a pricing strategy that targeted numerous drugs for a price increase. This list included Acetazolamide.

789.   As with the other drugs he targeted, Malek believed it was important to "socialize" the idea of an Acetazolamide price increase with competitors before implementing it.  To that end, he and the Heritage NAM's contacted Teva and Zydus to discuss pricing and customers either via phone, text, e-mail, or in person, often through industry trade association meetings and conferences.

790.   Male k personally took responsibility to communicate with Defendants Teva and Zydus. Anne Sather was responsible for Lannett, as well as two other Defendants.  Matt Edelson, Daniel Lukasiewicz, and Neal O'Mara were responsible for contacting four other Defendants about pricing for various drugs.

791.   Four days after this phone call, on April 26-29, CEO Glazer attended the NACDS Annual Meeting where he had the opportunity to meet with representatives from numerous Defendants, including the other manufacturers of Acetazolamide capsules, Teva and Zydus.  *See* Exhibit 1.

792.   While Teva's Patel and Heritage's Malek were discussing increasing prices for at least the seven Drugs at Issue discussed above, on April 24, 2014, Malek contacted a Zydus employee through the website LinkedIn to discuss at least Acetazolamide.  The Zydus employee responded later the same day.

793.   In an e-mail exchange May 6-7, 2014, Malek explained that he had obtained agreements to raise the price of Acetazolamide.  Malek had previously told a Heritage salesperson to hold off on responding to a large customer's request for a  price reduction.  After confirming his agreement with Teva and Zydus to raise the price of

Acetazolamide, he informed his salesperson that Heritage would not agree to reduce its price.

794.    Malek also confirmed an agreement with another competitor – likely Zydus – on Acetazolamide pricing on May 7, 2014.

795.    During this time, Heritage avoided bidding on any potential customers where Zydus was already supplying Acetazolamide.  Heritage did this in furtherance of Defendants' agreement not to compete on Drugs at Issue.  During this time, employees at Teva and Zydus were also in close contact with each other about Acetazolamide.  On May 14, 2014, employees of Teva and Zydus exchanged numerous text messages.

796.    All Defendants had plentiful opportunities to speak in person about these agreements without leaving electronic records of their communications.  Between April and October 2014, all U.S. Defendants attended at least one of the many trade events organized by NACDS, MMCAP, HDMA, or GPhA, in addition to several customer conferences.  *See* Exhibit 1.

797.    Defendants used these meetings as an opportunity to reconfirm their agreements on pricing and otherwise engage in anticompetitive conduct related to the Drugs at Issue.

798.    For example, on June 3, 2014 at the HDMA Business and Leadership Conference, Heritage's Sather had dinner and drinks with salespeople from Sandoz, Par, and Lannett.  Three weeks later, on June 23, the Heritage sales team had a meeting where they discussed the specific percentages by which they would increase prices on

the identified drugs and their strategy for doing so. The slated increase for Acetazolamide capsules was 75%.

799.    On June 26, 2014, Heritage began sending out price increase notices to its customers for nine different drugs, including Acetazolamide. By July 9, Heritage had raised the price of Acetazolamide to at least 17 different customers nationwide.

800.    No shortages or other market features can explain Defendants' price increases for Acetazolamide capsules during the Relevant Period.

801.    The elevated prices of Acetazolamide capsules that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

802.    The unlawful agreement between Heritage, Teva and Zydus regarding Acetazolamide capsules was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## O.    Temozolomide

803.    Temozolomide, also known by the brand name Temodar, is used to treat brain cancer, including glioblastoma multiforme and refractory anaplastic astrocytoma.

804.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Temozolomide as follows:

805.    The patent on Temozolomide was set to expire in early 2014, but both Teva and Sandoz had independently obtained the right to launch in August 2013 – six months prior to the patent's expiration.  Leading up to the launch of the generic, Teva co-ordinated with Sandoz to divide up the market.

806.    On July 18, 2013, a large retail pharmacy customer submitted an RFP to Sandoz for Temozolomide.  Playing by the rules of the road, Sandoz waited to see what Teva was going to do before submitting their own bid.  That same day, CW-1 received a telephone call from Patel. Patel sought information on Sandoz's current customers and discussed options to allocate customers for Temozolomide.

807.    On July 22, 2013, P.G., a senior Sandoz executive, instructed his team to find out Teva's plans with regard to this customer.  As directed, the next morning, S.G., a national account executive at Sandoz, spoke with the pharmacy and asked about Teva's plans for this customer's Temozolomide business.

808.    At the same time, CW-1 was reaching out to Teva directly to get more information.  CW-1 called Patel at approximately 1:45pm on July 23, 2013. After exchanging voicemails, they spoke for a quarter of an hour.  On that same afternoon, the pharmacy replied to Sandoz and delivered Teva's message regarding its plans for the Temozolomide business, telling Sandoz the timing of Teva's Temozolomide launch, that Teva had sufficient Temozolomide stock for the 50% market share that the "rules of the road provided," but would not seek more than that, and wanted to reconfirm

Sandoz's intentions.    Although the message was coded, Sandoz received and understood it.

809.   Just under a week later, on July 29, Patel called CW-1 at Sandoz and they spoke for nine minutes, discussing how to carve up the market for Temozolomide, on which they were exclusive manufacturers.

810.   Teva and Sandoz were also co-ordinating through other channels. On July 29, after receiving the RFP from the pharmacy, Sandoz's S.G., spoke with a senior account executive at Teva, T.S., for seven minutes; and the same day, there were two phone calls exchanged between Teva's then-Director of National Accounts, Kevin Green ("Green"), and CW-2 at Sandoz, regarding the pharmacy and its Temozolomide business.

811.   The next day, on July 30, a different retail pharmacy, CVS Caremark, contacted Teva to ask for a Temozolomide bid.  A senior sales executive at Teva, T.C., discussed the matter with her boss, Rekenthaler.  Rekenthaler responded by alluding to the arrangement they had with Sandoz.

812.   The day after that, July 31, arrangements were finalized:  Green and CW-2 discussed the pharmacy and its Temozolomide business, speaking for approximately six minutes.  In addition, T.S. and S.G. spoke for approximately eleven minutes, after which S.G. suggested internally that Sandoz submit a cover bid and cede the pharmacy's Temozolomide business to Teva, which Sandoz ultimately did.

813. On August 12, 2013, the same day as Teva's Temozolomide launch, CW-2 met in person with Rekenthaler at the Grand Lux Café in Las Vegas during the NACDS Total Store Expo conference. There, Rekenthaler discussed, among other things, Temozolomide and informed CW-2 that Teva had officially launched and shipped all formulations of the drug.

814. Although Teva initially obtained the CVS account in August of 2013, due to Sandoz's inability to supply the 250mg dose of Temozolomide, the companies had agreed that the account would revert back to Sandoz once Sandoz could supply that dosage strength. In addition, CW-1 spoke to Patel both before and after Sandoz sent out any offers regarding Temozolomide in an effort to develop and ensure there was an appropriate between the two competitors under Defendants' overarching conspiracy.

815. Sandoz's inability to supply the 250mg dose of Temozolomide cannot explain Defendants' elevated prices for Temozolomide during the Relevant Period. Indeed, no other shortages or other market features can explain Defendants' elevated prices for Temozolomide during the Relevant Period.

816. The elevated prices of Temozolomide that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

817. The unlawful agreement between Sandoz and Teva regarding Temozolomide was part of all Defendants' overarching conspiracy to restrain trade

unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### P.   Azithromycin Suspension

818.   Azithromycin Suspension is an antibiotic used to treat a variety of infections, including strep throat, pneumonia, and middle ear infections.

819.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Azithromycin Suspension as follows:

820.   In November of 2013, Defendant Greenstone began planning to increase prices on several drugs, including some that overlapped with Teva: Azithromycin Suspension, Azithromycin Oral Suspension, and Medroxyprogesterone Tablets.   Patel and R.H., a national account executive at Greenstone, were communicating frequently during that time, including exchanging six text messages on November 16, 2013 and a phone call on November 23, 2013.

821.   Because Greenstone was a high-quality competitor, and because the companies had successfully conspired to raise prices previously, it was understood between the two that if Greenstone raised prices Teva would follow and would not seek to poach Greenstone's customers after the increase.

822.   Defendant Pfizer was directly involved in the approval process for these price increases.  On November 18, 2013 - only two days after Defendant Patel and R.H.

exchanged text messages – a senior pricing executive at Greenstone sent an e-mail to Greenstone's General Manager, seeking approval to implement the price increases.

823.   But because Greenstone was a mere instrumentality of Pfizer, the General Manager could not make a decision on the price increase on his own; instead, he had to send a message to a senior Pfizer executive for sign off, and to help convince the Pfizer executive to approve the increase (because the considered decision of senior Greenstone management was unimportant to Pfizer), the Greenstone General Manager told the Pfizer executive that the price increases that Greenstone was seeking to take were consistent with Defendants' other price increases – in other words, he wanted to know that Pfizer was not risking losing customers in a commoditized industry by raising prices, which would be the result in a non-collusive market.

824.   Pfizer approved the price increases on November 22, 2013, the Friday before that year's Thanksgiving holiday. The next day, Saturday, Patel spoke to R.H. at Greenstone, discussing the increases.

825.   The Monday following the Thanksgiving holiday, on December 2, 2013, Patel and RH had two telephone calls, whereupon Patel sent an internal e-mail to her colleagues at Teva, informing them of Greenstone's upcoming price increases.

826.   Later that week, on Thursday, December 5, Patel continued her communications with R.H. about the Greenstone increases and how Teva would react to unsolicited customer requests for bids – trading two voice-mails. The same day, Teva declined to bid on Azithromycin at multiple customers.

827.   Over the next several months - during the period of time before Teva followed Greenstone's price increases – Teva continued to refuse to bid (and avoid taking Greenstone's market share) when requested by customers, for both Azithromycin formulations and Medroxyprogesterone Tablets.

828.   For example, on January 27, 2014, Teva was approached by a large wholesaler asking for bids on both Azithromycin Suspension and Medroxy-progesterone.   While Teva was not experiencing any supply issues of its own, after speaking with R.H. of Greenstone for a few minutes that same day, Patel agreed with the recommendation not to provide a bid to that customer.

829.   Consistent with the understanding between the two companies, rather than gaining market share in a commodity market when its competitor raised its price, Teva followed Greenstone's price increases for Azithromycin Oral Suspension, Azithromycin Suspension, and Medroxyprogesterone Tablets on April 4, 2014. Patel spoke twice with R.H. from Greenstone that same day.

830.   No shortages or other market features can explain Defendants' price increases for Azithromycin Suspension, Azithromycin Oral Suspension, and Medroxyprogesterone Tablets during the Relevant Period.

831.   The elevated prices of Azithromycin Suspension, Azithromycin Oral Suspension, and Medroxyprogesterone Tablets that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

832.   The unlawful agreement between Teva and Pfizer/Greenstone regarding Azithromycin Suspension, Azithromycin Oral Suspension, and Medroxyprogesterone Tablets was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## Q.   Tolterodine ER

833.   Tolterodine Extended Release ("Tolterodine ER"), also known by the brand name Detrol LA®, is used for treating an overactive bladder.

834.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Tolterodine ER as follows:

835.   Pfizer is the branded drug manufacturer for Detrol LA.  To resolve patent claims related to Detrol LA, Teva and Pfizer entered into a settlement agreement under which Teva would distribute an authorized generic of Tolterodine ER.  To resolve similar claims, Mylan entered into its own settlement agreement with Pfizer, which allowed Mylan to launch its own generic version of Tolterodine ER.

836.   On October 31, 2013, Mylan's ANDA for Tolterodine ER was approved. Under their respective settlement agreements with Pfizer, this triggering event allowed Teva and Mylan to launch their respective generics on January 2, 2014.

837.   Teva planned to launch on January 2, 2014. During the first half of December 2013, Teva was understood (based on conversations with potential customers) that Mylan would not be in a position to launch until 30 to 60 days after

Teva launched.  Nonetheless, Teva was considering how to allocate the market with Mylan when it did eventually launch.

838.   On December 3, 2013, J.K., a marketing executive at Teva, sent an e-mail to Rekenthaler, K.G., and several other Teva colleagues stating "we prepared for 50-60 share… I am looking into the numbers as far as what this means."  To prepare offers and figure out the allocation of customers that would bring Teva its desired 50% to 60% market share, Teva executives were instructed to gather usage from potential customers.

839.   Through the first half of December 2013, as Teva was soliciting usage amounts from potential customers, customers were asking Teva to send in pricing offers before the launch. Teva resisted sending out those offers and instead did not plan to do so until the launch date of January 2, 2014.

840.   Teva's delay in putting together pricing for potential customers was part of a plan to drive up the amount it could charge for Tolterodine ER.  Teva expected that on January 1, 2014, its last day before generic competition entered the market, Pfizer would raise the price of branded Detrol LA.  This would allow Teva to peg its price to the now inflated price of the branded drug and thereby command a higher price for Tolterodine ER on the January 2, 2014 generic launch date.

841.   At the end of the day on Friday December 20, 2013, T.C. of Teva learned from D.H. at Cardinal that Mylan intended to launch its Tolterodine ER on January 2. D.H. further provided T.C. with Mylan's pricing for two dosages, and conveyed that

Mylan is "looking for a 40% market share," and that Teva "can figure the rest out," illustrating the pervasive nature of the conspiracy and the involvement of third parties, often wholesalers with cost-plus distribution contracts that meant they also benefitted from the illegal profits of Defendants' cartel.

842.    T.C. informed her Teva colleagues of Mylan's new launch date.  K.G. of Teva then worked over the weekend to turn this information into initial pricing for all of Teva's potential customers and then shared it internally.  In a telling admission that Teva had no intention to bid competitively for all accounts, K.G. noted that the next step was "to pick who should receive" bids.  The goal in "pick[ing] who should receive" bids was to ensure that both Mylan and Teva received their previously stated market share goals:   Teva wanted "50-60 [%] share" while, in accordance with what Defendants' overarching conspiracy would sometimes euphemistically refer to as the "rules of the road,"  Mylan was only "looking for a 40% market share."

843.   On Monday, December 23, 2013, Rekenthaler, Patel, K.G., T.C., and several others at Teva had a telephone conference scheduled from 8:00am to 9:00am to discuss the Tolterodine ER launch strategy.

844.   Just minutes before the meeting was to start, Rekenthaler tried calling Nesta at Mylan. Nesta returned Rekenthaler's call at 8:15 am, during the Teva Tolterodine ER phone conference.  Rekenthaler nonetheless answered Nesta's call on his cell phone and the pair spoke for a minute and a half. Immediately after the Tolterodine ER phone conference, Rekenthaler tried calling Nesta two more times.

845.   Later that same morning, at 10:22 am, Nesta returned Rekenthaler's calls and they spoke for an additional 12 minutes.   During these calls, Defendants Rekenthaler and Nesta exchanged the details about their offers to various customers, including the specific contractual language used in their offers.

846.   During these calls between Defendants Nesta and Rekenthaler, Teva and Mylan reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and Mylan could reach their target share without eroding pricing.

847.   In addition, at 10:33 am – while Rekenthaler was still on the phone with Nesta – K.G. sent an e-mail to Rekenthaler and others, asking about the appropriate contractual language to use in offers about the potential for price increases.   Minutes later, at 10:41 am, Rekenthaler replied to K.G. with the exact language, in quotes, that Mylan was using, in an e-mail titled "Subject:  RE:  Proposed Price Increase Language": "Mylans [*sic*] language is vague.  'Pricing subject to change at Mylan's sole discretion.'"

848.   An hour and a half later, at 12:12 pm (still on December 23, 2013), K.G. circulated a revised version of Teva's pricing plan for the Tolterodine ER launch.  This new version incorporated Teva and Mylan's plan to allocate the market, including the submission of cover bids and abstention from bidding.  Notably, the revised pricing plan included a chart identifying the major customers (and their associated market share percentage) that Teva would receive to get close to its desired 60% market share:  Teva would retain CVS (with 18% of the market), EconDisc (15%), Cardinal (8%), McKesson (6%), Wal-Mart (5%), Rite Aid (4%), Anda (2%), and Omnicare (1%).

Meanwhile, Mylan would get its 40% share from the remainder of the market, including Walgreens, Cigna, Humana, Optum Rx ("Optum"), Prime Therapeutics ("Prime"), and Kaiser.

849.   In order to facilitate this market division, Teva had to arrange to lose the accounts.  This was easily accomplished, however; Teva simply jacked up its prices on the major accounts (which Teva sometimes wanted to retain for other products) and some others, and refused to submit bids to the other customers that Mylan targeted.

850.   Specifically, after Rekenthaler and Nesta spoke, Teva's direct invoice price for 30 capsules of the 2mg and 4mg dose for Walgreens was raised by 30%:  by $24.90, from $83.03 to $107.93 for 30 capsules; by $74.72, from $249.08 to $323.80, for 90 capsules; and Teva raised the price by $415.13, from $1,383.78 to $1,798.91, for 500 capsules.

851.   For Cigna, Humana, Optum, and Prime, after Rekenthaler and Nesta spoke, Teva's somewhat higher (than for Walgreens) direct invoice price was raised by 23%:  by $19.95, from $88.05 to essentially the same higher price as Walgreens, $108.00 for 30 capsules; by $59.85, from $264.15 to $324.00, for 90 capsules; and by $332.50, from $1,467.50 to 1,800.00, for 500 capsules.

852.   Finally, for Kaiser (which initially had the worst pricing), after Rekenthaler and Nesta spoke, Teva's direct invoice price for 30 capsules of the 2mg and 4mg dose was raised by only 4.5%:  by $4.15, from $91.85 to $ 96.00 for 30 capsules; by $12.45,

from $275.15 to $288.00, for 90 capsules; and by $69.17, from $1,530.83 to 1,600.00, for 500 capsules.

853.   The fact that Teva did not intend to actually win with these bids is further illustrated in the discrepancy between how Walgreens, Cigna, Humana, Optum, Prime, and Kaiser were priced ***before*** the Nesta-Rekenthaler conversations versus how they were priced after:  before, there were significant differences in the direct-invoice pricing. Walgreens had the best price, $83.03 for 30 capsules; Cigna, Humana, Optum, and prime all had the same middle price of $88.05, and Kaiser got the worst price, $91.85. ***After*** Nesta and Rekenthaler spoke, however, Kaiser now had the best price ($96.00), while Walgreens now shared the worst pricing with Cigna and the others ($108); there was simply no need to bother with proportionate final prices because Teva knew (and intended) these bids would not be successful, anyway.

854.   In addition to submitting inflated bids for Walgreens, Cigna, Humana, Optum, Prime, and Kaiser, Teva agreed to refrain from bidding for certain customers, such as Publix, Ahold, Hannaford, and PVA Health.

855.   The following day, on December 24, 2013, Defendants Rekenthaler and Nesta had two more calls to confirm and refine Teva and Mylan's market allocation agreement. Those calls lasted for nine (9) minutes and eight (8) minutes, respectively.

856.   No shortages or other market features can explain Defendants' elevated prices for Tolterodine ER during the Relevant Period.

857.   The elevated prices of Tolterodine ER that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

858.   The unlawful agreement between Teva and Mylan regarding Tolterodine ER was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## R.    Tolterodine Tartrate

859.   Like Tolterodine ER, Tolterodine Tartrate ("Tolterodine"), also known by the brand name Detrol®, is used for treating an overactive bladder.

860.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Tolterodine as follows:

861.   As with the many other examples cited herein, the integrated nature of Defendants' cartel is illustrated by the combined examples of Tolterodine and Tolterodine ER:  while Tolterodine ER is more convenient, allowing once-daily dosing, at some price point, the inflated price in the market for the ER formulation would drive patients to the market for the regular-release formulation – but whichever way consumers turned, they ran into Defendants' overarching conspiracy, because just as it covered Tolterodine ER, so it covered Tolterodine's regular-release formulation.

862.   Teva was already a manufacturer of Tolterodine tablets when Defendant Greenstone decided to enter the market, planning its entry for late January of 2014.

863.    So, in accordance with the established practices of Defendants' cartel, in the days leading up to Greenstone's entry, Greenstone's Senior Director of Sales and National Accounts, Jill Nailor ("Nailor") reached out to her counterpart at Teva (Patel and Rekenthaler) to co-ordinate Greenstone's entry into the market, in particular to ensure that their pricing was consistent and to allocate customer accounts to the new entrant, Greenstone, which Teva ultimately did, including one of its largest accounts, CVS, which held more than 20% of Teva's Tolterodine business.

864.    In addition, one of Nailor's subordinates, a national account manager at Greenstone ("R.H."), was part of the conversation, which was conducted by voice and text message, but not e-mails, which are more permanent records of what was said and are more easily recovered in discovery.

865.    Thus, on the afternoon of January 21, 2014, Nailor reached out to Patel via telephone, twice, but wasn't able to speak.  Illustrating the broad web of Defendants' overarching conspiracy, Patel did not call back; instead, she texted R.H., less than two hours after Nailor's initial calls – after all, co-ordination with fellow cartel members was a key priority for Defendants, as was obscuring their tracks.

866.    R.H. then telephoned her own boss at Greenstone, Nailor, and after speaking for a few minutes, R.H. then telephoned Patel at Teva back, and they spoke for nearly 20 minutes, at the conclusion of which call, R.H. then again telephoned her own boss, Nailor.  Nailor, in turn, then telephoned Rekenthaler, twice, but could not

get through to him, and left a voice-mail, which wrapped up communications among the co-conspirators for the day.

867.   The following morning, January 22, Rekenthaler returned R.H.'s calls at 9:47 am by calling Nailor, but also wasn't able to get through, and then at 11:25 am, someone at Teva (likely Rekenthaler) called Nailor again, and they spoke for about 10 minutes.  That afternoon, Patel called Nailor back twice, at 3:33 pm, but wasn't able to get through, so she sent two texts to Nailor, also at 3:33 pm.  3:33 pm was a busy minute for Patel that day.

868.   At 4:00 pm, Nailor sent two texts to Patel, to which Patel replied the same minute, followed by another text at 4:01 pm.  Upon information and belief, Patel and Nailor deleted these texts from their telephones to hide the existence of, and their participation in, Defendants' overarching conspiracy.

869.   At 4:26 pm, the two bosses (Nailor and Patel) were finally able to speak directly, for 11 minutes, and confirm their arrangements.  During these calls and text messages, Teva and Greenstone agreed that Teva would concede significant business to Greenstone in order to avoid price erosion.

870.   The very next day, on January 23, 2014, Greenstone entered the market for Tolterodine Tartrate 1mg and 2mg Tablets ("Tolterodine") with the exact same WAC prices as Teva for all formulations.

871.   This was far from Nailor's only contribution to Defendants' overarching conspiracy:  in addition to the communications detailed above, Nailor exchanged in

excess of 4,400 phone calls and text messages with her contacts at Defendants Amneal, Dr. Reddy's, Actavis, Aurobindo, Mylan, Glenmark, Zydus, Teva, Sandoz, Lupin, Wockhardt, Lannett, Apotex, Upsher-Smith, Par, and Taro between August, 2010, and May of 2017.

872.   The day after Greenstone's entry – January 24, 2014 – in a message to Teva's NAM's about how important it was for them to determine and document which competitor was challenging Teva for business in a particular situation (because it would help Teva determine whether to concede or not), Defendant Patel stated that "[a]s we've heard, Greenstone is entering the market for Tolterodine. I'm sure we will have to concede somewhere."

873.   A few days later, on Tuesday, January 28, Teva was informed by CVS that it had received a competitive price challenge on Tolterodine.  K.G. of Teva immediately asked:  "do we know who this could be?"  Rekenthaler responded that it was Greenstone, but did not want to put the details into writing:  in a reply e-mail from 4:02 pm, copied to Patel and Maureen Cavanaugh, on the subject "RE:  price challenge delphi 10707 cvs tolterodine," Rekenthaler wrote "It's Greenstone, new to market.  We can discuss."  The next day, Wednesday, January 29, Patel and R.H. tried to reach each other several times, and were ultimately able to speak for approximately two minutes.

874.   A few days later, on Monday, February 3, 2014, Patel instructed a colleague at Teva to concede the business at CVS by providing a small price reduction that she knew would not be sufficient to retain the business.

875.    T.C. of Teva, who had the customer relationship with CVS, challenged the decision to concede the business. Defendant Rekenthaler responded – again refusing to put the details in writing – at 11:29 am, saying: "I'll discuss the details of this with you later. There was a strategy here and you weren't in the office Thursday or Friday so we proceeded.  Again, it will make sense after I discuss with you."

876.    The next day, February 4, 2014, Patel spoke to R.H. (at Greenstone) for approximately a quarter of an hour.

877.    Shortly thereafter, conceded the CVS account to Greenstone.   As mentioned *supra*, CVS represented more than 20% of Teva's Tolterodine business.

878.    No shortages or other market features can explain Defendants' elevated prices for Tolterodine during the Relevant Period.

879.    The elevated prices of Tolterodine that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

880.    The unlawful agreement between Greenstone and Teva regarding Tolterodine was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**S.    Norethindrone/EE**

881.    Norethindrone/ethinyl estradiol ("Norethindrone/EE"), also known by the brand name Ovcon 35, is a combination of medications used as an oral contra-

ceptive. Teva markets its generic version of this combination medication under the trade name Balziva.

882.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Norethindrone/EE as follows.

883.    On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business. Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing its own generic of Ovcon 35.

884.    Teva employees discussed internally how to make room for this new player in the market, with one expressing concern that "[w]e would lose our current market lead if we were to concede this business."  Per Defendants' overarching conspiracy agreement, however, discussions about how to share the market with the recent entrant were not limited to internal communications.  So the very next day, Patel spoke to Berthold at Lupin twice by phone.

885.    A few days later, on January 29, Patel informed Rekenthaler of her recommendation, based on her communications with Berthold, to take a co-operative stance towards this competitor, saying: "we should concede part of the business to be responsible in the market."  By being "responsible," Patel meant voluntarily conceding market share to the new entrant so Lupin could achieve its "fair share" of the Norethindrone/EE the market without any unpleasant competition with its co-conspirators.

886.   On February 4, Patel received the profitability analysis she requested in order to determine how much of the customer's business to hand over to Lupin.  That same day, she spoke to Berthold two more times to further co-ordinate Lupin's seamless entry into the market.

887.   No shortages or other market features can explain Defendants' elevated pricing for Norethindrone/EE during the Relevant Period.

888.   The elevated prices of Norethindrone/EE that resulted from Defendants' anticompetitive conduct injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

889.   The unlawful agreement between Teva and Lupin for Norethindrone/ EE was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**T.   Capecitabine**

890.   Capecitabine, also known by the brand name Xeloda®, is a chemotherapy agent used in treating breast and colon cancers.

891.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Capecitabine as follows:

892.   As early as January, 2014, Teva and Mylan were planning their eventual Capecitabine launch.   As was standard practice in Defendants' cartel, part of this

planning process included sharing the market between them so they could allocate Capecitabine customers between them.

893.   For example, in a January 31, 2014 e-mail, J.P., a national accounts executive at Teva, told K.G., Rekenthaler, and others at Teva, that Mylan was courting a specific customer, Armada Health Care.  Teva incorporated this information from Mylan into its launch plan for Capecitabine.

894.   On February 26, 2014, Mylan's Nesta called Rekenthaler at Teva and they spoke for approximately a quarter of an hour.  Nesta told Rekenthaler that Mylan would not be able to launch Capecitabine on time, which Rekenthaler immediately passed on to his Teva colleagues; this meant that, as the sole generic supplier of Capecitabine, Teva would charge a higher price than it could if it faced generic competition.

895.   A week or two later, in early March, 2014, Teva launched as the sole generic supplier of Capecitabine, and remained the exclusive generic Capecitabine manufacturer until August, when Mylan finally entered the market.

896.   On August 4, Nesta and Rekenthaler spoke three times by telephone, during which calls they discussed how to divide up the market between them, including that Teva would concede its Capecitabine business at ABC, Econdisc, and McKesson/Rite-Aid to Mylan.

897.   After their 12:46 pm call, Rekenthaler e-mailed Maureen Cavanaugh, his boss at Teva, regarding this issue, to which Cavanaugh replied that they should discuss in person when she was back in the office the next day.

898.   Less than an hour later, Rekenthaler sent another e-mail, with a sole recipient, requesting Patel to run a customer report and indicating that Mylan will "be looking at ABC, McKesson, and Econdisc as well as a couple small guys, probably aiming at 35% share." Just as Rekenthaler said, Mylan did in fact seek the business for each of these three companies, and Teva conceded each of them, pursuant to the agreement Rekenthaler had reached with Nesta.

899.   A few days later, on August 7, 2014, McKesson told Teva it had received a bid for Capecitabine and gave Teva the opportunity to bid to retain the business. Patel then sent an e-mail to K.G., Rekenthaler, and a senior operations executive at Teva, C.B. C.B. did not want to put their plan in writing. Instead C.B. told Patel she needed to discuss it. K.G., separately, questioned whether the competitive bid was coming from Mylan, and asked Rekenthaler whether he had any additional information. Rekenthaler also did not want to put that information in writing.

900.   The same day that Mylan put in its bid to McKesson – August 7, 2014 – Nesta and Rekenthaler spoke by phone for nearly thirteen minutes. On that call, Nesta and Rekenthaler discussed Mylan's bid to McKesson and reconfirmed their market allocation scheme, including that the McKesson Capecitabine account would go to Mylan.

901.   This market allocation scheme was highlighted in other e-mails as well. On August 10, 2014, C.B. e-mailed Rekenthaler, Patel, and K.G. about the plan.

Rekenthaler knew Mylan was targeting Econdisc, even though Econdisc had not contacted Teva, because he and Defendant Nesta had previously discussed it.

902.   The next morning, at 8:30am on August 11, 2014, Rekenthaler alerted others at Teva that Mylan had received formal approval to market Capecitabine.  Five minutes later, Rekenthaler received a call from Nesta. After exchanging voicemails, the two spoke at 8:52 am. The call lasted just under six minutes. Shortly after hanging up the phone, at approximately 9:02 am, Rekenthaler e-mailed K.G., Defendant Patel and others at Teva to confirm Mylan's participation in the scheme.

903.   In accordance with their market allocation scheme and in furtherance of all Defendants' overarching conspiracy, Mylan targeted the Capecitabine accounts of ABC, Econdisc, and McKesson/Rite-Aid; and in accordance with their market allocation scheme and in furtherance of all Defendants' overarching conspiracy allocation, Teva conceded all three of those accounts.

904.   In addition, and also pursuant to these agreements, Teva conceded some smaller customers, as well.  For example, on August 14, 2014, Cigna (a smaller customer) told Teva that Cigna had received a bid for Capecitabine.  On August 18, Rekenthaler called Nesta to discuss the market allocation scheme and Mylan's bid to Cigna. The pair talked for thirteen minutes.  The next day, K.G. circulated an internal e-mail confirming that Teva "will be conceding this business" at Cigna.  Teva did not retain Cigna's Capecitabine business; instead, it went to Mylan.

905.   No shortages or other market features can explain Defendants' elevated

pricing for Capecitabine during the Relevant Period.

906.   The elevated prices of Capecitabine that resulted from Defendants' anticompetitive conduct injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

907.   The unlawful agreement between Teva and Mylan for Capecitabine was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**U.   Dexmethylphenidate HCL Extended Release**

908.   Dexmethylphenidate HCL Extended Release ("Dexmeth ER"), also known by the brand name Focalin, is used to treat ADHD.

909.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Dexmeth ER as follows:

910.   When Sandoz decided it was going to start marketing the 40mg dose of Dexmeth ER, it followed what was by then standard procedure:  reaching out to fellow cartel members to co-ordinate entry without decreasing price.  So Sandoz's CW-1 began speaking regularly with Patel about Dexmeth ER.

911.   For example, on February 10, 2014, after discussing marketing this dose at work during the day, CW-1 telephoned Patel in the evening to discuss Dexmeth ER and they spoke for approximately a quarter of an hour.

912.   Two days later, Sandoz submitted a bid to ABC for Dexmeth ER.  The same day, CW-1 and Patel spoke by telephone and Teva agreed to concede the ABC account to Sandoz, in order to avoid price competition between the two suppliers.  Patel then e-mailed her colleagues at Teva to summarize the details of the deal she had worked out with Sandoz.

913.   Two days after that, on Friday, February 14, 2014, Anda (a large GPO customer) – in light of Sandoz's entry into the market – approached Teva and asked for a price reduction on Dexmeth ER.  Rather than lower their price to retain the account, Teva refused – handing that business to its nominal competitor (and co-conspirator), Sandoz.

914.   The following week, on February 18, Patel left a voice-mail for CW-1; and that same day, Patel's firm (Teva) ceded the Rite Aid account to CW-1's company, Sandoz.  The two confirmed their arrangement again two days later, again via telephone.

915.   Two days after that, on February 20, 2014, another large retail customer approached Teva indicating that because a new competitor had launched for Dexmeth ER, the customer was entitled to certain price protection terms (i.e., a lower purchase price for the drug).  The same day, Patel spoke to CW-l for almost 21 minutes.  The next day, February 22, Patel responded internally about the customer's request, with additional inside information from Sandoz.  Patel and CW-1 spoke again a few days later, on February 27, to further co-ordinate about Dexmeth ER.

916.   Teva and Sandoz were not alone in allocating customers for certain formulations of Dexmeth ER.   The agreement was also carried out by other manufacturers, allowing Sandoz to take share from them.   In February of 2014, for example, as Sandoz was seeking share on the l5mg dosage strength of Dexmeth ER, Par assisted them.

917.   Simultaneously with Patel's co-ordination with Sandoz, Teva's Rekenthaler Teva was speaking to M.B., a senior national account executive at Par, including two calls on February 10 (18 and 3 minutes), two calls on February 19 (2 and 22 minutes), and calls on February 24 and 25, in order to effectuate the scheme.

918.   Throughout this time period, Sandoz, Par, and Teva all abided by the fair share principles as part of Defendants' ongoing conspiracy, ceding customer accounts to Sandoz in order to abide by the "rules of the road" to accommodate the new market entrant without lowering prices.   In accordance with the terms of Defendants' cartel, Sandoz's target market share for varying strengths of Dexmeth ER varied by how many manufacturers were in the market.   Further, the scheme was not limited to any particular dose of Dexmeth ER.

919.   On May 6, 2015, for example, Teva declined to submit a bid to Walgreens for the 5mg dose of Dexmeth ER.   Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed Health Care Associates, a large GPO, on Dexmeth ER 20mg, on the basis that Sandoz already had 57% market share – greater than its sole competitor on this dosage strength, Teva.   When a Sandoz national account representative

communicated this decision to the customer, however, he lied and told the customer that the decision not to bid was based on limited supply.

920.   No shortages or other market features can explain Defendants' elevated prices for Dexmeth ER during the Relevant Period.

921.   The elevated prices of Dexmeth ER that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

922.   The unlawful agreement between Sandoz, Par, and Teva regarding Dexmeth ER was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**V.   Piroxicam**

923.   Piroxicam, also known by the brand name Feldene®, is another NSAID used in the treatment of pain and inflammation associated with rheumatoid arthritis, juvenile rheumatoid arthritis, and other disorders.

924.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Piroxicam as follows:

925.   On March 3, 2014, Defendant Greenstone received FDA approval to market Piroxicam capsules in 10mg and 20mg doses.  Greenstone entered the market with the exact same WAC pricing as the incumbent generic manufacturer, Defendant

Teva, and immediately sought out customers.

926.    At 10:07 am on March 5, 2014, Teva's Patel received an e-mail about Greenstone's Piroxicam approval and the fact that Greenstone was trying to take business from Teva.

927.    Under Defendant's overarching conspiracy, this was acceptable conduct because, like Teva, Greenstone was entitled to its "fair share."  Nevertheless, to ensure the Greenstone would abide by what Defendants referred to as the "rules of the road," Patel reached out to her contacts at Greenstone that same day, less than an hour after receiving the e-mail with the news that Greenstone was entering the Piroxicam market. Patel called R.H. at Greenstone at l0:55amn and they spoke briefly.  Shortly thereafter, Patel called R.H.'s boss, Jill Nailor. At 2:14 that afternoon, Patel and Nailor spoke briefly, and then Patel replied to the 10:07 am e-mail discussing Greenstone's Piroxicam strategy.

928.    The following day – March 6, 2014, the day after Greenstone's Piroxicam launch – rather than focusing on her customers, Patel had multiple conversations with her ostensible competitors at Greenstone, R.H. and Jill Nailor.  Internally, Patel requested a sales and profitability analysis of Teva's Piroxicam customers so she could figure out which accounts to cede to Greenstone.

929.    The following day, Patel sent an internal e-mail to a marketing manager, identifying specific customers to concede to Greenstone because under the "rules of the road" for being a "Quality Competitor" as part of the overarching conspiracy, and

further based on Patel's several conversations with Greenstone, Greenstone had to take additional Teva customers to reach its "fair share" of the market.

930.   However, by the middle of the following week, on March 12, 2014, Patel learned that Greenstone attempted to get more than its "fair share" by also targeting Teva's largest Piroxicam account, CVS, which was responsible for over ¼ of Teva's Piroxicam business.

931.   This challenge was outside of the conduct permitted by the overarching conspiracy, so – unlike other examples of co-operative inaction detailed elsewhere herein – Teva fought to keep this particular account for this particular drug.  Teva lowered its price to CVS for Piroxicam by 20% and CVS stayed with Teva.

932.   Teva and Greenstone continued to co-ordinate their allocation over the coming days and weeks. On March 17, 2014, Patel called R.H. at Greenstone; R.H. called Patel back at 11:35 pm that night and they spoke for 15 minutes.  The fact that competitors Teva and Greenstone were speaking in literally the middle of the night illustrates the strength of the overarching agreement and Defendants' attempts to hide it from Plaintiffs and the public.

933.   Immediately after speaking to Patel – also in the middle of the night – R.H. called Nailor and they spoke for ten minutes.  Teva retained the CVS account but conceded other customers (representing less market share) to Greenstone through March and April.

934.   For example, on March 25, 2014, Teva learned of a challenge from

Greenstone at Anda, a wholesaler distributor.  Following an analysis of its market share, Teva determined that it still had more than its fair share of the market. Pursuant to the understanding among generic manufacturers alleged herein, Teva conceded the Anda business to Greenstone on Piroxicam.  Patel agreed with the decision to concede on April 1, 2014.

935.   No shortages or other market features can explain Defendants' price increases for Piroxicam during the Relevant Period.

936.   The elevated prices of Piroxicam that resulted from Defendants' anticompetitive conduct injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

937.   The unlawful agreement between Teva and Greenstone for Piroxicam capsules was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**W.     Niacin ER**

938.   Niacin Extended Release ("Niacin ER"), also known by the brand name Niaspan ER, is used to treat high cholesterol.

939.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Niacin ER as follows:

940.   As would be expected from the large and elaborate overarching conspiracy alleged herein, Fenofibrate was not the only drug on which Defendants Teva, Lupin, and Zydus colluded; Niacin ER was another.

941.   Teva entered the Niacin ER market on September 20, 2013, and as a result of patent litigation under the Hatch-Waxman Act, Defendant Teva had been awarded 180 days of exclusivity from that date.  As a result, Teva's exclusivity was set to expire six months later, on March 20, 2014.

942.   Teva knew that Defendant Lupin planned to enter on March 20, 2014, and that Lupin would have 100 days of semi-exclusivity (until June 28, 2014) before a third generic manufacturer (Defendant Zydus) could enter the Gabapentin market, on June 28, 2014.

943.   Knowing that Lupin was a "High Quality Competitor," *i.e.*, one that would stick to Defendants' overarching agreement and not compete with Teva on price, Teva increased price on Niacin ER by 10% on March 7, 2014, in advance of its competitors' entry.  Teva did this because it knew Lupin would not erode Teva's price to gain market share beyond the so-called "fair share" that the "Rules of the Road" allowed.

944.   In the days leading up to the price increase, all three competitors exchanged several calls during which they discussed, among other things, the price increase on Niacin ER and the allocation of customers to the new entrants, Zydus and Lupin.  The communications between Green (now of Zydus) and Patel and Rekenthaler of Teva, and Berthold of Lupin included, on March 3, two approximately 20-minute

calls, one from Green to Rekenthaler and one from Rekenthaler to Patel, and then the following day, on March 4, an approximately 13-minute call between Green and Berthold.

945.    These calls were in preparation for a March 6 meeting between Patel & Rekenthaler regarding which customers they would give to their competitors.

946.    The same day, Patel called Green to discuss the same issue: which Niacin ER customers would Teva cede to Zydus. They agreed that Teva would cede 40% of the market to Zydus.

947.    Although in a competitive market, a second generic entrant typically charges about 50% less than the incumbent, here, Zydus charged only 10% less than Teva's already-increased price – so the net result was essentially that both Defendants continued to charge what Teva originally charged during its exclusivity period, thereby avoiding the price erosion that would have occurred in the presence of competition.

948.    Additional calls among the three followed on May 7-9. Ultimately, the competitors agreed that Teva would retain its Niacin ER account with ABC but concede its account with McKesson and Cardinal, both large wholesalers, to Zydus and Lupin, respectively.

949.    On June 5, 2014, a Director of National Accounts at Teva ("J.P.") sent an internal e-mail regarding competition in the Niacin ER market and noted the loss of the McKesson Niacin ER account in Teva's internal database – named, appropriately, Delphi – and noted that the reason for the concession was that it was a strategic

decision, which was the conspirator's code for allowing "fair share" of the relevant market to their co-conspirator competitors.

950.    On June 28, 2014, Zydus launched Niacin ER and published WAC pricing that matched the per-unit cost for both Teva and Lupin.

951.    The agreement between Zydus, Teva, and Lupin caused prices for Niacin ER to be higher than they would have been in a competitive market and prevented price erosion that would have occurred in such a market.

952.    No shortages or other market features can explain Defendants' elevated prices for Niacin ER during the Relevant Period.

953.    The elevated prices of Niacin ER that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

954.    The unlawful agreement among Zydus, Teva, and Lupin regarding Niacin ER was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## X.    Baclofen

955.    Baclofen, also known by brand names Gablofen® and Lioresal®, is a muscle relaxant and is used in treating muscle spasms caused by certain conditions, such as multiple sclerosis and spinal cord injury or disease.

956.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Baclofen as follows:

957.    During the Relevant Period, Defendant Teva was a dominant supplier of generic Baclofen.  In early 2014, the primary suppliers in the market for Baclofen were Teva (62.4%), Qualitest (22.5%), and Upsher-Smith (6.8%).

958.    Prior to February of 2014, Defendant Upsher-Smith (or "Upsher") was a bit-player in the Baclofen market and Baclofen was not a very profitable drug for the firm, but its collusion with Teva changed all that.

959.    Effective February 21, 2014, Upsher imposed a significant price increase on its Baclofen customers, more than tripling or quadrupling its WAC price, depending on the formulation.

960.    Upsher's price increase meant Teva was now the lowest-price supplier of Baclofen:  Upsher's more than tripling/quadrupling of its price meant that Teva Baclofen now sold at a 66%-75% discount to Upsher.  In a competitive market, some or all of Upsher's customers would have moved their business to Teva to take advantage of Teva's lower pricing on its functionally-indistinguishable product.  But that is not what happened because Teva wouldn't let them.

961.    Instead, because of its anticompetitive, conspiratorial agreement with Upsher and all the other Defendants, Teva did not seek out additional business, even though it was now the lowest-priced market participant.  Not only did Teva not seek

out new business, but refused to accept new business that fell into its lap, instead deferring those requests to Upsher – and likely falsely explaining to customers that industry-wide supply issues meant Teva could not service additional, new accounts.

962.   Upsher-Smith, on the other hand, was able to secure several new customers as a result of Qualitest's exit from the market – and at more than triple or quadruple the earlier price.   As a result of this implementation of Defendants' overarching scheme, Baclofen suddenly (literally, overnight) became highly profitable to Upsher.

963.   Teva initially considered following the Upsher-Smith price increase as part of its April 4, 2014 price increases – but decided against doing so because Teva considered Qualitest a so-called "1ow-quality" competitor – in other words, in Teva's mind, Qualitest might take market share if Teva increased its price.

964.   Events showed that Teva was wrong about Qualitest, but in early April of that year, Teva learned that Qualitest was exiting the market for at least 3-4 months, if not permanently.   This completely changed Teva's analysis of the Upsher price increase.

965.   Upon learning that the only significant remaining competitor in the market would now be Upsher-Smith – a so-called "high-quality competitor" who would collude with Teva – Teva immediately decided to follow the Upsher price increase. Patel asked one of her direct reports to start working up price increase scenarios for Baclofen that same day.

966.    Patel felt that Upsher-Smith was what Defendants referred to as a "highly-quality competitor," meaning one that was particularly helpful to implementing the overarching conspiracy of all Defendants and achieving its goals,

in part because of Patel's relationship and understanding with a national account executive at Upsher ("B.L."). In the weeks before she started her employment at Teva (after leaving her previous job at wholesaler ABC), Patel and B.L. exchanged text messages, and during her first week on the job, as she was beginning to identify price increase candidates and co-operative co-conspirators, Patel spoke to B.L. on April 29, 2013 for nearly 20 minutes.

967.    During these initial communications, Patel and B.L. solidified the understanding and agreement that Teva and Upsher would follow each other's price increases, and would not compete for each other's customers after a price increase. Their agreement was further cemented in June and July of 2013, when the two competitors agreed to substantially raise the price of Oxybutynin Chloride.

968.    By April of 2014, a year after those initial discussions and agreement, there was no need for the two to speak directly because it was already agreed between them that Teva would follow an Upsher price increase in any market.

969.    Effective April 15, 2014, Teva raised its WAC and SWP pricing to match Upsher pricing exactly. Just as Upsher had done in February, now Teva imposed a significant price increase on its Baclofen customers, more than tripling or quadrupling its WAC price, depending on the formulation.

970.   As discussed above, pursuant to the agreement between the companies, Teva did not seek to take any customers from Upsher-Smith during the time period after Upsher's increase and before Teva's increase.  Teva would not have increased its prices on Baclofen without its agreement in place with Upsher or in the absence of Defendants' overarching conspiracy.

971.   Two months later, in June, 2014, Defendant Lannett entered the market for Baclofen at the same WAC prices as Defendants Teva and Upsher-Smith.  Teva and Lannett colluded so that Lannett could seamlessly enter the Baclofen market without eroding the dramatically higher prices that Defendants' over-arching conspiracy had already set.

972.   On June 12, 2014, Sullivan (Director of National Accounts at Lannett) sent a message to her competitor and co-conspirator, Patel (Teva's Director of Strategic Customer Marketing) – but in an attempt to hide their communications, she used Facebook Messenger, rather than e-mail or text.  Less than 15 minutes later, Patel returned Sullivan's message with a phone call.  During the conversation, Sullivan confided to Patel that Lannett would shortly be entering the Baclofen market – a message that was confirmed in a follow-up via Facebook Messenger that afternoon.

973.   After additional phone calls and texting between Sullivan and Patel on July 1 and 11, on July 22, a customer informed Teva that it had received a lower price on Baclofen.  Even though that price was only slightly below Teva's price, Teva decided to concede the business, and noted this in its internal Delphi database.

974.    Teva had significantly increased its price for Baclofen in April, 2014, (following the Upsher-Smith price increase), and was able to maintain those prices even after Lannett entered the market a few months later.  In fact, when Lannett entered the market, it came in at the exact same WAC price as Teva.

975.    No shortages or other market features can explain Defendants' price increases for Baclofen during the Relevant Period.

976.    The elevated prices of Baclofen that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

977.    The unlawful agreement among Teva, Upsher, and Lannett regarding Baclofen was part of Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**Y.    Fosinopril-HCTZ**

978.    Fosinopril-Hydrochlorothiazide ("Fosinopril-HCTZ"), also known by the brand name Monopril HCT®, is a medicine used to treat hypertension.  The primary sellers of Fosinopril-HCTZ during the Relevant Period were Aurobindo, Citron, Glenmark, Heritage and Sandoz.

979.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Fosinopril-HCTZ as follows:

980. In early 2012, the incumbent manufacturers of Fosinopril-HCTZ were Aurobindo, Glenmark and Sandoz. In the spring of 2012, Heritage entered the market. Citron did not enter the market until 2014.

981. Instead of entering with a lower-priced product in order to gain market share, Heritage announced a list price identical to Sandoz, slightly higher than Aurobindo, and slightly lower than Glenmark.

982. Even though it was not offering better pricing, Heritage quickly captured market share for Fosinopril-HCTZ, consistent with the "fair share" agreement between Defendants.

983. In this timeframe, all the Fosinopril-HCTZ manufacturers at the time—Aurobindo, Glenmark, Heritage and Sandoz—met on numerous occasions at trade events. *See* Exhibit 1.

984. Prices remained stable in the Fosinopril-HCTZ market from 2012 into 2014, at which time Heritage included Fosinopril-HCTZ on its target list for price increases.

985. As discussed *supra*, during the week of April 14, 2014, Heritage's Malek asked two employees to analyze the impact of price increases for numerous generic drugs, including Fosinopril-HCTZ, and during a Heritage conference call on April 22, 2014, Malek informed the sales team that Fosinopril-HCTZ was targeted for a price increase.

986.   As with Heritage's other targeted price increases, Malek aimed to "socialize" the idea of price increases with the other Fosinopril-HCTZ manufacturers by direct outreach and communication about Heritage's intentions.  Both Malek and Glazer pushed Heritage employees to communicate with their competitors and to obtain agreement to raise prices.

987.   Between the time of the sales team call in April and Heritage's price increase in July, Heritage communicated by phone call or text with every other manufacturer of Fosinopril-HCTZ, totaling at least 100 contacts.  *See* Table 3. Some of these communications are detailed below.

988.   On April 26, 2014, representatives from Aurobindo, Citron, Glenmark, Heritage and Sandoz met at the NACDS 2014 Annual Meeting in Scottsdale, AZ.

989.   Two days later, on April 28, Malek e-mailed Lukasiewicz, directing him to contact Aurobindo about pricing for Fosinopril-HCTZ, Glyburide, and Glyburide-Metformin.  Tellingly, Glazer told Lukasiewicz not to put any of his communications with Aurobindo in writing.  Lukasiewicz exchanged several voicemails with his contact at Aurobindo on April 28-29, 2014.

990.   In May, 2014, Heritage's Lukasiewicz began speaking with employees at Aurobindo and Glenmark, via phone and LinkedIn, about price increases for Fosinopril-HCTZ.   On May 2, 2014, a Heritage employee—likely Lukasiewicz—contacted an employee at Glenmark via LinkedIn to discuss pricing for at least Fosinopril-HCTZ.

991.   A Heritage employee—likely Lukasiewicz—spoke by phone with his Aurobindo contact for approximately 16 minutes on May 8, 2014.  During this call, they reached an agreement to raise the price of at least Fosinopril-HCTZ, Glyburide-Metformin, and Glyburide.

992.   On May 8, 2014—the same day Lukasiewicz spoke with Aurobindo— Lukasiewicz called an employee at Glenmark, and they spoke for approximately 14 minutes.

993.   The next day, on May 9, the Aurobindo employee spoke with an employee at Glenmark for approximately nine minutes.

994.   The same day, Heritage had another internal conference call discussing the list of drugs proposed for increases.  Fosinopril-HCTZ, Verapamil, Theophylline, Paromomycin, Nystatin, Nimodipine, Leflunomide, Glyburide-Metformin, and Glyburide were all on the price increase list.  During the conference call, the Heritage sales team shared the results of their conversations with competitors in seeking agreements to raise prices on certain drugs.

995.   Lukasiewicz was far from the only Heritage employee communicating with other Defendants, including manufacturers of Fosinopril-HCTZ.  On May 14, 2014, Sather attended the MMCAP National Member Conference in Bloomington, Minnesota.  She used this conference as an opportunity to speak in person with a number of different competitors about pricing.  Sather confirmed agreements on pricing with at least Aurobindo (Fosinopril-HCTZ, Glyburide, and Glyburide-

Metformin), Sandoz (Fosinopril-HCTZ), and Lannett (Doxy Mono). Sather e-mailed Malek the very next day, on May 15, telling him of the agreements with Aurobindo, Sandoz, and Lannett.

996.    Also on May 15, the day after speaking with Heritage's Sather and while the MMCAP National Member Conference was still ongoing, the same Aurobindo and Sandoz employees spoke by phone and texted each other multiple times. A week later, a competitor— likely an employee from Aurobindo or Heritage—exchanged text messages with the same employee at Sandoz to confirm she had his correct cell phone number.

997.    During this time, an employee at Aurobindo also spoke with employees at Glenmark and Sandoz about price increases for Fosinopril-HCTZ.

998.    On May 15, 2014, a large pharmacy customer informed Heritage that Aurobindo had recently provided a lower bid for Fosinopril-HCTZ. Sather recommended that Heritage not reduce its price to retain business, because she was confident that Aurobindo would stick to the pricing strategy she and Aurobindo had reached the previous day.

999.    Heritage's Sather continued her pricing discussions on Fosinopril-HCTZ in person while at the June 2014 HDMA Business and Leadership Conference. On June 3, Sather had dinner and drinks with a number of Heritage's competitors at the Sandbar Restaurant, including a contact at Sandoz.

1000. Following these trade association meetings, there was a sharp uptick in discussions among competitors.  In the week of June 3-10, 2014, an Aurobindo employee had three phone calls with a Sandoz employee and five phone calls and multiple text messages with Glenmark, likely to discuss pricing of at least Fosinopril-HCTZ.

1001. On June 16, 2014, a different Glenmark employee called a different Aurobindo employee and they spoke for approximately 22 minutes.  Again, these discussions were likely about pricing of Drugs at Issue, including Fosinopril-HCTZ.

1002. A week later, on June 23, the Heritage sales team had a meeting where they discussed the price increases targeted for the identified drugs.  The proposed increase for Fosinopril-HCTZ was 200%.

1003. Two days later, Heritage's Lukasiewicz spoke with his Aurobindo contact for approximately 18 minutes, on June 25, the day before Heritage issued price increase letters for numerous drugs, including Fosinopril-HCTZ.  They spoke for approximately three minutes again on July 7, 2014.

1004. Also on June 25, a Heritage employee texted a contact at Citron to discuss Citron's entry into the Glyburide market and proposed price increases in that market.  During this text exchange, Heritage learned for the first time that Citron was also planning to enter the market for Fosinopril-HCTZ.  After learning about Citron's proposed entry into the Fosinopril- HCTZ market, the Heritage employee disclosed

Heritage's plan to increase the pricing for Fosinopril-HCTZ. She also informed the Citron employee that Aurobindo was a competitor for Fosinopril-HCTZ.

1005. Just as the anticompetitive agreement between Heritage's Malek and Teva's Patel started with one Drug at Issue (Nystatin oral tablets) and evolved into an agreement about seven Drugs at Issue, this exchange between Heritage and Citron provides another example of the overarching conspiracy at work. Although Heritage contacted Citron to discuss pricing on Glyburide, the communications—and anticompetitive agreement—naturally and inevitably expanded to include an additional Drug at Issue, in this instance, Fosinopril-HCTZ.

1006. On June 26, 2014, Heritage issued price increase notices for nine drugs, including Fosinopril-HCTZ.

1007. On June 27, the day after Heritage began sending out price increase notices for Fosinopril-HCTZ, an employee of Aurobindo and an employee of Glenmark spoke twice, with one of their calls lasting almost 18 minutes. Over the next several months, Glenmark and Aurobindo continued to speak about at least Fosinopril-HCTZ.

1008. On July 1, 2014, a Citron employee called an employee at Heritage to discuss Citron's agreement to raise prices on certain drugs and to discuss Heritage's price increase plan for Fosinopril-HCTZ. They spoke for approximately 13 minutes. During this conversation, the Citron employee told Heritage that they should not

communicate with Citron through e-mail, but should instead orally convey any sensitive information about pricing for Fosinopril-HCTZ or any other drugs.

1009.  Employees of Heritage and Citron spoke for approximately 22 minutes again on July 2, 2014, about Fosinopril-HCTZ and other drugs.  These conversations continued throughout at least July and August of 2014.

1010.  On July 18, 2014, a Heritage employee – likely Lukasiewicz – spoke with a Glenmark employee for approximately 23 minutes about at least Fosinopril-HCTZ. On July 30, 2014, they spoke for more than five minutes about the same thing.

1011.  By this time, Heritage had double its list (WAC) prices for Fosinopril-HCTZ.  Fosinopril-HCTZ prices remained elevated – and well above the competitive price – thereafter.

1012.  The "fair share" agreement among Defendants enabled Heritage to maintain and even increase its market share for Fosinopril-HCTZ, even though it had raised prices above a competitive level, thereby injuring Plaintiffs.

1013.  During this timeframe, Citron also was communicating directly with Aurobindo.  On July 28, 2014, an employee of Citron called and texted an employee at Aurobindo several times until the two were finally able to connect by phone.  They spoke later that day for approximately 24 minutes.

1014.  That day, Citron confirmed internally that Heritage had increased its list prices for Fosinopril-HCTZ, and also had raised prices on two other drugs that Citron was trying to match on price increases:  Glyburide and Glyburide-Metformin.

1015. A Citron employee spoke with an employee of Glenmark twice on July 14, 2014. The first call lasted for approximately seven minutes. The second call, which occurred shortly thereafter, was for approximately 13 minutes. The next day, Citron increased its Fosinopril-HCTZ prices to be in line with the price increases adopted by Heritage.

1016. Although Heritage significantly raised its prices for Fosinopril-HCTZ, it did not lose market share until at least 2016 (when it appears to have begun to exit the market). Maintaining a dominant share of the market was only possible because of the "fair share" agreement among Heritage, Aurobindo, Citron, Glenmark and Sandoz.

1017. No shortages or other competitive market features can explain Defendants' price increases of Fosinopril-HCTZ.

1018. The elevated prices of Fosinopril-HCTZ that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1019. The unlawful agreement between Aurobindo, Citron, Glenmark, Heritage, and Sandoz regarding Fosinopril-HCTZ was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### Z.     Glipizide-Metformin

1020. Glipizide-Metformin HCl, also known by the brand name Metaglip®, is used to treat high blood sugar levels that are caused by Type 2 Diabetes Mellitus.

1021.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Glipizide-Metformin as follows:

1022.  Since 2009, numerous Defendants have sold Glipizide-Metformin, including Mylan, Teva, Sandoz (which had mostly exited the market by 2010), Actavis (which had mostly exited the market by 2014), Heritage (which entered the market in 2010 and mostly exited the market by July 2017), Sun (sold *de minimis* amounts up until 2016) and Zydus (entered the market in September 2016).

1023.  By April of 2014, Defendants Heritage, Teva and Mylan controlled nearly the entire Glipizide-Metformin market.

1024.  As noted above, on April 15, 2014, Heritage's Malek called Teva's Patel and the two spoke for approximately 17 minutes and discussed seven different Drugs at Issue for which Teva was a competitor of Heritage, including Glipizide-Metformin. During their conversation, Patel agreed that if Heritage increased prices for the seven drugs they discussed, including Glipizide-Metformin, Teva would support the price increases.

1025.  Heritage's Malek and Teva's Patel spoke several more times over the next several months to confirm and finalize their agreements regarding numerous drugs, including Glipizide-Metformin.

1026.  As discussed above, during an April 22, 2014, Heritage sales team teleconference, numerous drugs were slated for a price increase, including Glipizide-

Metformin.  Concurrent with these discussions, and as outlined throughout, Heritage sales staff were also speaking with Defendants to formalize pricing agreements.  For Heritage, O'Mara was responsible for communicating with Mylan (either Aigner or Nesta) about a number of drugs, including Glipizide-Metformin.

1027.  On April 23, the day after Malek directed Heritage's sales team to contact Defendants about price increases, Mylan and Heritage agreed to raise prices on at least three different drugs, including Glipizide-Metformin (as well as Doxy Mono and Verapamil).  O'Mara conveyed this agreement with Mylan to Malek via e-mail the same day.

1028.  Teva and Mylan were also in frequent communication with each other about pricing.  On May 9, 2014, an employee at Mylan and an employee at Teva spoke with each other multiple times about pricing for at least Glipizide-Metformin.  Their conversations included one call that lasted approximately seven minutes. Their communications continued throughout 2014.

1029.  Also on May 9, 2014, Heritage held an internal call about price increases. Glipizide-Metformin was one of the drugs slated for a price increase.

1030.  Heritage had a call on June 25 and discussed an analysis of the proposed price increases and reviewed inter-competitor communications.  The next day, Heritage began notifying customers of price increases for nine drugs, including Glipizide-Metformin.  Glipizide-Metformin was slated to double in price, effective July 1, 2014. Price Increase Notices were also mailed on June 26.

1031. By July 9, 2014, Heritage had increased prices of Glipizide-Metformin nationwide for at least 27 different customers.

1032. On August 20, 2014, an unidentified individual – likely a Heritage employee – updated a Sun employee via text messages on the agreements Heritage had reached with Actavis to increase the prices of Glyburide-Metformin and Verapamil. These text messages occurred just days before the start of the 2014 NACDS Total Store Expo, which was attended by employees of Heritage, Teva, Mylan, and Sun who are directly implicated in anticompetitive communications: Heritage (Glazer, Malek, O'Mara and Sather), Mylan (Aigner and Nesta), and Teva (Patel). Numerous other Defendants' employees attended as well. *See* Exhibit 1.

1033. Because of their anticompetitive agreement, neither Teva nor Mylan challenged Heritage on its price increases. By November of 2014, Teva had increased its bid prices of Glipizide-Metformin to potential customers.

1034. Throughout the rest of the relevant period, following Heritage, Mylan and Teva's price increases, the list (WAC) prices announced for Glipizide-Metformin by Heritage, Mylan and Teva, as well as by Defendants Actavis, Sandoz and Zydus, were virtually identical and unchanged, regardless of the number of sellers in the market and despite multiple entrances and exits from the market. This is because price competition was absent from this market and is further evidence of Defendants' "fair share" agreement. Rather than compete in the market, Defendants announced identical list

prices, then, as described above, colluded with each other to elevate the prices paid by their customers.

1035. No shortages or other competitive market features can explain the elevated pricing of Glipizide-Metformin.

1036. The elevated prices of Glipizide-Metformin resulted from Defendants' anticompetitive conduct and have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1037. The unlawful agreement between at least Heritage, Mylan and Teva regarding Glipizide-Metformin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## AA.   Glyburide

1038. Glyburide is a commonly prescribed oral anti-diabetic medication used to treat high blood sugar levels caused by Type 2 Diabetes. Introduced in the mid-1980's under the brand names Micronase® and DiaBeta®, generic Glyburide has been available since the mid-1990's.

1039. As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Glyburide as follows:

1040.  As of April of 2014, Defendants Aurobindo, Heritage, and Teva were the dominant sellers of Glyburide.  A few months later, Defendant Citron entered the Glyburide market, in July of 2014.

1041.  As detailed above, on April 15, 2014, Heritage's Malek called Teva's Patel and they discussed seven different Drugs at Issue, including Glyburide.  During their conversation, Heritage and Teva agreed not to compete in the Glyburide market. Malek and Patel spoke several more times over the next several months to confirm and finalize their agreements regarding Glyburide and numerous other drugs.

1042.  As discussed above, on April 22, 2014, the Heritage sales team held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide.  At the time of this call, Aurobindo and Teva were Heritage's only competitors in the Glyburide market.

1043.  Malek was responsible for communicating with Teva (among other Defendants) and Lukasiewicz was assigned to communicate with Aurobindo.  Malek and Glazer directed Heritage employees to communicate with their competitors in order to reach agreements to raise prices.  Malek and Glazer sent several e-mails directing their sales staff to reach agreements with their competitors in the generic Glyburide market, among other generic markets, as soon as possible.

1044.  For example, on April 28, 2014, Malek sent an e-mail to one Heritage employee – likely Lukasiewicz – concerning the status of discussions with Aurobindo.

1045.  Glazer followed up the next day (April 29) with an e-mail to Lukasiewicz requesting further information, and Malek sent another e-mail the day after that, on April 30, requesting an update.  Lukasiewicz eventually connected with his Aurobindo contact on May 8, 2014, when the two spoke for a quarter of an hour.  During this call, they agreed to raise the price of a number of drugs, including Glyburide.

1046.  Lukasiewicz also spoke with his contact at Glenmark for a quarter-hour the same day, and the following day, an Aurobindo employee spoke with an employee of Glenmark, likely about Fosinopril-HCTZ.  While co-ordinating price increases for Glyburide as part of the overarching conspiracy, Aurobindo, Heritage, Glenmark and Sandoz were also coordinating price increases for Fosinopril-HTCZ.

1047.  On May 9, 2014, Heritage's sales team had another teleconference to share the results of their conversations with competitors and further discuss planned price increases for at least nine generic drugs, including Glyburide.  Verapamil, Theophylline, Paromomycin, Nystatin, Nimodipine, Leflunomide, Glyburide-Metformin, and Fosinopril-HCTZ were all slotted for price increases.

1048.  The following week, on May 14, Heritage's Sather met in person and discussed price increase strategies with several competitors at MMCAP in Bloomington, Minn.  During that meeting, Aurobindo and Heritage's Sather agreed to raise the prices of Glyburide.  Sather confirmed this agreement in a May 15 e-mail to Malek.  Sather also indicated that she would try to meet with Teva at MMCAP.

1049.  On June 23, 2014, Heritage employees met and discussed the specific percentage amounts they would seek to increase Glyburide, as well as other generic drugs, and the strategies for doing so.  They reached a consensus that Glyburide prices would be increased by 200%.

1050.  Over the next several weeks, Heritage employees continued reaching out to numerous generic drug competitors and potential competitors—including in the Glyburide market—in order to secure agreements to raise prices for Glyburide and other generic drugs.

1051.  On June 25, 2014, one Heritage employee texted a contact employed at Defendant Citron, to discuss whether Citron would be selling Glyburide in the near future.  Once it was determined that Citron would be entering the Glyburide market, Citron and Heritage had extensive phone, text message, and in-person conversations concerning Citron's pricing and bidding strategies for Glyburide.

1052.  For example, on July 1, 2014, Citron called an employee at Heritage and they spoke for approximately 13 minutes, confirming Citron's agreement to raise prices on certain drugs, including Glyburide.  During this conversation, the Citron employee told Heritage that they should not communicate with Citron via e-mail, but should instead orally convey any sensitive information about pricing for Glyburide or other drugs.  This was done to avoid leaving detailed electronic records of their collusion, especially of the terms of their agreements; the two spoke for approximately 22 minutes the next day.

1053. As Citron entered the Glyburide market in July, 2014, it frequently contacted Heritage about Glyburide pricing and bidding strategies. Citron set an initial target of obtaining less than 10% of the Glyburide market. Citron was careful, however, to co-ordinate with Heritage so that it could acquire additional market share without eroding the price increases.

1054. Citron and Heritage's discussions did not occur in isolation. Concurrent with these pricing discussions, Heritage's Malek and his sales team continued to communicate with Defendants about pricing for Glyburide and other Drugs at Issue.

1055. By July 9, 2014, Heritage had announced Glyburide price increases for at least seventeen customers. Teva also had increased pricing on Glyburide. Citron, after confirming internally that Heritage had increased its list prices for Glyburide, also increased its Glyburide pricing in line with the price increases on July 15, 2014.

1056. Because of Defendants' conspiracy and the principles of "playing fair," throughout the summer, Teva, Aurobindo, Citron, and Heritage were in contact with each other to ensure they were complying with their agreements on pricing for Glyburide.

1057. For example, because of Heritage's price increases, on July 9, 2014, a large national retail chain asked Teva to bid on both Glyburide and Nystatin. But instead of quoting a price that would win the business, Teva—following Defendants' agreement—raised its own prices for Glyburide to a similar level as Heritage's.

1058.  Similarly, in response to Heritage's price increase on Glyburide and other drugs discussed in this complaint, a large wholesaler separately e-mailed Teva and Aurobindo on July 25, 2014, and asked for bids.  Aurobindo and Teva immediately contacted Heritage to co-ordinate their responses and ensure that they were complying with their pricing agreements.

1059.  Teva's Patel and Heritage's Malek spoke for a quarter of an hour on the day the wholesaler's request was received. After this conversation, Teva declined to provide a bid to the wholesaler.

1060.  The same day, Malek sent a text message to an unidentified individual, likely at Aurobindo.  Malek and this individual then spoke for almost a quarter of an hour and agreed Aurobindo would not provide a Glyburide bid to the wholesaler. Ultimately, neither Teva nor Aurobindo responded to the request for a bid.

1061.  While Teva, Aurobindo, and Heritage were trying to maintain their price increases for Glyburide, Citron was also communicating directly with Aurobindo, likely to co-ordinate its entry into at least the Glyburide market.

1062. On July 28, 2014, a Citron employee called and texted an Aurobindo employee several times until the two were finally able to connect by phone. They spoke later that day for approximately 24 minutes, discussing the pricing of Glyburide and other Drugs at Issue.

1063. No shortages or other competitive market features can explain Defendants' price increases for Glyburide.

1064.  The elevated prices of Glyburide that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1065.  The unlawful agreement between Aurobindo, Citron, Heritage and Teva regarding Glyburide was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## AB.   Glyburide-Metformin

1066.  Glyburide-Metformin, also known by the brand name Glucovance®, is an oral medication used to treat Type 2 diabetes.

1067.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Glyburide-Metformin, as follows:

1068.  Glyburide-Metformin has been marketed and sold by a number of Defendants since 2009, including Actavis, Aurobindo, Citron (which entered the market in August, 2014), Dr. Reddy's (which sold only *de minimis* amounts during the Relevant Period), Heritage (which entered the market in January, 2013), Par (selling only *de minimis* amounts by 2010), Sandoz (which sold only only *de minimis* amounts by 2013), Teva, and Zydus (which entered the market in September of 2016).

1069. As of April, 2014, the dominant sellers in the market for Glyburide-Metformin were Teva, Aurobindo, and Actavis.  Heritage had approximately a 5% market share, but nonetheless wanted to raise prices.

1070. As discussed above, on April 15, 2014, Heritage's Malek called Teva's Patel and the two discussed a number of Drugs at Issue, including Glyburide-Metformin.  Patel and Malek agreed not to compete on these drugs.  Over the next several months, Malek and Patel spoke several more times reconfirming and finalizing their agreements.

1071. On April 22, 2014, Heritage held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide-Metformin.   After the call, Malek assigned Lukasiewicz to contact Aurobindo about Glyburide-Metformin (and, as discussed above, Fosinopril-HCTZ), and Sather was assigned to Actavis to discuss Glyburide-Metformin.

1072. Heritage NAM Sather was assigned to speak with Defendants Actavis, Sun, and Lannett and, through her discussions, reached pricing agreements on at least five drugs: Nystatin, Paromomycin, Glyburide-Metformin, Verapamil, and Doxy Mono.  Right after the Heritage sales call and in response to Malek's direction, Sather communicated with three different competitors about multiple drugs—including with Actavis about Glyburide-Metformin.  Sather spoke with Actavis for nine minutes the day of the April 22 pricing call and reached an agreement with Actavis to raise the price

of Glyburide-Metformin (and, as discussed below, Verapamil). Sather updated Malek on her communications with Actavis on May 8, 2014.

1073. Within Actavis, news of its agreement with Heritage spread quickly. On April 28, 2014, an e-mail to the Actavis sales and pricing team discussed the agreement and potential price increases for a number of different drugs.

1074. A week later, in response to that April 28 e-mail, on May 6, an Actavis employee called an employee at Mylan, and they spoke for five minutes. They spoke three more times on May 6, with one call lasting a quarter of an hour. They continued to communicate over the next several months and likely continued to discuss pricing for Glyburide-Metformin.

1075. On April 28, 2014, Heritage CEO Glazer sent an e-mail to Lukasiewicz directing him to contact Aurobindo about potential price increases on a number of drugs, including Glyburide-Metformin. Tellingly, Glazer told Lukasiewicz not to put any of his communications with Aurobindo on pricing in writing. Lukasiewicz exchanged several voice-mails with his contact at Aurobindo on April 28 and 29. Glazer requested status updates from Lukasiewicz several times at the end of April.

1076. Heritage's Lukasiewicz and his Aurobindo contact spoke for approximately a quarter hour on May 8, 2014. During this phone call, they reached an agreement to raise the prices of at least Glyburide, Glyburide-Metformin and Fosinopril-HCTZ.

1077. And, as noted above, on May 15, 2014, while attending the MMCAP National Member Conference, Sather confirmed pricing agreements for five different drugs with three different Defendants.  Among the agreements Sather confirmed was an agreement with Aurobindo on pricing for Glyburide-Metformin and two other drugs.

1078. Concurrent with these discussions, on May 12, an employee of Actavis spoke with Bob Cunard, the CEO of Aurobindo, twice about its Glyburide-Metformin pricing.  Between May 19 and May 22, 2014, that same Actavis employee also exchanged thirty text messages with a Teva employee about drug pricing.

1079. On June 25, 2014, a Heritage employee texted a friend at Citron about Citron's entrance into the Glyburide market.  As part of this discussion, they also spoke about Glyburide-Metformin, a drug which Citron had approval to sell, but was not actively selling at the time.

1080. In July, 2014, both Heritage and Teva increased their WAC prices for Glyburide-Metformin.

1081. Citron took note of these actions. On July 9, 2014, in an internal memo, Citron noted that both Heritage and Teva had increased their prices on three different drugs, including Glyburide-Metformin.  In the same memo, a Citron employee then reiterated Citron's intent to abide by the agreement with Heritage and Teva.

1082. On August 20, 2014, a person – likely a Heritage employee – exchanged text messages with a Sun employee.  The text exchange described the agreements

reached with Actavis to increase the price of Glyburide-Metformin and Verapamil. This, again, highlights the overarching nature of the conspiracy and the fact that all Defendants were competitors in all drugs that were not presently subject to an exclusivity period; Sun was kept apprised of agreements (in this case, between Actavis and Heritage) relating to Drugs at Issue that it did not market or sell because it **could** have chosen to enter those other markets.

1083. By September of 2014, Citron was ready to enter the Glyburide-Metformin market, but instead of undercutting the prices of Actavis, Aurobindo, Heritage and Teva in an effort to gain market share, Citron announced list (WAC) prices higher than all of the incumbent suppliers.

1084. No shortages or other market features can explain Defendants' price increases for Glyburide-Metformin.

1085. The elevated prices of Glyburide-Metformin that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1086. The unlawful agreement between Actavis, Aurobindo, Citron, Heritage and Teva regarding Glyburide-Metformin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**AC.   Leflunomide**

1087. Leflunomide, also known by the brand name Arava®, is an

immunosuppressive disease-modifying antirheumatic drug used to treat active, moderate-to-severe rheumatoid arthritis and psoriatic arthritis.

1088.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Leflunomide as follows:

1089.  As of April of 2014, the main sellers in the market for Leflunomide were Defendants Apotex, Teva, and Heritage.  Heritage was a dominant seller in the market, with a 60% market share.

1090.  As discussed above, during the week of April 14, 2014, Malek met with two employees and asked them to analyze the impact of price increases for numerous generic drugs, including Leflunomide.

1091.  Before introducing the market-wide price increases to the rest of his sales team, Malek began communicating with Patel at Teva about at least seven Drugs at Issue, including Leflunomide.

1092.  On April 15, 2014, Malek and Patel spoke on the phone and agreed that if Heritage increased prices for at least Leflunomide, Acetazolamide, Glipizide-Metformin, Glyburide, and Glyburide-Metformin, Teva would follow those increases, and impose identical or nearly-identical prices on its own customers.

1093.  Malek and Patel spoke several more times over the next several months to co-ordinate and re-confirm their agreements and to keep each other updated on

market developments for Leflunomide and other pharmaceuticals.  During this time, Malek kept Patel updated on the progress of Heritage's proposed price increases.

1094.  While Malek was speaking with Teva's Patel about increasing prices on Leflunomide, he and other Heritage employees were also in contact with individuals from Apotex to discuss price increases for at least Leflunomide.

1095.  During the infamous April 22, 2014 Heritage sales call, Malek identified Leflunomide as a drug slated for an increase.  In the wake of this call, Malek personally took responsibility for communicating with Teva.  Matt Edelson was assigned communicating with Apotex.

1096.  Defendants had numerous opportunities to meet in person at industry meetings and conferences to discuss and co-ordinate their pricing of Leflunomide. For example, on April 26-29, Heritage's Glazer attended the NACDS Annual Meeting where he had the opportunity to meet with representatives from Teva and Apotex, among others.  *See* Exhibit 1.

1097.  On May 2, 2014, Heritage's Edelson spoke with Apotex's Beth Hamilton for thirteen minutes about at least Leflunomide.  Four days later, on May 6, after learning that Teva would be exiting the Leflunomide market, a Heritage employee—likely Edelson—had two more phone calls with Apotex's Hamilton.

1098.  After speaking with Hamilton, Edelson e-mailed Malek to report what they discussed.  Malek replied, confirming the strategy with Edelson. That same day

(May 6), either Malek or Edelson called an Apotex employee. They had two calls, each lasting nine or eight minutes.

1099. The next day – on May 7, 2014 – Edelson and Hamilton had two more telephone conversations where they agreed to avoid competition and increase prices on Leflunomide. After seven phone calls in five days, the agreement was finalized.

1100. The day after that, on May 8, in response to an e-mail from Malek requesting a status update, Edelson provided an additional update on his discussions with Apotex.

1101. The next day, May 9, Heritage had another internal conference call discussing the list of drugs proposed for increases, including for Leflunomide. During the conference call, the Heritage sales team shared the results of their conversations with competitors, including Apotex.

1102. On May 27, Heritage learned that Apotex had increased its price on Leflunomide to bring it line with Heritage's price.

1103. A month later, on June 26, 2014, Heritage began sending **new** price increase notices to its customers for at least nine drugs, including Leflunomide.

1104. Beginning the month after that, in July of 2014, rather than compete for Leflunomide sales, Teva ceded the market to Apotex and Heritage and began to exit the market.

1105. No shortages or other market features can explain these Leflunomide price increases.

1106. The elevated prices of Leflunomide that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1107. The unlawful agreement between Apotex, Heritage and Teva for Leflunomide was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**AD. Paromomycin**

1108. Paromomycin, also known by the brand names Humatin®, Catenulin® and others, is a broad-spectrum antibiotic used to treat amoeba infection in the intestines and complications of liver disease.

1109. As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Paromomycin as follows:

1110. Sun and Heritage were the sellers of Paromomycin during the Relevant Period. Heritage was a dominants seller, with approximately 65% market share.

1111. As discussed above, starting in at least June of 2012, Heritage and Sun began discussing price increases and market allocation for at least Paromomycin and Nimodipine.

1112. At Malek's direction, Ann Sather contacted Sun—likely Knoblauch. Throughout the summer of 2012, Heritage's Sather exchanged numerous text messages and had multiple phone calls with her Sun contact.

1113. Heritage and Sun, as well as other Defendants, had the opportunity to discuss pricing and market share and otherwise further their conspiratorial discussions at trade meetings throughout this period, including at the October GPhA Fall Technical Conference. *See* Exhibit 1.

1114. As part of Defendants' overarching conspiracy, by the end of October 2012, Sun had increased its list WAC prices for Paromomycin to be identical with Heritage's pricing. Despite their different initial prices, Heritage and Sun kept their list prices at the same level thereafter.

1115. After the Heritage teleconference with the sales team of April 22, 2014, in which Paromomycin was targeted for a price increase, Malek assigned Anne Sather to communicate with Sun.

1116. Right after that Heritage sales call, Sather communicated with three different competitors—Sun, Actavis, and Lannett—and reached a number of pricing agreements with these Defendants covering at least five different drugs, including Paromomycin.

1117. Sather spoke with Susan Knoblauch, her counterpart at Sun, for more than ¾ of an hour. During this conversation, Sather and Knoblauch discussed pricing

and agreed to increase the prices of numerous drugs, including Paromomycin. Sather thereafter immediately reported her agreement with Sun to Malek.

1118.  In response to a May 8 status request from Malek, Sather e-mailed him to report the agreement she had reached with a number of competitors, including with Sun for Paromomycin.  Sather also reported agreements she reached with Actavis for Glyburide-Metformin and Verapamil, with Lannett for Doxy Mono, and with Sun for Nystatin; during an internal Heritage call the next day, Paromomycin remained on the list of drugs slated for a price increase.

1119.  Heritage and Sun spoke again for more than twelve minutes on May 20. During the call, Heritage learned that Sun would be making changes to the production of Paromomycin.  Malek was immediately informed of this development.

1120.  On June 23, Heritage employees discussed the specific percentage increases they would seek for a variety of drugs.  Paromomycin was slated for a 100% increase.

1121.  Heritage had a final call confirming that Paromomycin would have a price increase on June 25, 2014, and the next day Heritage began sending out price increase notices.

1122.  By July 9, 2014, Heritage announced price increases for Paromomycin to at least thirteen different customers nationwide.  Over the ensuing months, pursuant to their agreement, Heritage and Sun continued to increase their prices for Paromomycin.

1123. No shortages or other market features can explain Defendants' price increases for Paromomycin.

1124. The elevated prices of Paromomycin that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1125. The unlawful agreement between Heritage and Sun regarding Paromomycin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## AE.   Theophylline Extended Release

1126. Theophylline Extended Release ("Theophylline or "Theophylline ER"), also known by the brand name Theodur®, is used to treat asthma and airway narrowing associated with long-term asthma or other lung problems, such as chronic bronchitis and emphysema. Theophylline is an extended release medication, which means that it is released into the body throughout the day.

1127. As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Paromomycin as follows:

1128. Prior to Heritage's entry into the market for 300mg and 450mg Theophylline tablets in late 2011, Teva had captured nearly 100% of sales.   Teva

marketed and sold Theophylline during the Relevant Period at least in part through its subsidiary, PLIVA.

1129.  Instead of pricing its Theophylline products below Teva's, in order to gain market share, Heritage announced list prices that were identical to, or even slightly higher than, those of Teva.  Even with Heritage's market entry, Theophylline prices remained relatively high and stable.  Consistent with their "fair share" agreement, prices did not decline, as would be expected in a competitive market.

1130.  In early 2014, Teva began considering Theophylline for another price increase.  On February 4, 2014, Teva's Patel contacted Heritage's Malek for the first time since she went on maternity leave in August of 2013.  Malek returned her call the next day and the two spoke for more than an hour, discussing price increases for Theophylline and at least one other drug (Nystatin, as discussed above).

1131.  Three days later, on February 7, a Heritage employee created a spreadsheet that included Theophylline as a candidate for price increases.

1132.  Throughout February and March of 2014, Malek and Patel had a series of phone calls discussing price increases for multiple drugs, including Theophylline.

1133.  Shortly thereafter, Teva began implementing across-the-board price increases for Theophylline. These price increases also had an effective date of April 4, 2014.

1134.  By the time Heritage held its April 22, 2014, meeting with its sales team to discuss a number of price increases, it had already agreed to follow Teva on at least

the Theophylline and Nystatin price increases.  As he outlined the proposed price increases, Malek specifically told his sales team that Heritage would follow Teva's price increase on Theophylline.

1135.  On April 24, 2014, Teva received an e-mail from a customer seeking an adjustment to its price increase.  Consistent with its agreement with Heritage, Teva stuck to its price increase for Theophylline.

1136.  On May 9, 2014, Heritage had an internal sales call regarding the drugs subject to price increases, including Theophylline.  Several weeks later, on June 23, Heritage employees discussed the specific percentage price increases they would seek. Theophylline was slated for a 150% increase.

1137.  On June 25, Malek had a nearly 14-minute call with a Teva employee, likely Patel.  Malek reported that Heritage would be sending out price increase notices on June 26 for Theophylline and several other drugs – drugs for which Heritage and Teva had agreed to raise prices.

1138.  The next day, June 26, Heritage began telling customers that it would be increasing prices for nine drugs, including Theophylline.  By July 9, 2014, among the other price increases it implemented, Heritage increased its Theophylline prices to at least twenty different customers nationwide.

1139.  Teva and Heritage imposed list price (WAC) increases of approximately 80% on 300mg tablets and approximately 30% on 450mg tablets.

1140. No shortages or other market features can explain Defendants' price increases for Theophylline.

1141. The elevated prices of Theophylline that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1142. The unlawful agreement between Heritage and Teva regarding Theophylline was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**AF.   Verapamil HCL**

1143. Verapamil HCL ("Verapamil"), also known by various brand names, is a calcium channel blocker used to treat hypertension, angina, and certain heart rhythm disorders. It works by relaxing the muscles of the heart and blood vessels.

1144. As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Verapamil as follows:

1145. From 2009 forward, Actavis and Mylan have dominated the market for Verapamil HCL regular release tablets and for certain dosages of Verapamil HCL sustained release capsules. Combined, the two companies enjoyed nearly 100% market share until Heritage began to gain tablet share in 2013.

1146.  Heritage entered the Verapamil tablet market in the second half of 2011, but its share remained around 5% until 2013.  When Heritage entered, it announced list (WAC) prices identical to Mylan and slightly higher than Actavis for 80mg tablets. Heritage announced prices slightly higher than both Mylan and Actavis for 120mg tablets. Heritage did not begin to sell 40mg Verapamil tablets until the second half of 2015, at which point it set list prices identical to Actavis, the only seller of 40mg tablets at that time.

1147.  Instead of entering the market with lower prices of Verapamil tablets in order to gain market share—as would occur in a competitive market—Heritage priced its tablets identically or even higher than the incumbent producers, Actavis and Mylan. While inconsistent with a competitive market, this was entirely consistent with Defendants' "fair share" agreement, and in fact was done pursuant to it.

1148.  Without offering better prices, Heritage was hard pressed to gain market share, and initially was able to capture only a sliver of the market.  In October of 2012, however, Mylan increased its tablet prices by approximately 50%, which facilitated Heritage rapidly gaining market share.  By January of 2013, Heritage had captured more than 25% of the entire tablet market.  As devised by their "fair share" agreement, market shares between Actavis, Heritage and Mylan quickly stabilized and remained relatively constant thereafter.

1149.  In the months prior to Mylan's price increases, Actavis, Heritage and Mylan had numerous opportunities to meet and discuss Verapamil.  *See* Exhibit 1; for

example, all three Defendants attended the HDMA Business Leadership Conference in San Antonio in early June, 2012. All three also attended the GPhA Fall Technical Conference in Bethesda, MD, which took place on October 1-3 of the same year.

1150.  Similarly, shortly after the 2013 NACDS Total Store Expo in Las Vegas attended by (among others) Actavis, Mylan (Nesta and Aigner) and Heritage (Glazer, Malek, O'Mara, Sather and Edelson), Mylan raised the WAC prices of its Verapamil capsules to identical levels as Actavis.

1151.  As market shares for Verapamil tablets between Actavis, Heritage and Mylan stabilized, Heritage aimed to implement a price increase.  Verapamil was on the list of drugs that Heritage's Malek identified on the April 22, 2014 sales team call.

1152.  As part of those price increase discussions, Heritage's O'Mara had the primary responsibility for communicating with Mylan about Verapamil.  On April 23, O'Mara contacted his counterpart at Mylan, likely Aigner.  O'Mara and his opposite number at Mylan agreed to raise prices on at least three different drugs, including Verapamil and, as discussed *supra*, at least also Doxy Mono and Glipizide-Metformin.

1153.  Immediately after speaking with Mylan's Aigner, O'Mara e-mailed Malek, providing an update of his discussions with Mylan.

1154. Heritage's Sather was responsible for speaking with Actavis about Verapamil, among other drugs.  On April 22, she and an Actavis employee spoke for approximately 9 minutes and reached an agreement to raise the price of Verapamil and other drugs.

1155.  News of the agreement on Verapamil and at least one other drug (as discussed above, Glyburide) reached the Actavis sales and pricing team no later than April 28, 2014, including through an internal e-mail discussing possible price increases for a list of drugs.

1156.  A week after the April 28 e-mail, on May 6, 2014, an Actavis employee called a Mylan employee and left a message seeking to discuss at least pricing for Verapamil.  The two spoke for three minutes on May 9 and spoke for almost seven minutes on May 19, likely about pricing of at least Verapamil.  They continued to communicate with each other over the next several months.

1157.  On May 8, 2014, Malek e-mailed the Heritage sales team requesting an update on competition communications.  A Heritage employee responded to Malek's e-mail, providing an update on communications with at least Actavis (Verapamil and Glyburide-Metformin), Lannett (Doxy Mono), and Sun (Nystatin and Paromomycin).

1158.  While Heritage did not increase its Verapamil prices market wide in July as it did for other drugs, it announced a price increase for Verapamil to at least one customer as the result of Defendants' price increase efforts.

1159.  On August 20, 2014, a Heritage employee exchanged text messages with an employee at Sun.  The text exchange described the agreement Heritage and Actavis reached to increase the price of Verapamil among other drugs.

1160.  Throughout this period, Actavis and Mylan co-ordinated increases on their Verapamil HCL sustained release capsules (120mg, 180mg, 240mg).  Throughout

the Relevant Period, price increases by Actavis and Mylan were staggered, but steady and unexplained by market forces, because they were the result of Defendants' anticompetitive agreement, including pricing agreement and co-ordination between Actavis and Mylan.

1161.  From April of 2012 (shortly before Mylan imposed a price increase for its Verapamil tablets) through April of 2016, Actavis and Mylan attended at least 25 trade events together.  *See* Exhibit 1.  Over this period, despite very different starting places, Mylan's and Actavis's Verapamil capsule came to the same, much higher, place:  Mylan's prices nearly tripled, and Actavis's prices doubled.  By the spring of 2016, Actavis and Mylan had imposed virtually identical list (WAC) prices.

1162.  The higher prices for 120mg, 180mg, and 240mg capsules enabled Actavis also to raise its prices for 360mg capsules, for which it was the lone seller in the market, again illustrating one of the many ways in which Defendants' overarching conspiracy reached to include products that some Defendants were not even selling.  As a result of this conspiracy, Actavis's prices for 360mg capsules nearly tripled between April, 2012 and May, 2016.

1163.  No shortages or other market features can explain Defendants' price increases for Verapamil during the Relevant Period.

1164.  The elevated prices of Verapamil that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1165.  The unlawful agreement between Actavis, Heritage, and Mylan regarding Verapamil was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**AG.   Fenofibrate**

1166.  Fenofibrate, also known by brand names such as Tricor, is a medication used to treat cholesterol conditions by lowering blood levels of "bad" cholesterol and fats (such as LDL and triglycerides) and raising blood levels of high-density, "good" cholesterol (HDL).

1167.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Fenofibrate as follows:

1168.  As of the end of 2012, Teva and Lupin were the only major suppliers of generic Fenofibrate 48mg and l45mg tablets, with Teva having approximately 65% market share and Lupin having approximately 35% market share.

1169.  On February 27, 2013, a senior marketing executive at Teva e-mailed multiple Teva colleagues, asking them to provide information on Mylan's potential entry to the market, including details of the timing of Mylan's planned launch – sensitive competitive information that, in the absence of Defendants' overarching conspiracy, would have been unavailable to Teva.  In advance of this launch, Teva, Lupin, and Mylan conspired to allocate the market for Fenofibrate.

1170.  In order to get this information, Teva's then-Director of National Accounts, Kevin Green, called Mylan's Vice President of National Accounts, Jim Nesta. Over the course of that day, Green and Nesta spoke at least four different times.  That same day, Green reported back to his Teva colleagues what he had learned:  that Mylan planned to launch Fenofibrate 48mg and 145mg in November.

1171.  A few months later, however, Teva made a startling discovery:  Mylan was moving its launch date for Fenofibrate dramatically.  Rather than being months away, Mylan's launch date was actually scheduled for May 17, 2013 – just days away.

1172.  In a competitive market, this information would have been closely held by Mylan, who would have wanted to surprise their competitors – but instead, the co-conspirators disseminated this information and acted on it.

1173.  In general, because they were aware their conduct was flagrantly illegal, Defendants tried to keep their communications regarding this conspiracy oral, so there would be no record of who said what to whom:  on May 6, 2013, Lupin employee David Berthold called Teva employee Nisha Patel regarding this price increase, and they spoke for approximately 22 minutes.

1174.  The next day, May 7, Mylan employee Jim Nesta called Jim Green at Teva and Berthold at Lupin on the same subject, speaking to Green for approximately 11 minutes and to Berthold for approximately three minutes; the Nesta-Green call began at 2:42 pm and was immediately followed – without even time for a bathroom break in between – at 2:54 pm by the Nesta-Berthold call.

1175.  The day after that, May 8, 2013, Mylan's Nesta called Berthold at Lupin *again* on the same subject, speaking to Berthold for approximately four minutes.

1176.  But despite the co-conspirators' best efforts to avoid leaving electronic evidence of their words by communicating orally (including in person), the speed of business sometimes required the convenience of written electronic communications, and on that same day, May 8, 2013, Green e-mailed his colleagues at Teva regarding this impending launch for Teva's profitability and sales data on fenofibrate, a request that was repeated the following day by Green's boss at Teva, who also did so while mentioning the fact that Mylan's launch date for fenofibrate was imminent.

1177.  At the time, Green's and Patel's boss at Teva was K.G., Senior Director, Marketing Operations.

1178.  On May 10, 2013, K.G. received the Teva sales and profitability information he had requested.  Because Defendants' conspiracy meant Teva would not compete for business beyond the agreed division of the market, and before there was even a formal price challenge by Mylan at any of Teva's customers, KG decided that Teva would cede Teva's Econdisc business to interloper Mylan, even though Econdisc was a significant source of revenue and profit on fenofibrate; indeed, Econdisc was Teva's largest single customer (by volume) for the 48mg dose.

1179.  That same day, May 10, 2013, Green reached out to Nesta, his contact at Mylan, and told him that Teva was on board with the scheme and Mylan would get the Econdisc account.  They spoke for a little over 10 minutes, whereupon Nesta reached

out to Patel at Teva, who in turn left a message for Berthold at Lupin, who then called Patel back to discuss the conspiracy, in particular, pricing and allocating the fenofibrate market. Lupin and Patel spoke twice that day, for a total of approximately a half hour.

1180. Teva made good on its agreement to concede Econdisc to Mylan. On May 15, 2013, Econdisc informed Teva that a new market entrant – which, because of the conspiracy, Teva already knew about, including the identity of the new bidder – had submitted a competitive offer for Fenofibrate 48mg and 145mg tablets and asked Teva for a counteroffer to retain Econdisc's business.

1181. Because of Defendants' conspiracy, it took Green less than an hour after receiving the notice of the price challenge to recommend to his boss at Teva that Teva concede the Econdisc account to Mylan. In furtherance of the conspiracy and to Plaintiff's detriment, Teva did so.

1182. Following Teva's internal confirmation of the market allocation scheme, Teva executives spoke with executives at Mylan and Lupin numerous times over the next two days – when Mylan actually launched, and the news that Mylan was selling Fenofibrate was finally made public.

1183. Patel spoke with Berthold at Mylan on at least three separate calls on May 16, and an 11-minute call the next day, May 17, the day of Mylan's Fenofibrate launch.

1184. In a competitive market, the sales force of a company launching a product is speaking to its customers and shippers, not to its competitors; but the importance to

Defendants' conspiracy of co-ordination and of reassuring each other of their intent to abide by the agreement meant the Fenofibrate launch was not a normal launch.

1185.  It was not just Teva and Mylan who were speaking on the day of Mylan's Fenofibrate launch; in turn, Nesta at Mylan spoke with Berthold at Lupin for two minute and with Green at Teva twice for a total of almost a half-hour (on, again, launch day); Green spoke with Berthold for ten minutes and, completing the circle, with Patel for approximately the same length of time, all confirming the conspiracy and the ceding of the Econdisc fenofibrate business from Teva to Mylan.  This is not how non-collusive competitors act.

1186.  Teva, Mylan, and Lupin were not the only Defendants involved in the Fenofibrate part of Defendants' overarching conspiracy:  in February of 2014, Zydus was preparing to launch into the Fenofibrate market on March 7, 2014.

1187.  By this time, Green was now at Zydus as the Associate Vice President ("AVP") of National Accounts, and maintained his collusion with his former Teva colleagues, Patel and David Rekenthaler ("Rekenthaler"), then Vice President of Sales for US Generics at Defendant Teva until April, 2015.

1188.  At that time, in another example of the cozy relationships among ostensible competitors in the market for generic pharmaceuticals, Rekenthaler then transitioned from Defendant Teva to Defendant Apotex, where – as VP of Sales – he maintained and cultivated the cross-manufacturer relationships he had begun developing while at Teva, including at least 1,044 phone calls and text messages with

his contacts at Defendants Actavis, Mylan, Par, Aurobindo, Apotex, Zydus, Sandoz, Rising, Amneal, Breckenridge, Lupin, Dr. Reddy's, Glenmark, Greenstone, Taro, Lannett, and Wockhardt, further including, as discussed in detail below, at least:

433 calls or texts with Defendant Actavis's Marc Falkin in the two years prior to joining Actavis in 2015;

102 calls or texts with Defendant Mylan's Jim Nesta in the three years from April, 2012 – March, 2015;

89 calls or texts with G.B. at Defendant Par in the approximately four years from January, 2011 – February, 2015;

75 calls or texts with R.C. at Defendant Aurobindo in the approximately four years from October, 2011 – March, 2015;

65 calls or texts with J.H. at Defendant Apotex in the two years from May, 2013 – March, 2015; and with the aforementioned Green during his time at Zydus, from November, 2013 – March, 2015, 42 calls or texts.

1189.  In addition to doing so with Patel and Rekenthaler, Green maintained his active collusion with Nesta and Berthold, sharing pricing information and allocating market share with all four for the benefit of his new employer.

1190.  In the absence of joint participation in a conspiracy, competitors do not telephone each other right before launching competing products, but between February 19 and February 24, 2014, Patel and Green spoke by phone at least 17 times – including

two calls on February 20 lasting a combined total of over a half hour, and another call the next day, lasting almost a half hour.

1191.  On February 21, 2014, Patel at Teva sent a calendar invite to her boss, KG, and to Rekenthaler for a meeting three days later, on February 24, 2014. One discussion item was Zydus's planned entry into the Fenofibrate market.  Notably, Defendant Zydus did not enter the Fenofibrate market until two weeks later, on March 7, 2014.

1192.  Beyond the communications detailed above, in the days leading up to Zydus's Fenofibrate launch, Defendants from all four competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus, exchanging at least 26 calls or voice mails with each other between March 3 and March 7, 2014.

1193.  In a competitive market for fungible products, such as generic pharmaceuticals, new entrants come in at a price below the incumbent suppliers in order to obtain customers, who otherwise have no incentive to switch from the incumbents; but that is not what happened here; instead, because of Defendants' overarching anticompetitive agreement, Defendant Zydus entered the Fenofibrate market with WAC pricing that matched Defendants Teva, Mylan, and Lupin.

1194.  On March 17, 2014, Patel at Teva and her erstwhile co-worker Green (now working at Teva's competitor and co-conspirator, Zydus) had two separate phone conversations, discussing how to divide the markets for multiple products where Zydus

was entering the market, including Fenofibrate.  Patel then reported the results of this discussion to her boss (and Green's former boss), KG, in an e-mail sent that same day.

1195.  In the months that followed, Teva ceded several customers to Zydus in accordance with the agreement they had reached.

1196.  For example, on Friday March 21, 2014, J.P., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, notifying them that Zydus had submitted an unsolicited bid to a Teva customer, OptiSource.  That same morning, Patel sent a calendar invite to Rekenthaler and to K.G. scheduling a meeting to discuss this development.

1197.  The following Monday – March 24, 2014 – Patel called Green and they spoke for a quarter of an hour.  She also spoke with Lupin's Berthold for about twelve minutes.  That same day, Patel sent internal e-mails directing that Teva cede the OptiSource and Humana accounts to Zydus.

1198.  No product shortages or other market changes can explain Defendants' price increases.  The pricing conduct here is not consistent with competitive behavior. As multiple sellers enter the market, prices in a competitive market decline. Yet, Fenofibrate prices remained elevated above the competitive level because of the anticompetitive agreement among Defendants.

1199.  No shortages or other competitive market features can explain the elevated pricing of Fenofibrate.

1200. The elevated prices of Fenofibrate that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1201. The unlawful agreement between Teva, Lupin, and Zydus regarding Fenofibrate was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## AH.  Diflunisal

1202.  Diflunisal is a salicylic acid derived NSAID with analgesic properties and was developed by Merck Sharp & Dohme in 1971.

1203.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Diflunisal as follows:

1204.  By February 26, 2014, Patel had a list of "P[rice] I[ncrease] Candidates," which she forwarded to another colleague for his review.  In addition to other drugs described elsewhere in this complaint, such as Niacin ER and Azithromycin suspension, the list included Diflunisal and correctly noted in the "Market Notes" column that the drug was "Shared only with Rising."

1205. In a practice that was routine at Teva, Patel and Rekenthaler both communicated multiple times with the relevant members of Defendants' cartel – in this case Taro, Lupin, Actavis, Greenstone, Zydus, Heritage, and Rising – to co-ordinate the price increases, calls and text messages.

1206.  Then, on March 17, 2014, having confirmed the co-operation of these Defendants with the planned price increases, Patel sent a near final version of the "PI Candidates" spreadsheet to K.G. for approval.

1207.  At that time, Rising had a 21% market share and Teva dominated the market with the remaining 79%.

1208.  That same day, Rekenthaler spoke with CW-2 twice. During those calls, CW-2 told Rekenthaler that Rising was having supply problems for Diflunisal and might be temporarily exiting the market at some point in the future.  CW-2 confirmed that it would be a good opportunity for Teva to take a price increase.

1209.  Rekenthaler and CW-2 spoke again on March 31, 2014, shortly before Teva's Diflunisal price increase. On April 4, 2014, Teva increased its WAC pricing on Diflunisal by as much as 30%, and its contract pricing by as much as 182%.

1210.  Rising exited the Diflunisal market for a short period of time a few months later, in mid-July of that year.  When Rising decided to exit the market, CW-2 called Defendant Rekenthaler to let him know.  Four months later – when Rising's supply problems were cured – Rising re-entered the market for Diflunisal. Consistent with the fair share principles of Defendants' cartel, CW-2 and

Rekenthaler spoke by phone on several occasions in advance of Rising's re-entry to identify specific customers whom Rising would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4.

1211.  On December 3, 2014, Rising re-entered the market for Diflunisal Tablets. Its new pricing exactly matched Teva's WAC price increase from that April.

1212. No shortages or other competitive market features can explain Defendants' price increases for Diflunisal Tablets.

1213.  The elevated prices of Diflunisal Tablets that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1214. The unlawful agreement between Teva and Rising regarding Diflunisal Tablets was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**AI.    Ketoconazole**

1215.  Ketoconazole is an imidazole antifungal drug and is primarily used to treat fungal infections.  Ketoconazole is sold commercially as a tablet for oral administration and as a cream for topical administration.

1216. As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Ketoconazole as follows:

1217.  Although they were not listed on the original list that Teva's Patel sent to her boss, K.G., on January 14, 2014, Patel identified Ketoconazole Cream and Ketoconazole Tablets as price increase candidates sometime in January-February of

2014, and included them on the list of price increase targets that she sent to a Teva colleague on February 26, 2014.

1218.  Taro was a common competitor on both drugs, but there were different sets of competitors for each formulation.  For Ketoconazole Cream, Teva's nominal "competitors" (and co-conspirators) were Taro and Sandoz; for the Ketoconazole Tablets, Teva's nominal "competitors" (and co-conspirators) were Taro, Mylan and Apotex.

1219.  Teva led the price increases for both drugs, but made sure to co-ordinate with all of its competitors as it was doing so.  Meanwhile, co-conspirators Taro and Sandoz were also communicating directly with each other.  For example, on April 4, 2014 – the day of Teva's price increase – Patel spoke separately with both Aprahamian of Taro and CW- I of Sandoz and told each co-conspirator about Teva's immediate price increasing on Ketoconazole.

1220.  That same day, Friday, April 4, 2014, Aprahamian then spoke to a senior sales executive at Sandoz, who will be referred to in this Complaint as CW-3, for approximately 20 minutes to discuss the Teva increase and co-ordinate their response. They agreed that at least Taro would follow the increase and raise its prices.  CW-3 then sent an internal e-mail, informing his Sandoz colleagues about Teva's immediate price increase and Taro's commitment to follow the price increase, and directing them not to bid on any new opportunities for Ketoconazole; Aprahamian sent a similar message to his colleagues at Taro.

1221.  Also that same Friday, Teva's Rekenthaler spoke to Nesta at Mylan; he had previously communicated with a senior sales executive at Apotex, J.H., a few weeks earlier, on March 20 and 25.

1222.  The following Monday, April 7, 2014, Taro received a request for a bid from the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), a group purchasing organization.  MMCAP asked for a bid on its Ketoconazole Tablets account owing to Teva's price increase from the previous week.  Taro refused to bid on the account, but to cover its anticompetitive conspiracy, lied to MMCAP about the reason for not bidding.

1223.  The next day, Tuesday, April 8, Aprahamian called Patel and the two spoke for more than a quarter of an hour.  Later that same day, he initiated a price increase for all of Taro's customers on both Ketoconazole Cream and Tablets. Aprahamian directed that the notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014.

1224.  Although Sandoz already knew that it would follow the increased prices, it was not able to implement them until October. The delay was due to the fact that Sandoz had contracts with certain customers that contained price protection terms which would pose substantial penalties on Sandoz if it increased its prices at that time. Those penalties outweighed the profits to be made from the increased prices, so Sandoz delayed following the price increases until that October.

1225. This put Sandoz in a bind:  its prices were lower than its competitors, which would normally lead to an increase in business; but increased market share would mean Sandoz was getting more than the overarching "fair share" conspiratorial agreement with the other Defendants allowed.

1226. As with Teva, Upsher, and Baclofen (when Teva was the lowest-priced supplier in the Baclofen market), to avoid violating Defendants' overarching agreement, Sandoz did not seek out additional business, even though it was now the lowest-priced market participant.  Likewise, Teva not only chose not to seek out new business, but refused to accept new business that fell into its lap.

1227.  For example, a month after the price increase, Cardinal approached Teva to ask for a bid on its Ketoconazole business.  The request was forwarded to Patel, who communicated several times via text and telephone with Aprahamian at Taro, and then directed that Teva decline to bid for Ketoconazole at Cardinal.  The same day, May 14, 2014, Patel also directed that Teva decline to bid for Ketoconazole at ABC, thus protecting Taro from price competition.

1228. The Teva increases on Ketoconazole were significant.  For the cream, Teva, Taro and Sandoz all more than doubled the WAC price.  For the tablets, Teva's WAC increases were more than triple, but its customer price increases were even larger, averaging more than 5 times the original price.

1229.  No product shortages or other market features can explain Defendants' abrupt, simultaneous (or, in Sandoz's case, delayed by six months), and substantially identical price increases during the Relevant Period.

1230.  The elevated prices of Ketoconazole that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1231.  The unlawful agreement among Teva, Taro, Sandoz, Mylan, and Apotex on Ketoconazole was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## AJ.    Fluocinonide

1232. Fluocinonide, also known by the brand name Lidex®, is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, psoriasis, and vitiligo.  It is one of the most widely prescribed dermatologic drugs in the United States and is sold in multiple formulations, including 0.05% cream, 0.05% emollient-based cream, 0.05% gel, and 0.05% ointment.

1233.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the price of Fluocinonide as follows:

1234.  In July of 2013, Teva co-ordinated with Taro and Sandoz to raise the WAC price of all four formulations by between 10-17%, based in part on discussions between Patel and Taro's Aprahamian and Taro's agreement to join Teva's pricing.

1235.  As of May of 2014, only Defendants Teva, Taro, and Sandoz were making any of the four Fluocinonide formulations identified above; Taro had the dominant market share in several of these formulations.

1236.  On May 14, 2014, Patel and Aprahamian were texting and had a short telephone call, in which Aprahamian told Patel that Taro wanted to increase prices on its Fluocinonide formulations – communications for which there was no reason other than the co-ordination sometimes required by Defendants' overarching conspiracy.

1237.  Shortly thereafter, Patel ordered another Teva employee to create a spreadsheet for price increases of products, including the four Fluocinonide formulations.  Two weeks later, knowing that Taro's price increases were soon to be implemented – ***but before they had been revealed to customers or others outside Taro*** – Patel received the spreadsheet, including reference to Taro's upcoming price increase for the Fluocinonide formulations.

1238.  A few weeks later, on Monday, June 2, 2014, Taro notified its customers that as of the next day, Tuesday, June 3, 2014, Taro was implementing a dramatic WAC price increase, as follows:  the price of the cream at least tripled, and in some cases, increased more than seven-fold; the emollient-based cream at least doubled, and in some cases, more than tripled; the gel at least doubled, and in some cases, more than

tripled; and the price of the ointment at least doubled, and in some cases, went up almost five-fold – all literally overnight.

1239.  Patel knew of these (and other) Taro increases well in advance, and was prepared so that Teva would be able to quickly follow the price increases.  Indeed, it was Teva's turn to go next, and Patel was already preparing the next round of price increases, to be implemented by Teva in August.

1240.  The day the Taro increases on Fluocinonide became effective, on June 3, 2014, CVS reached out to T.C., a senior sales executive at Teva, indicating that it wanted bids on Fluocinonide 0.05% Cream and Fluocinonide 0.05% Emollient Cream, offering to move a significant amount of business from Taro to Teva, but did not give a reason for providing that opportunity to Teva.  However, Patel knew the reason for the offer: because of Taro's (not-publicly known) price increase.  K.G. at Teva noted that this was a good opportunity to take some share from Taro – the market share leader on several of the Fluocinonide formulations – but because of Defendants' overarching anticompetitive agreement, including the previous communication between Patel and Aprahamian, Teva did not give CVS a bid lower than Taro's newly-increased price.

1241.  Similarly, the next day, June 4, Teva received a bid request from another large customer, Walmart.  Shortly after that e-mail was forwarded to her, Patel responded by making it clear that Teva would play nice in the sandbox with Taro.  As a result, Teva did not submit a bid on the Walmart business at all.

1242.  The following week, on June 13, 2014, Patel sent an internal e-mail to her group (which included her boss, K.G.) a list of drugs to increase prices on, including Teva's Fluocinonide formulations, and gave them instructions which meant they were **not** to compete with Defendants Zydus or Taro for Fluocinonide accounts, even if/when approached by those companies' customers.

1243.  As Teva was planning to implement its price increase to follow Taro, on both June 17 and Thursday, June 19, 2014, Patel spoke to Aprahamian for approximately a quarter of an hour.  In addition, she spoke with Kevin Green (now at Zydus) for a similar length of time.

1244.  These successful calls understate the telephone-tag efforts that Patel, Aprahamian, and Green made to communicate with each other:  there were actually at least 10 calls between them, beginning with calls from Patel to Aprahamian at 8:38 am and from Patel to Green, three minutes later, at 8:41 am – but those calls were very short, of only a few seconds duration, suggesting that neither Aprahamian nor Green were available to answer.

1245.  That afternoon, at 1:56 pm and 2:08 pm, Aprahamian and Green each called back to Patel – but again, for no more than a few seconds' duration.  Then, in less than a minute – because both calls were for the same purpose, but with different competitors – Patel called both Aprahamian and Green back, one after the other, at 2:24 and 2:25 pm, and again, only for a few seconds.  Then, at 3:40 pm, Aprahamian called Patel unsuccessfully, and finally, at 4:01 pm, they connected, and spoke for

approximately a quarter of an hour.  Clearly, this call was important to them.  Shortly thereafter, at 4:23 pm, Patel called Green again, also for only a few seconds, and finally, at 5:24 pm, Patel and Green connected, and spoke for approximately a quarter of an hour.

1246.  Their efforts to speak were not in vain:  on the Monday following this flurry of calls, June 23, Patel sent a spreadsheet with Taro pricing information in it to a Teva colleague.  The spreadsheet included prices for the different Fluocinonide formulations for different types of customers, such as GPO's, wholesalers, retailers, etc. These contract prices came from Aprahamian and were not publicly available.

1247.  Aprahamian was also co-ordinating with the only other "competitor" in the Fluocinonide space, co-conspirator Sandoz.  Sandoz made both the gel and ointment formulations, but actively marketed only the gel because it was leaving the ointment market.  Aprahamian spoke with CW-3 at Sandoz at least once on each of June 17-20, including three calls (further including a ten-minute call) on June 20, meaning that on both June 17 and 19, Aprahamian spoke with both Patel and CW-3.

1248.  As he had done with Patel, during one of the calls with CW-3 on June 20 (likely the 10-minute call), Aprahamian gave his company's non-public pricing information to a nominal "competitor" and co-conspirator, which CW-3 wrote down for the purpose of having Sandoz follow them, which Sandoz in fact did:  three months later, on October 10, 2014, Sandoz raised the WAC price on its Fluocinonide gel product almost five-fold.

1249. No shortages or other market features can explain Defendants' price increases for Fluocinonide during the Relevant Period.

1250. The elevated prices of Fluocinonide that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1251. The unlawful agreement among Teva, Taro, and Sandoz regarding Fluocinonide was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**AK.    Warfarin, Carbamazepine, and Clotrimazole**

1252. Warfarin, also known by the brand name Coumadin, *inter alia*, is an anticoagulant for blood and is commonly used to help prevent strokes and other cardiac events and to treat blood clots, such as deep vein thrombosis.

1253. Carbamazepine, also known by the brand name Tegretol, *inter alia*, is an anticonvulsant medication used primarily in the treatment of epilepsy and neuropathic pain, and is used in schizophrenia along with other medications and as a second-line agent in bipolar disorder.  It was discovered in 1953 by chemist Walter Schindler at J.R. Geigy AG (now part of Novartis) in Basel, Switzerland.

1254. Clotrimazole, also known by the brand name Canesten, *inter alia*, is an antifungal medication. It is used to treat vaginal yeast infections, oral thrush, and certain types of ringworm, including those that cause athlete's foot and jock itch.

1255.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Warfarin, Carbamazepine, and Clotrimazole, as follows:

1256.  As of May, 2014, there were three suppliers in the market for Warfarin: Teva, Taro and Zydus.

1257.  On May 14, 2014, Patel and Aprahamian exchanged eight text messages and had one phone conversation lasting just under five minutes.  Thereafter, Patel directed a colleague at Teva, T.S., to create a list of future price increase candidates, based on a set of instructions and data she provided.

1258.  On May 28, 2014, T.S. then sent Patel the requested list of "2014 Future Price Increase Candidate Analysis."  The list included several drugs sold by Taro, including Carbamazepine, Clotrimazole, and the four formulations of Fluocinonide just discussed, all with "Follow/Urgent" listed as the reason for the increase, even though Taro had not yet increased its price on those drugs or notified its customers that it would be doing so.

1259.  A few days later, on June 3, 2014, Taro increased prices on, *inter alia*, Warfarin, Carbamazepine, Clotrimazole, Fluocinonide – and Patel and Aprahamian exchanged five text messages.  After exchanging those text messages, Patel confirmed to her boss K.G. and another Teva colleague that Taro had raised its pricing on these drugs.  Patel added:  "I'll be looking at shares and intel tomorrow and will

provide commentary." She also noted that "Taro is a high-quality competitor. It's just a matter of who the others are.)"

1260. By "high-quality competitor," Patel meant – and K.G. understood – that Taro was a reliable member of the cartel, who would not cheat on Defendants' overarching conspiracy by trying to cadge a little extra market share.

1261. At 5:08 pm that evening (June 3), Patel called Aprahamian and the two spoke for nearly seven minutes. The next morning, Patel and Aprahamian exchanged text messages. Then, at 9:56am, the two spoke again for a little less than a half hour. Shortly after hanging up the phone with Aprahamian, Patel sent an e-mail to K.G., making it clear that she had obtained additional "intel" regarding the Taro price increases – and that she did not want to put them into writing: "I have additional intel (I can discuss with you) that will be useful."

1262. The following week, on June 11, Aprahamian (Taro), Patel (Teva) Rekenthaler (Teva), and Green (Zydus) again played telephone tag: under the cover of darkness, at 4:30 am, Green called Rekenthaler and they spoke for eight minutes; then, that afternoon, Patel called Green, and a few minutes later, Green returned the call, and they spoke for a quarter of an hour. The following day, June 12, Patel called Aprahamian just before 8:00 am and they spoke for just under ten minutes.

1263. The very next day, June 13, 2014, Green (at Zydus) called Patel (at Teva), just after 8:15 am, and they spoke until nearly 8:30 am – and Zydus raised its price on Warfarin tablets.

1264.  Later that same day, a customer gave Teva an offer for a one-time buy on Warfarin; Patel responded, "We will review, but note that we intend to follow [the] Taro and Zydus increase price."  Later that same day, Defendant Patel sent an internal e-mail alerting her group, including her boss, K.G., about a list of drugs on which Teva planned to raise prices.  A number of them – including Carbamazepine Chewable Tablets , Carbamazepine Tablets, Clotrimazole Topical Solution, Warfarin Tablets, and Fluocinonide Cream, Emollient Cream, Gel and Ointment – included the notation "Follow/Urgent – Taro" as the reason for the increase.

1265.  For that list of drugs, Patel directed that "we should not provide any decreases on these products."  This meant Teva would not seek to compete for market share against Taro or Zydus when approached by customers due to those cartel members' price increases.

1266.  On August 28, 2014, Teva followed the Taro price increases on Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution, and Warfarin Sodium Tablets.  As discussed more fully *supra*, Teva coordinated those increases with Taro and Zydus through direct communications with those competitors in the days leading up to the increase.

1267.  No shortages or other market features can explain Defendants' price increases for Warfarin, Carbamazepine, or Clotrimazole during the Relevant Period.

1268. The elevated prices of Warfarin, Carbamazepine, and Clotrimazole that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1269. The unlawful agreement among Teva, Taro, and Zydus regarding Warfarin, Carbamazepine, and Clotrimazole was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AL.   Tobramycin

1270.   Tobramycin, also known by the brand name Tobi, is an eye drop used to treat bacterial infections.

1271.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Tobramycin as follows:

1272.   Beginning in October of 2013, prior to the first generic launch of Tobramycin (for which Teva would have 180-day generic exclusivity), Sandoz began making plans for its entry after Teva's statutory exclusivity period expired. These plans included trying to get a so-called "fair share" for Sandoz, but depended on the incumbent generic manufacturer, Teva, being co-operative – or as Defendants like to refer to their co-conspirators, it required Teva to act as a "Quality Competitor."

1273.   As a partner in the conspiracy, Teva was, in fact, co-operative when it came time to give up share to Sandoz.  Nearing Teva's loss of exclusivity and Sandoz's

entry, on July 1, 2014, Teva and Sandoz began sharing information and co-ordinating to divide up the market for Tobramycin. Patel exchanged seven (7) calls with a Sandoz pricing executive on July 1, during which they discussed Sandoz's launch plans and how to divide up the market for Tobramycin. Patel conveyed some of this competitor's information in an internal Teva e-mail the same day.

1274. On July 7, 2014, Patel and the Sandoz pricing executive spoke five more times, including one call lasting approximately 11 minutes. On these calls, Patel and the Sandoz pricing executive discussed how to divide up the market for Tobramycin, including specific accounts that each would maintain or concede to the other. Patel then memorialized the agreement in an e-mail two days later. The agreement: Teva would take Walgreens, McKesson Corporation ("McKesson") (a wholesaler), Econdisc Contracting Solutions ("Econdisc") (a group purchasing organization ("GPO") that includes Express Scripts, Kroger, and Supervalu), ABC, and Omnicare; while Sandoz would take CVS, Cigna, Prime Therapeutics, Kinney Drugs, and OptumRx. Teva also planned to concede the Cardinal business to Sandoz.

1275. Patel told the Sandoz pricing executive specifically that Teva would not even submit a bid to CVS. This was significant because Tobramycin was a very expensive product, and Sandoz was able to acquire the CVS business by offering only a nominal reduction to the extremely high price that Teva was able to set when it was the only generic manufacturer, and was very close to the branded price that was charged during the patented and 180-day exclusivity periods.

1276.  As planned, Teva conceded the CVS business to Sandoz after CVS contacted Teva and requested that Teva submit a lower price to retain the business; Teva also went through with its plan to concede Cardinal to Sandoz.

1277.  The Sandoz pricing executive, in turn, told Patel that Sandoz would not pursue business from ABC and Walgreens. The Sandoz pricing executive spoke with Kellum about his conversations with Patel and the agreement to stay away from Walgreens and ABC, and Kellum agreed with the plan. Pursuant to that agreement, Sandoz made no effort to contact those two large customers when it entered the market for Tobramycin.

1278.  The Sandoz pricing executive and Patel also discussed Sandoz's target market share. The pricing executive informed Patel that Sandoz was seeking a 50% share.

1279.  No product shortages or other market changes can explain Defendants' elevated pricing.  The pricing conduct here is inconsistent with competitive behavior. In a competitive market, as multiple sellers enter the market, prices decline, but that is not what happened here.   Instead, because of the overarching anticompetitive agreement among Defendants, Tobramycin prices remained unchanged despite multiple sellers entering the market.

1280.  The elevated prices of Tobramycin that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1281.  The unlawful agreement between Teva and Sandoz regarding Tobramycin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**AM.  Glimepiride**

1282.  Glimepiride, also known by the brand name Amaryl®, is a medicine used to treat high blood sugar levels that are caused by Type 2 Diabetes Mellitus.

1283.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Glimepiride, as follows:

1284.  In July of 2014, Dr. Reddy's wanted to implement a price increase on its Glimepiride products – so, naturally (in light of Defendants' conspiracy), its first step was to make sure that Teva would follow such an increase.

1285.  Accordingly, V.B., a senior sales executive at Dr. Reddy's, reached out to Patel, his opposite number at Teva, to co-ordinate.  They spoke for approximately 12 minutes on July 10, then again for about five minutes on each of July 21, 22, and 24.

1286.  On August 18, 2014, Dr. Reddy's significantly increased its pricing on Glimepiride, approximately quadrupling the price overnight for all dosage strengths. V.B. continued to communicate with Patel, regarding Glimepiride pricing, after Dr. Reddy's price increase, including exchanging at least four text messages on both August 25 and October 10, 2014.

1287.  Based on the understanding that had been reached between V.B. and Patel during these conversations, Dr. Reddy's anticipated that Teva would follow Dr. Reddy's price increase – which it did, less than six months later, on January 28, 2015, when Teva raised its WAC to exactly match Dr. Reddy's.

1288.  That same January day – illustrating the applicability of Defendants' overarching conspiracy to ***all*** products made by any one of them – Dr. Reddy's sought and obtained a complete list of Teva's price increases, ***including drugs not made or sold by Dr. Reddy's***.

1289.  No shortages or other market features can explain Defendants' price increases for Glimepiride during the Relevant Period.

1290.  The elevated prices of Glimepiride that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1291.  The unlawful agreement between Teva and Dr. Reddy's on Glimepiride was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**AN.   Griseofulvin**

1292.  Griseofulvin, also known by the brand name Grifulvin V®, is an oral antifungal medication primarily used to treat ringworm infections that do not respond to topical medications, such as ointments or creams.  Its method of action is to prevent fungal mitosis.

1293.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Griseofulvin, as follows:

1294.  In September of 2014, Actavis wanted to implement a price increase on its Griseofulvin products – so, naturally (in light of Defendants' conspiracy), just as Dr. Reddy's did with Glimepiride, so Actavis's first step with Griseofulvin was to make sure that its fellow seller of Griseofulvin, co-conspirator, and nominal competitor (in this case, also Teva) would follow such an increase.

1295.  Thus, Actavis employees Marc Falkin and Rick Rogerson reached out to their counterparts Patel and Rekenthaler at Teva – but not by phone.  Instead, their first contact on this particular sub-agreement was likely at the NACDS 2014 Total Store Expo, held in Boston's Convention Center over the week-end of August 23-26 through that Tuesday, and attended by, Falkin, Rogers, Rekenthaler, and Patel – and, in fact, representatives of every Defendant.

1296.  The very next week, on the Wednesday after the Labor Day holiday, September 3, Rekenthaler followed up with two telephone calls to Falkin, speaking for a few minutes.  The next day, September 4, they called back and forth and eventually spoke for a quarter of an hour.  The next Monday, September 8, they again called back and forth, speaking once for over 20 minutes – and then calling back for another 5-minute call to confirm their discussion.

1297. The day after that, September 9, 2014, Rogerson called Patel and they spoke for a few minutes – and Actavis notified its customers it raised the price of Griseofulvin Microsize Oral Suspension, effective October 6, 2014.

1298. Likewise, Teva immediately added Griseofulvin to its own price increase list. True to its word, on January 28, 2015, Teva raised the WAC on its Griseofulvin Microsize Oral Suspension to exactly match that of Actavis.

1299. No shortages or other market features can explain Defendants' price increases for Griseofulvin during the Relevant Period.

1300. The elevated prices of Griseofulvin that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1301. The unlawful agreement between Actavis and Teva on Griseofulvin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**AO.   Gabapentin**

1302. Gabapentin, also known by the brand name Neurontin, is part of a class of drugs called anticonvulsants and is used to treat the symptoms of epilepsy and neuropathic pain. Glenmark entered the market for Gabapentin 800mg and 600mg tablets on April 1, 2006.

1303.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Gabapentin as follows:

1304.  On October 13 and 14, 2014, Defendant Patel attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of Teva's competitors.  PCMA describes its Annual Meetings as a "premier executive conference. The event provides an unmatched **venue for senior executives from** PBMs, payer-aligned specialty pharmacies, and **pharma/biotech manufacturers to network, conduct business** and learn about the most current and strategic issues impacting the industry. The **high-level interactions** that take place at this conference are ultimately what make the event so special, and **the relationships formed help to promote continued industry collaboration**," (emphasis added) – and that is exactly what happened with Teva, Glenmark, and Gabapentin tablets.

1305.  The Glenmark increase had not yet been made public and would not be effective until November 13, 2014.  Nonetheless, shortly after returning from the PMCA meeting, on October 15, but as with other examples in this complaint, Patel knew about this in advance and informed her colleagues at Teva that Glenmark would be increasing its Gabapentin price.  Patel also informed her colleagues in an e-mail that same day that there would be a WAC increase by Glenmark effective November 13,

and that she had already been able to obtain certain contract price points that Glenmark would be charging to distributors.

1306. Around the time she sent the e-mail, Defendant Patel exchanged two text messages with Brown of Glenmark. Having relatively little market share for Gabapentin, Teva discussed whether it should use the Glenmark price increase as an opportunity to pick up some market share, and over the next several weeks, Teva did pick up market share to be more in line with "fair share" principles.

1307. No shortages or other market features can explain Defendants' price increases for Gabapentin during the Relevant Period.

1308. The elevated prices of Gabapentin that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1309. The unlawful agreement between Teva and Glenmark regarding Gabapentin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**AP. Celecoxib**

1310. Celecoxib, also known by the brand name Celebrex®, is a Non-Steroidal Anti-Inflammatory (NSAID) drug, and, like Piroxicam, is used in the treatment of pain and inflammation associated with rheumatoid arthritis, juvenile rheumatoid arthritis, and other disorders.

1311. Teva received approval to market generic Celecoxib in May of 2014.

1312.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the price of Celecoxib as follows:

1313.  On November 20, 2014, as Teva was preparing to launch generic Celecoxib, a customer informed Teva that Actavis was bidding on some of that customer's Celecoxib business.  The customer said that Actavis was preparing for a launch of its own Celecoxib product and had advocated for the sale by pointing out that Teva had already secured over 30% of the market.

1314.  Rekenthaler took a co-operative – rather than competitive – stance upon hearing that news.

1315.  Eleven days later, on December 1, 2014, the issue of which account for Teva to give to Actavis to obtain its "fair share" remained undecided. Another customer, a large retail pharmacy chain, became actively involved in trying to broker an agreement between Teva and Actavis, and – in accordance with the Defendants' overarching conspiracy – ultimately split its business between Teva and Actavis to accommodate the "rules of the road," as Defendants sometimes referred to their conspiracy.

1316. In addition, in the days leading up to Teva's Celecoxib launch of December 10, 2014, Teva executives had numerous telephone conversations with their counterparts at Actavis.  Rekenthaler had a six minute call with Falkin at Actavis on November 25; the two spoke twice more a week later, on December 3.  Patel spoke to

A.B., a senior sales and marketing executive at Actavis, for approximately eight minutes on December 5, and for over a quarter hour a few days later, on December 8. Rekenthaler and Falkin resumed their communications the day before the Teva launch December 9 with a one-minute phone call. On the day of the launch – December 10 – Rekenthaler and Falkin spoke three times, the longest of which was for approximately nine minutes.

1317. No shortages or other market features can explain Defendants' elevated pricing for Celecoxib during the Relevant Period.

1318. The elevated prices of Celecoxib that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1319. The unlawful agreement between Teva and Actavis regarding Celecoxib was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AQ.   Cabergoline

1320. Cabergoline, a fungal (ergot) derivative, also known by the brand name Dostinex®, is used in managing certain benign tumors of the pituitary gland, among other uses.  Throughout the relevant period, Defendant Teva was the incumbent supplier of Cabergoline.

1321.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the price of Cabergoline as follows:

1322.  In December of 2014, Greenstone was preparing to enter the market for Cabergoline.  Under the "rules of the road," Greenstone would therefore be entitled to its "fair share" of Teva customers.  Accordingly, Greenstone wanted to communicate this to Teva – but, in light of the illegal nature of the overarching conspiracy among Defendants, Greenstone wanted to reach out to Teva discreetly.

1323.  Accordingly, Greenstone passed this message via an intermediary, *viz.* its customer's employee F.H., a senior executive responsible for generic products at a large joint venture between a retail pharmacy and a large wholesaler, which purchased over $800,000 of Cabergoline annually, or approximately 1/7th of Teva's Cabergoline business.  Because the wholesalers typically had "cost-plus" distribution contracts, such that they also profited from Defendants' scheme – not just for Cabergoline, but for all of Defendants' generic products – such that this joint venture, and its wholesaler corporate parent, were very likely profiting handsomely from the illegal actions of Defendants' cartel, as, for example, joint venture Red Oak was (which is discussed below), such that they were incentivized to assist its operation, including likely being the conduit just described for the anticompetitive discussions and agreement regarding Celecoxib.

1324.  For example, in McKesson's 10-K filing for 2014, the company

reported that:

A significant portion of our distribution arrangements with the manufacturers provides us compensation based on a percentage of our purchases. In addition, we have certain distribution arrangements with pharmaceutical manufacturers that include an inflation-based compensation component whereby we benefit when the manufacturers increase their prices as we sell our existing inventory at the new higher prices.  For these manufacturers, ***a reduction in*** the frequency and magnitude of ***price increases***, as well as restrictions in the amount of inventory available to us, could have a ***material adverse impact on our gross profit margin***.

(emphasis added).  In other words, the higher and more often that Defendants' cartel hiked up prices, the more profit McKesson made.

1325.  In that same filing, McKesson also reported that "The business'[s] practice is to pass on to customers published price changes from suppliers."  In other words, rather than absorbing any increases, McKesson explicitly admitted to passing them on to its customers as a matter of fact.

1326.  Similarly, in Cardinal's 10-K filing for 2014, the company reported that:

Gross margin in our Pharmaceutical segment is impacted by generic and branded pharmaceutical price appreciation and the number and value of generic pharmaceutical launches. In past years, these items have been substantial drivers of Pharmaceutical segment profit. Prices for generic pharmaceuticals generally decline over time. But at times, some ***generic products*** experience ***price appreciation,*** which ***positively impacts our margins***.

(emphasis added).  In other words, as with McKesson, the higher and more often that Defendants' cartel hiked up prices, the more profit Cardinal made.

1327.  ABC's Annual Summary 2014 and Annual Report 2014 make very similar admissions:  "Our results of operations continue to be ***subject to the risks*** and

uncertainties of inflation in branded and generic pharmaceutical prices and ***deflation in generic pharmaceutical prices***." (emphasis added).

Certain distribution service agreements that we have entered into with branded and generic pharmaceutical manufacturers continue to have an inflation-based compensation component to them. Arrangements with a small number of branded manufacturers continue to be solely inflation-based.  As a result, our gross profit from brand-name and generic manu- facturers continues to be subject to fluctuation based upon the timing and extent of manufacturer price increases. ***If the frequency or rate of branded and generic pharmaceutical price increases slows, our results of operations could be adversely affected.***  In addition, generic pharma-ceuticals are also subject to price deflation. ***If the frequency or rate of generic pharmaceutical price deflation accelerates, our results of operations could be adversely affected***.

The fact that slowing and lesser rates of price increases and lowering in generic prices

is a risk for ABC emphasizes that, as with McKesson and Cardinal, the higher and more

often that Defendants' cartel hiked up prices, the more profit ABC made.

1328.  Other large retail customers have similar contractual provisions in their

contracts with generic manufacturers that allow for greater compensation when prices

are higher.  For example, contracts between Walgreens Boots Alliance Development

GmbH, a GPO, and generic manufacturers contain provisions about Rebates and

Administrative fees that are directly tied to "total contract sales" – a number that

increases when prices increase.  In other words, that GPO (and other larger retail

customers with similar contractual terms) can make more money when generic

pharmaceutical prices are higher.

1329.  The generic manufacturers are keenly aware that some of their customers benefit from their price increases.  In fact, many of the generic drug manufacturers regularly tout these price increases in their discussions with customers. As just one example, when Teva met with large customer Red Oak (a joint venture between Cardinal and CVS) in December 2014, Teva boasted that its price hike of August 28, 2014, had increased the prices of twenty different product families, resulting in an estimated $29.0M price increase value to the customer – paid for, of course, in part by Plaintiffs.

1330.  F.H. told Teva that Greenstone was entering the market for Cabergoline and was seeking to target specific customers, specifically requesting that Teva give up a large wholesaler to the new entrant, telling Teva that "Greenstone has promised to play nice[ly] in the sandbox."  It is unclear why Defendants generally ignored the standard written English adverbial form of "nice" (*i.e.*, "nicely") when modifying the verb "play," but Defendants repeatedly referred to "playing nice [*sic*] in the sandbox" as part of their conspiracy, perhaps attempting to mimic the language of children who might play in an actual sandbox.

1331. After discussing the matter internally, T.C. of Teva representative responded – again, via the same intermediary, thus minimizing the number of its communications directly with co-conspirators – that Teva would give the business with the requested wholesaler to Teva's competitor:  "[t]ell Greenstone we are playing nice in the sandbox and we will let them have [the wholesaler]."

1332.  Pursuant to this agreement, Greenstone was able to acquire the wholesaler as a customer for Cabergoline without fear that Teva would compete to retain the business.  In exchange, Greenstone agreed to "play nice in the sandbox" – i.e., not to compete with Teva for other customers and drive prices down.  As Defendants all knew, that sort of "race to the bottom" in pricing wouldn't benefit anyone in the market – except, of course, for the victims of the scheme:  Defendants' customers, including Plaintiffs.

1333.  No shortages or other market features can explain Defendants' elevated pricing for Cabergoline during the Relevant Period.

1334.  The elevated prices of Cabergoline that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

1335. The unlawful agreement between Teva and Greenstone regarding Cabergoline was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.


## XI.   GENERIC PHARMACEUTICAL MARKETS' HIGH SUSCEPTIBILITY TO COLLUSION AND DEFENDANTS' CARTEL

1336.  The markets for generic drugs in the United States are highly susceptible to cartelization, including by Defendants.  Some of the factors that make a market or

set of markets susceptible to collusion include:  a standardized product with a high degree of interchangeability between the products of cartel participants and inter-competitor contacts and communication.

1337.  In addition, demand for generic drugs is highly inelastic. Each generic drug described above is medically necessary to the health and well-being of the patient for whom it is prescribed. Despite the substantial price increases alleged in this Complaint, demand for each of the generic drugs remained largely the same, even in the presence of price increases and/or elevated pricing above the competitive level.

## A.    Fungible Products

1338.  By approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug because its active pharmaceutical ingredient ("API") is identical. This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that is bioequivalent to the branded product.  As a result, one generic equivalent to a particular branded drug is highly substitutable for another generic equivalent to that same branded drug, even if made by a different manufacturer.

1339.  A commodity product is one that is standardized across suppliers, which allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are easily interchangeable, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices

effectively – and in particular, to monitor whether cartel members are sticking to the cartel's price for a given product, including Defendants here.

1340.  Another example is the Organization of Petroleum-Exporting Countries ("OPEC"), a well-known cartel operating in a market with a highly interchangeable or "fungible" product:  the global petroleum market, where one barrel of crude oil is indistinguishable from another.

1341.  Generic drugs are also commodity products because every generic drug – including all of the ones identified by this Complaint – is an interchangeable bioequivalent  to the branded counterpart:  for any particular branded product, the generic equivalent is required, by law and enforced by FDA, to be bioequivalent to, and therefore highly substitutable with, that branded product.  In addition, and crucially for the functioning of Defendants' overarching conspiracy, this means that for any particular branded product, the generic equivalent is bioequivalent to, and therefore highly substitutable with, every *other* generic equivalent to that same branded product.

1342.  As a result of the high interchangeability of every one of these products for their other generic equivalents, the primary mechanism through which their manufacturers compete is price.

## B.   Inter-Competitor Contacts and Communications

1343.  As discussed in detail *supra*, especially in Sections IX-X, Defendants' representatives communicated privately, extensively, and frequently.  They met at conferences convened by customers and trade associations of customers (such as the

ECRM and NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, in addition to the numerous calls, text-messages, e-mails, and other communications identified above – and the countless others not specifically identified herein – Defendants' representatives have many opportunities to, and in fact repeatedly did, in part as detailed herein, meet and conspire at industry meetings.

1344. Defendants routinely co-ordinated their schemes through direct interaction with one another at industry trade shows, customer conferences, and other events such as industry dinners, girls nights out, lunches, parties, and frequent telephone calls, e-mails, and text messages. For example, Heritage's Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of Doxycycline Hyclate and Glyburide.

1345. DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, have uncovered numerous inter-competitor communications. These types of communications are not unique or isolated, but instead are rampant; as noted above, generic drug manufacturers promote routine and direct interaction with and among their competitors. Further, the sheer number of Defendants implicated in these government investigations (including many of the Defendants here) highlights the

prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion.

## XII.   FACTS RELATING TO STATUTES OF LIMITATION

1346.  Because of the ongoing nature of Defendants' overarching conspiracy, for as long as Defendants' products are priced above the competitive level because of Defendants' cartel, Plaintiffs continue to incur new damages every day that they purchase generic pharmaceuticals made or sold by Defendants, including when Plaintiffs incur an obligation to reimburse a purchase of generic pharmaceuticals made or sold by Defendants, further including through and beyond the filing of this Complaint.  As such, the applicable statutes of limitation do not bar this case.

1347.  In addition, even for purchases earlier in the Relevant Period, Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) the State Attorneys General disclosed of the substance of their Complaint in May of this year.  Prior to that time, no information in the public domain or available to Plaintiffs revealed, or even suggested, that Defendants' extensive cartel and conspiracy to fix prices for all generic drugs.

1348.  Further, Defendants repeatedly and expressly misled the public, including Plaintiffs, by openly and falsely stating, including on their public Internet websites, that they prohibited the type of collusion alleged in this Complaint.

1349.  In addition, Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims.  Indeed, were it not for the lawsuit filed by the State Attorneys General on May 10, 2019, even today Plaintiffs might be unaware of the violations alleged herein.

1350.  Indeed, Plaintiffs had no notice of any kind of Defendants' misconduct and could not have discovered Defendants' misconduct through the exercise of reasonable diligence, and also Defendants actively concealed their misconduct and misled the public, including Plaintiffs, as to what Defendants' cartel had done.

1351.  For further examples:

(a) Allergan's (predecessor to Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly";

(b) Apotex's Code of Conduct directs employees: "Do not communicate with competitors about competitive business matters such as prices, costs discounts, customer suppliers, marketing plans, production capacities or any terms or conditions of sale that could create the appearance of improper agreements or understandings.  Do not make agreements or reach understandings with competitors regarding allocation of customers, territories or market share.  Do not  conspire with other  bidders when competing for contracts";

(c) Dr. Reddy's' Code of Conduct states:  "We believe in free and open competition and never engage in improper practices that may hamper fair competition.  We never

look to gain competitive advantages through unethical or unlawful business practices. . . . [W]e must never enter into agreements with competitors to engage in any anti-competitive behavior, including colluding or cartelization, fixing prices, dividing up customers, suppliers or markets."

(d) Glenmark's Code of Conduct states: "We must engage in fair competition and must ensure that our business dealings comply with all applicable local antitrust and competition laws, such as monopoly, unfair trade, or price discrimination laws. We must not make agreements or engage in concerted actions with a competitor with the intent of improperly dividing markets by allocating territories, customers, goods, or services, or price-fixing or collusion";

(e) Hikma's (the parent of West-Ward) Code of Conduct provides: "Hikma will engage in free and fair competition and not seek competitive advantage through unlawful means. Hikma will not collude with competitors on prices, bids or market  allocations, nor exchange information with third parties in a way that could improperly influence business outcomes";

(f) Mayne's Business Code of Conduct provides:  "Do not agree, even informally, with competitors on price (or any elements of price including discounts or rebates), production, customers or markets without a lawful reason";

(g)    Mylan's Code of Conduct and Business Ethics states:  "Mylan is committed to complying with applicable antitrust and fair competition laws";

(h)    Novartis's (Parent of Sandoz) Code of Conduct states: "We are committed to fair competition and will not breach competition laws and regulations";

(i) Par's Code of Conduct provides:  "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business";

(j) Perrigo's Code of Conduct provides:  "We will succeed based on the quality and value of our products and not by illegal or otherwise improper business practices. Competition laws, also known as 'antitrust' laws, generally prohibit agreements with competitors, suppliers or customers that could unfairly limit free and open competition";

(k) Sun Pharmaceutical Industries, Ltd. (parent of Sun and Taro) has a Global Code of Conduct that provides: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices."  It goes on to direct its employees that: "Sun Pharma shall compete only in an ethical and legitimate manner and prohibits all actions that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws";

(l) Taro's Code of Conduct provides: "we do not discuss any of the following topics with our competitors: prices or price-fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition.  If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do

not wish to participate.  Leave the conversation immediately, and report  the matter to

Corporate Compliance";

(m) Teva's Code of Conduct provides: "We believe that customers and society

as a whole benefit from fair, free and open markets.  Therefore, we compete on the

merits of our products and services and conduct business with integrity.  We recognize

that the potential harm to Teva's reputation and the penalties for breaching competition

laws are severe, and can subject Teva, members of the Board of Directors and

employees to severe civil fines and criminal penalties."

1352.  It was reasonable for Plaintiffs to believe these false assertions and to

believe that Defendants were following these spurious orders and policies that

prohibited violating, *inter alia*, the antitrust laws of the United States and the State of

New York.

1353.  For these reasons, the statutes of limitations as to Plaintiffs' claims under

the federal and state common law identified herein did not begin to run, and have been

tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

1354.  Through their misleading, deceptive, false and fraudulent statements,

Defendants effectively concealed their conspiracy, thereby causing economic harm to

Plaintiffs.  Defendants' misrepresentations regarding their price changes were intended

to lull Plaintiffs into accepting the price hikes as a normal result of competitive and

economic market trends rather than the consequences of Defendants' collusive acts.

The public statements made by Defendants were designed to mislead Plaintiffs into paying unjustifiably higher prices for generic drugs.

1355.  For further example, Heritage executives took overt steps to conceal their illegal activity, and destroy evidence of any wrongdoing, going back to at least 2012. This conduct included a concerted and conscious effort to destroy documents, instructions not to put incriminating evidence in writing, directives not to use e-mail, and the deletion of incriminating text messages.

1356.  Further specific examples of these acts of fraudulent concealment with respect to Heritage's President Malek and CEO Glazer include: (a) Glazer reminding Malek on June 26, 2014, not to put evidence of his illegal conduct in writing; (b) Heritage being instructed by a competitor not to communicate through e-mail but to instead communicate by telephone; (c) Malek sending a text message about how to avoid detection by regulators, a text message that was not produced by Heritage in response to a subpoena by the Connecticut AG; (d) deletion of e-mails and text messages by Glazer, Malek, and other employees of Heritage regarding illegal communications with competitors; and (e) one of Mayne's key executives who participated in the conspiracy deleting several of the most incriminating text messages from her cellular telephone before the information on that telephone was imaged  and produced to the Connecticut AG's office.

1357.  Defendants also gave pretextual reasons for price increases in an effort to hide their misconduct and the existence of their cartel.  For example, during an earnings

call on August 11, 2015, Dilip Shanghvi, the Managing Director at Sun Pharmaceutical Industries Ltd., misleadingly discussed "competitive pressure on some of the products…where competitive intensity has increased," when in fact, Sun was engaged in a conspiracy to lessen competitive forces and inflate prices.

1358.  These false statements and others made by Defendants actively concealed the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic drugs to inflated, supracompetitive levels.

1359.  Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs into paying unjustifiably higher prices for generic drugs.

1360.  In addition, and as also discussed *supra*, Defendants frequent and repeated face-to-face meetings among cartel members were a deliberate attempt to avoid discovery of their cartel, and even if the cartel was discovered, to minimize creating a record of their illegal conduct.  There were numerous collusive communications at trade shows, customer events, and smaller, more intimate dinners and meetings, which Defendants deliberately did to avoid leaving even an electronic reference to the fact of their communications (such as a record that a telephone conversation occurred) and

completely avoid any record of the content and substance of these communications. When emergent business circumstances forced Defendants' employees to put their communications in writing in an e-mail or text message, Defendants often took overt and calculated steps to destroy those communications and evidence that any communications had occurred.

1361.  Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

1362.  Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs were unaware of Defendants' unlawful conduct, and did not know that they were paying supra-competitive prices during the Relevant period.

## XIII.  PLAINTIFFS' MEDICAID OVERPAYMENTS

1363.  As alleged in detail *supra*, each Defendant is or has been engaged in the business of manufacturing, marketing and selling prescription pharmaceuticals throughout the United States.  One of the principal payors for such prescription pharmaceuticals are federal, state and local governments under the Medicare and Medicaid Programs.

1364.  As noted, Plaintiffs, as required by law, pay approximately 25 % of the Medicaid costs attributable to their residents.  N.Y. Soc. Serv. L. §§ 367-a and 368-a; 42 U.S.C. § 1396d(b).  New York State pays another 25%, and the federal government pays 50 percent.

1365.  There are two components of the price Medicaid pays for prescription drugs.  One is determined by the Average Wholesale Price ("AWP"); the other is determined by the Best Price (defined by deferral statute as the lowest price paid to any purchaser) and/or Average Manufacturer's Price ("AMP").  Defendants' antitrust violations and other wrongdoing alleged herein affect both components.  As described herein, Defendants' inflation of AWP, Best Prices AMP has resulted in overcharges of many millions of dollars by the Counties for the costs of the provision of Medicaid benefits to their residents.

1366.  The price initially paid by Medicaid to a provider – generally a dispensing pharmacy – of the drug is determined by New York State law, based on price data provided by the manufacturers.  State law provides that Medicaid will reimburse the provider pursuant to a formula based on AWP.  N.Y. Soc. Serv. L. §367-a(9).  AWP's for each dosage and packaging of each drug are published by several industry publishing services based wholly on information supplied by the manufacturers.  In sum, the Medicaid program pays based on AWP, and the setting of AWP is in the control of the manufacturers – including Defendants here.

1367. As a result of the antitrust conspiracy and other wrongdoing alleged herein, the pricing information provided to the publishing services was grossly inflated, causing them in turn to publish similarly inflated AWP's.

1368. In addition, the prices paid by Medicaid are affected by a federally mandated rebate that drug manufacturers pay to the states, which is calculated by the United States Department of Health and Human Services based on price information provided quarterly by the manufacturers. 42 U.S.C. § 1396r-8 (the Medicaid rebate statute"). The rebate is based on two statutorily defined prices, the Best Price and the AMP. Best Price is the lowest price paid by any purchaser, while AMP is the average price paid to the manufacturer by wholesalers. See 42 U.S.C. § 1396r-(c)(1)(c) (defining Best Price); 42 U.S.C. § 1396r-8(k)(1) (defining AMP).

1369. As a result of the antitrust conspiracy and other wrongdoing alleged herein, the Best Price and AMP were likewise inflated, resulted in overcharges of many millions of dollars by the Counties for the costs of the provision of Medicaid benefits to their residents.

1370. In sum, Defendants have knowingly and deliberately published false, inflated and misleading price data in connection with the Medicaid reimbursement program that directly has caused excessive payments by Plaintiffs, thereby causing Plaintiffs to suffer millions in damages.

## XIV.   CONTINUING VIOLATION

1371.   This Complaint alleges a continuing course of conduct (including conduct within the limitations period) and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

## XV.   DEFENDANTS' ANTITRUST VIOLATIONS

1372.   During the period relevant to this Complaint, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix, raise, maintain, and/or stabilize prices for Drugs at Issue sold throughout the United States, including within each of the Plaintiff Counties.

1373. In formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of Drugs at Issue sold throughout the United States, including within each of the Plaintiff Counties. These activities included the following:

(a)      Defendants participated in meetings and/or conversations regarding the price of Drugs at Issue;

(b)    Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of Drugs at Issue sold throughout the United States, including within each of Plaintiff Counties;

(c)    Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of Drugs at Issue; and

(d)    Defendants issued price announcements and price quotations in accordance with their agreements.

1374.  Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described herein.

1375.  During and throughout the Relevant Period, Plaintiffs directly and indirectly purchased and reimbursed purchases of the Drugs at Issue at inflated, supracompetitive prices.

1376.  Defendants' cartel, contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of the State of New York, as enumerated below.

1377.  As a result of Defendants' unlawful conduct, Plaintiffs have suffered financial damages in that they have paid more for Drugs at Issue than they would have paid in a competitive market.

1378.  General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at lower level(s). Moreover, the

institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payers such as Plaintiffs. Whereas, in a normal market wholesalers may have an incentive to cut costs, the structure of the pharmaceutical distribution industry is such that wholesalers' "cost-plus" distribution contracts with Defendants meant that far from absorbing the cost of the conspiracy, the wholesalers profited from it and passed the entire cost on to end-purchasers (including Plaintiffs) and their reimbursers (also including Plaintiffs). Wholesalers and retailers passed on the inflated prices to Plaintiffs. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of the drugs.

1379. The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)     price competition in the market for Drugs at Issue has been artificially restrained;

(b)     prices for Drugs at Issue sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)     end-payer purchasers of Drugs at Issue sold by Defendants have been deprived of the benefit of free and open competition in the market for Drugs at Issue.

# XVI.  CAUSES OF ACTION

1380.  As to the overarching conspiracy in which all Defendants participated, and as to each drug-specific conspiracy in which certain Defendants participated as alleged above, Plaintiffs seek relief under the laws specified in Counts 1 through 3 below.

## FIRST COUNT

### Violation of Sections 1 and 3 of the Sherman Act

1381.  Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

1382.  This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of Drugs at Issue.

1383.  This count is also brought against Defendant-participants in each of the drug- specific conspiracies alleged above.

1384.  Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

1385.  Throughout the period relevant to this Complaint, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for Drugs at Issue, thereby creating anticompetitive effects.

1386. The conspiratorial acts and combinations have caused unreasonable restraints in the market for Drugs at Issue.

1387. As a result of Defendants' unlawful conduct, Plaintiffs have been harmed by being forced to pay inflated, supracompetitive prices for Drugs at Issue.

1388. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

1389. Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for Drugs at Issue has been restrained, suppressed, and/or eliminated throughout the United States, including within every Plaintiff County;

(b) Prices for Drugs at Issue provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States, including within every Plaintiff County; and

(c) Plaintiffs purchased or reimbursed purchases of the Drugs at Issue indirectly from Defendants and their co-conspirators, and have been deprived of the benefits of free and open competition.

1390. Plaintiffs have been injured and will continue to be injured by paying more for the Drugs at Issue purchased or reimbursed indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

1391.  Defendants' contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

1392.  Plaintiffs are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

### Violation of New York Antitrust Statutes

1393.  Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

1394.  This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of Drugs at Issue.

1395.  This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above.

1396.  Throughout the period relevant to this Complaint, Defendants' continuing contract, combination or conspiracy with respect to the sale of Drugs at Issue in unreasonable restraint of trade and commerce and in violation of the Donnelly Act, New York General Business Law § 340, *et seq*.

1397.  The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, and/or maintain the prices of Drugs at Issue and to allocate customers for Drugs at Issue throughout the United States, including within every Plaintiff County.

1398.  In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Drugs at Issue at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize prices paid by Plaintiffs with respect to Drugs at Issue; and (b) participating in meetings  and  trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

1399.  Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for Drugs at Issue.

1400.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Donnelly Act, New York General Business Law § 340, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New York; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid and reimbursed supracompetitive, artificially inflated prices for Drugs at Issue that were higher than they would have been absent Defendants' illegal acts. Defendants' illegal conduct substantially affected New York  commerce in each of the Plaintiff Counties.  As a direct and proximate result of Defendants' unlawful

conduct, Plaintiffs have been injured and are threatened with further injury. The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs seek all relief available under New York Gen. Bus. Law § 340, *et seq*. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

1401. In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct at the expense, and to the detriment of, Plaintiffs.

1402. Accordingly, Plaintiffs seek damages, to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT

## Unjust Enrichment

1403. Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

1404. This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of Drugs at Issue.

1405. This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above.

1406.  Defendants have unlawfully benefited from their sales of Drugs at Issue because of the unlawful and inequitable acts alleged in this Complaint.  Defendants unlawfully over-charged Plaintiffs, who made purchases of or reimbursements for Drugs at Issue at prices that were more than they would have been but for Defendants' unlawful actions.

1407. Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs.

1408.  Plaintiffs have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs.

1409. Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue while Plaintiffs have been impoverished by the overcharges they paid for Drugs at Issue imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected.

1410.  There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs because Plaintiffs paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

1411.  Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

1412.  The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Drugs at Issue.

1413.  The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Drugs at Issue are ascertainable by review of sales records.

1414.  It would be futile for Plaintiffs to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs with respect to Defendants' sales of Drugs at Issue.

1415.  It would be futile for Plaintiffs to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Drugs at Issue, as the intermediaries cannot reasonably be expected to compensate Plaintiffs for Defendants' unlawful conduct.

1416.  The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Drugs at Issue is a direct and proximate result of Defendants' unlawful practices.

1417.  The financial benefits derived by Defendants rightfully belong to Plaintiffs because Plaintiffs paid supracompetitive prices, inuring to the benefit of Defendants.

1418.  It would be inequitable under unjust enrichment principles under the law of New York for Defendants to be permitted to retain any of the overcharges for Drugs

at Issue derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1419.  Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

1420.  Defendants should be compelled to disgorge to Plaintiffs all unlawful or inequitable proceeds they received from their sales of Drugs at Issue.

1421.  Plaintiffs have no adequate remedy at law.

1422.  By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs of the opportunity to purchase lower-priced generic versions of Drugs at Issue and forcing them to pay higher prices for Drugs at Issue, Defendants have been unjustly enriched in violation of the common law of New York.

1423.  Defendants unlawfully overcharged Plaintiffs, who made purchases of or reimbursements for Drugs at Issue in New York at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue, which revenue resulted from anticompetitive prices paid by Plaintiffs, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

# FOURTH COUNT

## Violation of New York Social Services Law § 145-b

1424.  Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

1425.  This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

1426.  This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above.

1427.  Section 145–b(1) provides in part:

(a)      It shall be unlawful for any person, firm or corporation knowingly by means of a false statement or representation, or by deliberate concealment of any material fact, or other fraudulent scheme or device, on behalf of himself or others, to attempt to obtain or to obtain payment from public funds for services or supplies furnished or purportedly furnished pursuant to this chapter.

(b) ... "[S]tatement or representation" includes, but is not limited to: a claim for payment made to the state, a political subdivision of the state, or an entity performing services under contract to the state or a political subdivision of the state; an acknowledgment, certification, claim, ratification or report of data which serves as the basis for a claim or a rate of payment, financial information whether in a cost report or otherwise, health care services available or rendered, and the qualifications of a person that is or has rendered health care services.

(c) ... [A] person, firm or corporation has attempted to obtain or has obtained public funds when any portion of the funds from which payment was attempted or obtained are public funds, or any public funds are used to reimburse or make prospective payment to an entity from which payment was attempted or obtained.

1428.  By fraudulently reporting inaccurate pricing information as to the costs of pharmaceuticals reimbursed by Medicaid – including the Drugs at Issue –Defendants violated New York Social Services Law § 145-b.

1429.  As a proximate result, the Plaintiff Counties have suffered overpayments of Medicaid reimbursements and other damages.

## XVII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

1.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the New York State antitrust and unfair competition laws as set forth herein; and/or (d) acts of unjust enrichment by Defendants as set forth herein.

2.      Plaintiffs recover damages, to the maximum extent allowed under such law and that a judgment in favor of Plaintiffs be entered against Defendants jointly and severally in an amount to be trebled to the extent the law permits;

3.      Plaintiffs recover damages, to the maximum extent allowed by law, in the form of restitution and/or disgorgement of profits unlawfully obtained;

4.      Plaintiffs be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

5.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.      Plaintiffs be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

7.      Plaintiffs recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

8.      Plaintiffs have such other and further relief as the Court may deem just

and proper.

## XVIII.   JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable.


Dated:         December 20, 2019

Respectfully submitted,

NAPOLI SHKOLNIK PLLC

*/s/ Salvatore C. Badala*
Paul J. Napoli, Esq. (PN8845)
Salvatore C. Badala, Esq. (SB2053)
360 Lexington Ave., 11th Floor
New York, NY, 10017
Tel: (212) 397-1000
Fax: (646) 843-7603
pnapoli@NSPRLaw.com
sbadala@napolilaw.com

*Attorneys for the Plaintiff Counties*